## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Terre Beach, individually and on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>JPMorgan Chase Bank, National Association, Board of Directors for JPMorgan Chase Bank, National Association, JPMorgan Chase & Company, Board of Directors for JPMorgan Chase & Company, the Compensation & Management Development Committee, the Selection Committee, the Employee Plans Investment Committee, J.P. Morgan Investment Management Inc., Head of Human Resources for JPMorgan Chase & Co., Chief Financial Officer for JPMorgan Chase & Co., Benefits Director of JPMorgan Chase & Co., Linda B. Bammann, James A. Bell, Crandall C. Bowles, Stephen B. Burke, James S. Crown, Jamie Dimon, Timothy P. Flynn, Laban P. Jackson, Jr., Michael A. Neal, Lee R. Raymond, William C. Weldon, Frank J. Bisignano, John C. Donnelly, Marianne Lake, Matthew E. Zames, Bernadette J. Branosky, Thelma Ferguson, and John Does 1-20,<br><br>Defendants. | Civil Action No.: _____ |

## <u>COMPLAINT</u>

Plaintiff Terre Beach, by and through her attorneys, on behalf of the JPMorgan Chase 401(k) Savings Plan (the "Plan"), herself and all others similarly situated, alleges the following.

## INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132 against

JPMorgan Chase Bank, National Association (the "Bank"), the Board of Directors for JPMorgan Chase Bank, National Association (the "Bank Board"), JPMorgan Chase & Company ("JPMorgan Chase"), the Board of Directors for JPMorgan Chase & Company (the "Chase Board"), the Compensation & Management Development Committee (the "CMDC"), the Selection Committee, the Employee Plans Investment Committee (the "EPIC"), J.P. Morgan Investment Management Inc. ("JPMIM"), Head of Human Resources for JPMorgan Chase & Co., Chief Financial Officer for JPMorgan Chase & Co., Benefits Director of JPMorgan Chase & Co., Linda B. Bammann, James A. Bell, Crandall C. Bowles, Stephen B. Burke, James S. Crown, Jamie Dimon, Timothy P. Flynn, Laban P. Jackson, Jr., Michael A. Neal, Lee R. Raymond, William C. Weldon, Frank J. Bisignano, John C. Donnelly, Marianne Lake, Matthew E. Zames, Bernadette J. Branosky, Thelma Ferguson, and John Does 1-20 (collectively "Defendants").

2.     Plaintiff is a participant in the Plan during the Class Period (defined below), during which time the Plan's fiduciaries breached their duties of loyalty and prudence to the Plan and its participants by failing to utilize an established systematic review of the investment options in its portfolio to evaluate them for both performance and cost, regardless of affiliation to JPMorgan Chase.  This failure to adequately review the investment portfolio of the Plan led thousands of Plan participants to pay higher than necessary fees for both proprietary investment options and certain other options for years.

3.     401(k) plans confer benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan is limited to the investment options selected by the plan's fiduciaries.  In failing to review the investment options and make changes in a timely manner, Defendants cost the Plan participants millions of

dollars, while in part enriching themselves in blatant self-dealing by allowing higher than necessary fees to continue to be paid on their own proprietary options.

4. Plaintiff alleges that Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to her and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Defendants' utilization and retention of proprietary mutual funds and their failure to use their expertise and the Plan's bargaining power, as a result of its massive assets (valued between $14.64 billion and $20.94 billion during the Class Period), to secure lower fees on the investment options in the Plan, and consequently, in Plaintiff's portfolio.

5. Specifically, Plaintiff alleges in Count I that Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to prudently and loyally manage the Plan's investments by: (1) failing to adequately review the investment portfolio of the Plan to ensure that each investment option was prudent, both in cost and performance and without regard to the option's affiliation with JPMorgan Chase; (2) retaining proprietary mutual funds, from the Bank and its affiliated companies, within the Plan despite the availability of nearly identical lower cost and better performing investment options; (3) failing to affect a reduction in fees on twenty different investment options at an earlier date, most of them proprietary funds; and (4) failing to offer commingled accounts, separate accounts, or collective trusts in lieu of the proprietary mutual funds in the Plan, despite their far lower fees. These actions/inactions cost Plan participants millions of dollars and run directly counter to the express purpose of ERISA pension plans, including 401(k) plans, which are designed to help provide funds for participants'

retirement.   *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.       Plaintiff's Count II alleges that certain of the Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were failing to manage the Plan and its investment portfolio in a prudent and loyal manner as required by ERISA.

7.       This action seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.  Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in proprietary funds during the Class Period, and because ERISA specifically authorizes a participant such as the Plaintiff to sue for relief to the Plan for breaches of fiduciary duty such as those alleged herein, Plaintiff brings this action as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

**JURISDICTION AND VENUE**

8.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

9.       This Court has personal jurisdiction over Defendants because they are headquartered and transact business in, or reside in, and have significant contacts with, this District, and because ERISA provides for nationwide service of process.

10.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**PARTIES**

**Plaintiff**

11.    Plaintiff Terre Beach is a citizen and resident of Plainfield, Illinois.  Plaintiff is a current participant of the Plan.  While a participant, and within the applicable statute of limitations, Plaintiff invested in the Target Date 2020 Fund.  Through her investment in this Target Date Fund (which itself is made up of other mutual funds), Plaintiff was also invested in BlackRock index funds offered within the Plan.

12.    Plaintiff did not have knowledge of all material facts (including, among other things, the cost of the investments in the Plan relative to alternative investments that were available to the Plan but not offered by the Plan) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.  Further, Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Defendants**

**(a)**   **Company Defendants**

13.     Defendant JPMorgan Chase Bank, National Association (defined above as the "Bank") is the Plan Sponsor and is a national banking association with retail branches in 23 states, as well as foreign branches and subsidiaries in a variety of countries.   The Bank is headquartered in Columbus, Ohio.   The Bank is also the Plan Trustee, as well as the Asset Manager for the Plan, for which it receives no fee income.   The Bank is also the sponsor/fund manager of twelve of the investment options in the Plan, for which it does receive fee income.

14.     Defendant JPMorgan Chase & Company (defined above as ("JPMorgan Chase") is a global financial services firm with worldwide operations.   It is the corporate parent of the Bank, which is its wholly-owned, primary banking subsidiary.   JPMorgan Chase is incorporated in Delaware and has its headquarters in New York, New York.

15.     The Company Defendants were fiduciaries of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

**(b)**   **Director Defendants**

16.     At all times, the Company Defendants acted through the Director Defendants, identified below, to perform Plan-related fiduciary functions in the course and scope of their employment.   Through their Boards of Directors and Selection Committee (discussed below), or otherwise, the Bank and JPMorgan Chase had the authority and discretion to hire/appoint or designate, and the concomitant duty to monitor and supervise, the Compensation & Management Development Committee (CMDC), Defendant EPIC, and the Plan Administrator Defendants

identified below.  By failing to properly discharge their fiduciary duties under ERISA, the CMDC, the EPIC and the Plan Administrator Defendants breached duties they owed to the Plan and its participants.  Accordingly, the actions of these Defendants are imputed to the Company Defendants under the doctrine of *respondeat superior*, and the Company Defendants are liable for these actions.

### (1)    **The Boards**

17.    The Bank Board has the ability to appoint a Plan Administrator and make any changes it deems necessary to the Plan.

18.    The Chase Board has the ability to appoint a Plan Administrator and make any changes it deems necessary to the Plan.

### (2)    **Compensation & Management Development Committee**

19.    Defendant CMDC is a committee of the Chase Board which is directly authorized by the Bank Board to provide oversight to the Plan, and is a fiduciary of the Plan.  Its functions include:

- Delegating authority to appoint the Plan Administrator for employee benefit plans subject to ERISA, such as the Plan, to the Head of Human Resources and the Chief Financial Officer;

- Approving the Fiduciary Rules;

- Approving the compensation of any Named Fiduciary who is not an employee; and

- Receiving reports regarding the operation of the Plan.

*See* Charter of the Compensation & Management Development Committee, available at https://www.jpmorganchase.com/corporate/About-JPMC/compensation-committee-charter.htm#Auth

20.     During the Class Period, the CMDC appointed two JPMorgan Chase executives, the Director/Head of Human Resources and the Chief Financial Officer, who in turn appointed a Plan Administrator.

### (3)     Individual Board Members

#### (a)     The Chase Board

21.     Defendant Linda B. Bammann ("Bammann") is a director on the Chase Board, a position she has held since 2013.  In her role as director, she is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

22.     Defendant James A. Bell ("Bell") is a director on the Chase Board, a position he has held since 2011.  In his role as director, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

23.     Defendant Crandall C. Bowles ("Bowles") is a director on the Chase Board, a position she has held since 2006.   In her role as director, she is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

24.     Defendant Stephen B. Burke ("Burke") is a director on the Chase Board, a position he has held since 2004.  In his role as director, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to

the Plan.  He is also a member of the CMDC, where he delegates the authority to appoint the Plan Administrator and receives reports regarding the operation of the Plan.

25.     Defendant James S. Crown ("Chase") is a director on the Chase Board, a position he has held since 2004.  He is also a director on the Bank Board, a position he has held since 2010.  In his role as directors for both, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

26.     Defendant Jamie Dimon ("Dimon") is chief executive officer and chairman of the Chase Board.  He has held these positions from the beginning of the Class Period.  In his role as a director, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

27.     Defendant Timothy P. Flynn ("Flynn") is a director on the Chase Board, a position he has held since 2012.  In his role as director, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

28.     Defendant Laban P. Jackson, Jr. ("Jackson") is a director on the Chase Board, a position he has held since 2004.  He is also a director on the Bank Board, a position he has held since 2010.  In his role as directors for both, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

29.     Defendant Michael A. Neal ("Neal") is a director on the Chase Board, a position he has held since 2014.  In his role as director, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

30.     Defendant Lee R. Raymond ("Raymond") is a director on the Chase Board, a position he has held since 2001.  He is also a director on the Bank Board, a position he has held

since 1987.  In his role as directors for both, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan. He is also a member of the CMDC, where he delegates the authority to appoint the Plan Administrator and receives reports regarding the operation of the Plan.

31.     Defendant William C. Weldon ("Weldon") is a director on the Chase Board, a position he has held since 2005.  He is also a director and chairman of the Bank Board, a position he has held since 2013.  In his role as directors for the Chase Board, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.  He is also a member of the CMDC, where he delegates the authority to appoint the Plan Administrator and receives reports regarding the operation of the Plan.

### (b)     The Bank Board

32.     Defendant Frank J. Bisignano ("Bisignano") is a director on the Bank Board.  In his role as director, he has the authority to make any changes deemed necessary to the Plan and designated the CMDC to have oversight of the Plan.

33.     Defendant Weldon is a director on the Bank Board, a position he has held since 2013.  In his role as directors for the Bank Board, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan. He is also a member of the CMDC, where he delegates the authority to appoint the Plan Administrator and receives reports regarding the operation of the Plan.

34.     Defendant Matthew E. Zames ("Zames") is the chief operating officer of JPMorgan Chase.  He is also the chief operating officer and member of the Bank Board.  In his role as director, he has the authority to make any changes deemed necessary to the Plan and designated the CMDC to have oversight of the Plan.

35.     Defendants CMDC, Bammann, Bell, Bowles, Burke, Crown, Dimon, Flynn, Jackson, Neal, Raymond, Weldon, Bisigano, and Zames are collectively referred to herein as the "Director Defendants."

36.     Each of the Director Defendants was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

(c)     **Selection Committee Defendants**

37.     Defendant Selection Committee is a Named Fiduciary under the Plan.   The Selection Committee is comprised of the Chief Financial Officer and Director/Head of Human Resources for the Bank, who upon information and belief, also fill those roles at JPMorgan Chase.  The sole duty of the Selection Committee is to appoint members of the Employee Plans Investment Committee (EPIC).  *See* JPMorgan Chase 401(k) Savings Plan Document, Effective January 1, 2016, attached hereto as Exhibit 1, at § 12.2(a).

38.     During the Class Period, Defendant John C. Donnelly ("Donnelly") served on the Selection Committee because he was the Head of Human Resources for JPMorgan Chase and the Bank.  He was also given delegated authority by the CMDC to appoint the Plan's Administrator.

39.     During the Class Period, Defendant Marianne Lake ("Lake") served on the Selection Committee because she was the chief financial officer of JPMorgan Chase and the Bank.  She is also the chief executive officer, the chief financial officer, president and member of the board of directors for the Bank.  She was also delegated authority by the CMDC to appoint the Plan's Administrator.

40.     Defendants Donnelly and Lake, along with any other members of the Selection Committee, and the Selection Committee itself, are collectively referred to herein as the "Selection Committee Defendants."

41.     Each of the Selection Committee Defendants was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

### (d)     Investment Defendants

42.     Defendant Employee Plans Investment Committee (EPIC) is a Named Fiduciary under the Plan.  EPIC has the "exclusive power to manage, invest and reinvest (including the power to acquire and dispose of) assets of the Plan."  *See* JPMorgan Chase 401(k) Savings Plan Document, Effective January 1, 2016, at § 12.2(b).

43.     The EPIC also has the power to appoint the trustee and any investment manager of all or a portion of the Plan's assets, as well as establish the investment policy and funding policy of the Plan.  Upon information and belief, the members of the EPIC are all employees of JPMorgan Chase and/or the Bank.

44.     Defendant Thelma Ferguson ("Ferguson") is the Region Head for Chase Commercial Banking and a member of the EPIC.  In her role as a member of the EPIC, she has the responsibility of reviewing, adding or removing all investment options in the Plan.

45.     Defendant J.P. Morgan Investment Management Inc. (identified above as JPMIM) is a registered investment advisor organized under the laws of Delaware and headquartered in New York, New York.  JPMIM is the investment advisor of the Plan, as appointed by the Plan Administrator, and receives compensation in connection with mutual fund investments in the

Plan. JPMIM is also the Fund Manager for the Small Cap Core Fund, a current investment option in the Plan, and the Mid Cap Growth Fund, a former investment option in the Plan.

46.     Defendant EPIC as well as all individual members of the EPIC during the Class Period including, but not limited to Defendant Ferguson and Defendant JPMIM, are collectively referred to herein as the "Investment Defendants."

47.     The Investment Defendants were fiduciaries of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

### (e)      Plan Administrator Defendants

48.     Defendant Benefits Director is the Plan Administrator and a Named Fiduciary. Upon information and belief, the Benefits Director is a senior executive of JPMorgan Chase and may also be known as the Compensation and Benefits Executive. In his/her role as the Plan Administrator, the Benefits Director is responsible for a variety of duties, including:

- Furnish, publish and file all plan descriptions, annual reports and reports of Participants' benefits rights;

- Maintain records regarding all such material;

- Approve payment of all reasonable administrative expenses; and

- Appoint the Plan's trustee

49.     Defendant Bernadette J. Branosky ("Branosky") is the current benefits director at JPMorgan Chase and the Plan Administrator. In her role as Plan Administrator, Defendant Branosky signed the Plan's Forms 5500 filed with the Department of Labor ("DOL") for the plan years ending in 2010 through 2015.

13

50.     As Plan Administrator, the Benefits Director of JPMorgan Chase exercised discretionary authority with respect to management and administration of the Plan.

51.     Instead of delegating fiduciary responsibility for the Plan to external service providers, the Bank chose to internalize certain vital aspects of this function to the Benefits Director of its corporate parent.

52.     The Plan Administrator, and any individual acting on behalf of the Plan Administrator, including Defendant Branosky, are collectively referred to herein as the "Plan Administrator Defendants."

53.     The Plan Administrator Defendants were each a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he or she exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

### (f)     Additional "John Doe Defendants"

54.     To the extent that there are additional officers and employees of the Bank, JPMorgan Chase, or JPMIM, who were fiduciaries of the Plan during the Class Period, including members of the EPIC and/or Selection Committee, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 1-20 include other individuals, including, but not limited to, JPMorgan Chase officers and employees, who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## THE PLAN

55.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.   Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

56.    The Plan's original effective date was January 1, 1958.   Upon information and belief, it has been restated several times since them, particularly with regards to the acquisition and folding-in of other banks and their own 401(k) retirement plans.

57.    All employees who are U.S. dollar-paid, regularly paid and scheduled to work more than 20 hours a week and employed by JPMorgan Chase or one of its subsidiaries who has adopted the Plan are eligible to participate in the Plan.   An employee becomes an eligible participant/employee as of the first day of employment for full-time employees, or as of the first of the month following the completion of 60 days of service for part-time employees.   *See* JPMorgan Chase 401(k) Savings Plan Summary Plan Description dated January 1, 2016 ("SPD"), attached hereto as Exhibit 2, at 6.

58.    Eligible employees are automatically enrolled 31 days following their eligibility date at a rate of 3% of ongoing compensation, defined as the base salary or regular pay of the employee, unless they specifically opt out or elect to enroll earlier.   Each year, the contribution rate will increase by 1% up to a total contribution rate of 5%.   The default investment choice is the appropriate Target Date Fund based on the employee's age and assumed retirement date of 65.  *See* SPD, at 7.

59.     Eligible employees may contribute up to 50% of their ongoing compensation on a combined before-tax and/or after-tax basis, up to the legal limits imposed by the Internal Revenue Service.  *Id*. at 9.  Plan participants are always 100% vested in their own contributions. *Id*. at 13.

60.     JPMorgan Chase provides matching contributions up to 5% of ongoing compensation, following the completion of one year of service for employees making less than $250,000 a year.  *Id*. at 9-11.  Plan participants are vested in matching contributions following three years of total service.  *Id*. at 13.

61.     As alleged above, the Bank is the Plan Sponsor and its designee, the CMDC, designated the Head of Human Resources and the Chief Financial Officer to appoint the Plan Administrator.  The Head of Human Resources and the Chief Financial Officer are also on the Selection Committee, where they appoint the members of the EPIC, which oversees all investments of the Plan.   The JPMorgan Chase Benefits Director is the named Plan Administrator.   The members of the CMDC are appointed by the Board of Directors for JPMorgan Chase and the CMDC has been named by the Board of Directors for the Bank to have oversight of the Plan.

62.     The Plan may be amended or modified "for any reason at any time by act of the Director of Human Resources, other authorized officers, or the Board of Directors."  *Id*. at 38.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the proposed class (the "Class") defined as follows:

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the Plan, at

any time between January 25, 2011 and the present (the "Class
Period.

64.     The members of the Class are so numerous that joinder of all members is
impractical.  Upon information and belief, the Class includes thousands of persons.

65.     Plaintiff's claims are typical of the claims of the members of the Class because
Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies,
and practices of Defendants as alleged herein, and all members of the Class are similarly affected
by Defendants' wrongful conduct.

66.     There are questions of law and fact common to the Class and these questions
predominate over questions affecting only individual Class members.  Common legal and factual
questions include, but are not limited to:

    A.     Whether Defendants are fiduciaries of the Plan;

    B.     Whether Defendants breached their fiduciary duties of loyalty and
           prudence with respect to the Plan;

    C.     Which Defendants had a duty to monitor the other fiduciaries of the Plan;

    D.     Whether the monitoring Defendants failed to adequately monitor the
           Plan's fiduciaries to ensure the Plan was being managed in compliance
           with ERISA;

    E.     The proper form of equitable and injunctive relief;

    F.     The amount of losses suffered by the Plan as a result of Defendants'
           fiduciary breaches.

67.     Plaintiff will fairly and adequately represent the Class, and has retained counsel
experienced and competent in the prosecution of ERISA class action litigation.  Plaintiff has no
interests antagonistic to those of other members of the Class.  Plaintiff is committed to the

vigorous prosecution of this action, and anticipates no difficulty in the management of this litigation as a class action.

68.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.   Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

69.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

70.     As described above, during the Class Period, upon information and belief, each Defendant was a fiduciary of the Plan, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

71.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."   ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

72.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

73.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan; and/or

(e)     they rendered investment advice for a fee or other compensation, direct or indirect, with respect to the Plan's investment options.

74.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent man acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims.

These twin duties are referred to as the duties of loyalty and prudence.

75.    The duty of loyalty also includes a mandate that the fiduciary display complete

loyalty to the beneficiaries, and set aside the consideration of third persons.    As noted in an

Advisory Opinion 88-16A by the Department of Labor:

> … in deciding whether and to what extent to invest in a particular
> investment, a fiduciary must ordinarily consider only factors
> relating to the interests of plan participants and beneficiaries in
> their retirement income. A decision to make an investment may not
> be influenced by non-economic factors unless the investment,
> when judged solely on the basis of its economic value to the plan,
> would be equal or superior to alternative investments available to
> the plan.

1988 WL 222716, at *3 (Dec. 19, 1988).

76.    During the Class Period, the Defendants acted in the interests of the Bank, to the

detriment of the Plan and its participants and beneficiaries, by including and retaining mutual

fund investments from the Bank itself or a related company in the Plan that were more expensive

than necessary and not justified on the basis of their economic value to the Plan.

77.    Not only did the Defendants include these investments out of self-interest, they

failed to disclose the conflict of interest to Plaintiff and members of the Class.

78.    Pursuant to 29 U.S.C. § 1104(a)(1)(B), ERISA also mandates that fiduciaries act

with prudence in the disposition of Plan assets and selection and monitoring of investments

including the monitoring and minimization of administrative expenses.

79.    During the Class Period, upon information and belief, Defendants failed to have

an independent system of review in place to ensure that Plan participants were being charged

appropriate and reasonable fees for both proprietary and non-proprietary investment options.

## SUBSTANTIVE ALLEGATIONS

### A.    Overview

80.    The Bank is the U.S. consumer and commercial banking business arm of JPMorgan Chase, which is a global financial services business with over $2.4 trillion in assets.

81.    The Bank established and maintained the Plan for the benefit of the employees of JPMorgan Chase, the Bank, and certain of their subsidiaries.  The Plan included a number of investment options, including mutual funds, commingled or separate accounts, collective trust vehicles, and Company stock.

82.    Each investment option within the Plan charged certain fees, to be paid by deductions from the pool of assets under management.  For passively managed investments, which are designed to mimic a market index such as the Standard & Poor's 500 Index, securities were purchased to match the mix of companies within the index.  Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

83.    By contrast, actively managed investments, which have a mix of securities selected in the belief they will beat the market, have higher fees, to account for the work of investment managers and analysts.

84.    Under 29 U.S.C. § 1104(a)(1)(C), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA") § 7.  "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and

reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/ebsa/publications/401k_employee.html (last visited January 25, 2017) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan."). As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on your investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1190 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

85.    Nor is a reduction in a Plan participant's account balance merely academic. Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. *See* Brandon, Emily, The Top 10 Sources of Retirement Income, available at http://money.usnews.com/money/blogs/planning-to-retire/2014/05/13/the-top-10-sources-of-retirement-income ("'The 401(k) is the major source people think they are going to rely on.'"). Although at all times 401(k) accounts are fully funded, that does not prevent Plan participants from losing money on poor investment selection choices of Plan Sponsors and Administrators, whether due to poor performance, high fees, or both.

86.    In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service

providers once selected to see that they continue to be appropriate choices," among other duties. *See "A Look at 401(k) Plan Fees," supra.*

87.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by Plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.   *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses,* (July 2016), at 4.   "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 5.

88.     Because the investment choices for Plan participants are limited, Plan fiduciaries have a responsibility to take into account the reasonableness of any expense ratio when selecting a mutual fund or any other investment option for the Plan.

89.      On average, there are lower expense ratios for 401(k) participants than those for other investors.   *See The Economics of Providing 401(k) Plans*, at 11.    ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones with over a $1 billion in assets managed, lead to economies of scale and special pricing within mutual funds.  *See id* at 10.

90.     This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000.  In fact, these expense ratios have fallen 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds.  *See id.* at 1.

91.     The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years.[1]

FIGURE 7
**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

|  | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
|  | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*Id.* at 12.

92.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

93.     This is especially critical because while higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely

---

[1] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management.  Active management funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?*

*Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-

there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P

Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top

quartile in performance and found most did not replicate performance from year to year).

Conversely, mutual funds with the worst performance tend to continue to perform poorly in the

future.  Jonathan B. Berk, Jing Xu, *Persistence and Fund Flows of the Worst Performing Mutual*

*Funds*, at 6, (2004) available at

http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.421.2127&rep=rep1&type=pdf

(attributing continuing poor mutual fund performance to less responsive investors who do not

pull their capital from the funds, causing the fund manager to change strategies).

94.     One of the key findings in a study conducted by Morningstar was that:

> Actively managed funds have generally underperformed their
> passive counterparts, especially over longer time horizons, and
> experienced high mortality rates (*i.e.* many are merged or closed).
> In addition, the report finds that failure tends to be positively
> correlated with fees (*i.e.* higher cost funds are more likely to
> underperform or be shuttered or merged away and lower-cost
> funds were likelier to survive and enjoyed greater odds of success).

*See* Morningstar's Active/Passive Barometer: A new yardstick for an old debate, at 2 (June

2015) available at

http://corporate.morningstar.com/US/documents/ResearchPapers/MorningstarActive-

PassiveBarometerJune2015.pdf.

95.     As a result, plan fiduciaries such as Defendants here, must be continually mindful

of investment options to ensure they do not unduly risk plan participants' savings, and do not

charge unreasonable fees.  Some of the best investment vehicles to achieve these goals are

collective trusts, which pool plan participants' investments further and provide lower fee alternatives than even institutional and 401(k) plan specific shares of mutual funds. However, even collective trusts, commingled accounts, and separate accounts must be actively monitored and continually evaluated to ensure that plan participants are not paying higher fees than necessary and/or experiencing unduly poor performance on their investments.

96.     Plan fiduciaries must also be wary of conflicts of interest that arise when plan administrators and other fiduciaries select proprietary funds as investment options for the plans they administer. The inherent conflict of interest in such situations can cause proprietary funds to be selected when they are not a prudent investment option, and can cause those same funds to remain as investment options despite their poor performance and/or excessive fees.

97.     In fact, one recent Pension Research Council working paper found in a study of such situations that "[a]ffiliated funds are more likely to be added and less likely to be removed from 401(k) plans" especially for the worst performing funds. *See* Pool, Veronika, Clemons Sialm, and Irina Stefenescu, *It Pays to Set the Menu: Mutual Fund investment Options in 401(k) Plans*, at 2 (May 2015), available at https://www.federalreserve.gov/econresdata/feds/2014/files/201496pap.pdf.

98.     The fact that fiduciaries may have "superior information about their own proprietary funds" does not correlate to improved performance. *Id* at 3. "[A]ffiliated funds that rank poorly based on past performance but are not deleted from the menu do not perform well in the subsequent year" and thus "the decision to retain poorly-performing affiliated funds is not driven by information about the future performance of these funds." *Id*. at 3, 26.

99.     Given the vulnerability of plan participants, who are presented a menu of very limited choices but who are dependent on the retirement income earned by those choices, plan

fiduciaries must be particularly vigilant about the selection and maintenance of affiliated, proprietary funds in their 401(k) plans.

**B.**   **Defendants' Breaches of Fiduciary Duty**

    **(1)**   **Defendants Breached their Fiduciary Duties by Failing to Minimize Expenses and Allowing Excessively-Costly Investments to Remain in the Plan for Years**

100.   The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015).  In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."  *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

101.   The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ."  135 S. Ct. at 1828 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)).  The official comment explains that "'[m]anaging' embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments."  *Id*. § 2 comment.

102.   As described *supra*, one of the responsibilities of the Plan's fiduciaries is to utilize and retain investment options which have reasonable and not excessive fees for the performance and quality of service received, and to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007).  *See also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an

"adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *See Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

103.   As the amount of assets under management approaches and exceeds $1 billion, economies of scale dictate that lower cost investment options will be available to defined contribution plans. When large plans, which those with over $1 billion in assets clear are, have options which approach the retail cost of shares for individual investors or simply have options that are more expensive than the average institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

104.   Because economies of scale make mutual fund alternatives such as collective trusts and separate accounts more attractive, these alternatives have become the norm in larger plans. As of 2012, among plans over $1 billion in size, more assets were held in collective trusts than in mutual funds. *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 21, 23 (Dec. 2014), *available at* https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf. In plans with over $5 billion in assets, such as the Plan, as of 2015 88% of assets were held in separate accounts or collective trusts. *See* Robert Steyer, *Use of CITs in DC Plans Booming, Rises 68% since 2008*, PENSIONS & INVESTMENTS (Feb. 22, 2016), *available at* http://www.pionline.com/article/20160222/PRINT/302229985/use-of-cits-in-dc-plans-booming-rises-68-since-2008.

(a)     **Heavy Use of Proprietary Funds Cost Plan Participants Millions in Excessive Fees**

105.    According to the Plan's Form 5500s filed with the Department of Labor during the Class Period, from years 2010 through 2015, approximately half of all the possible investment options were proprietary investment vehicles managed by the Bank or by another subsidiary of JPMorgan Chase.[2]    Similarly, seven investment vehicles were managed by BlackRock Institutional Trust Company, N.A. ("BlackRock").    At all times during the Class Period, approximately 72% of the Plan's portfolio was being managed either by a JPMorgan Chase affiliate or with companies such as BlackRock who maintain lucrative business arrangements with JPMorgan Chase and its affiliates.

106.    As noted above, during the Class Period, the total assets under management of the Plan's portfolio ranged between $14.64 billion and $20.94 billion, qualifying the Plan as a "jumbo plan" readily capable of using a variety of investment products, including collective trusts, comingled account and separate accounts, and securing the lowest fees on the market while also being provided the highest level of service.

107.    A single committee comprised of JPMorgan Chase executives, the EPIC, was responsible for all of the investment review and selection or removal of all the investment options available for the $20.9 billion in assets under management of the Plan as of December 31, 2015.    In addition to these duties, the EPIC also reviews, selects and removes the investment options for every other benefit plan offered by JPMorgan Chase and its subsidiaries, including all health plans.

---

[2] At all times during the Class Period, JPMorgan Chase company stock has been one of the investment options.

108.    Further, JPMIM is the investment advisor to the Plan.  Upon information and belief, due to the size of the Plan and all other duties assigned to the EPIC, JPMIM's investment advice to the Plan is merely "rubber-stamped" by the EPIC.  Moreover, because each member of the EPIC is also a JPMorgan Chase employee, they have a conflict of interest in impartially reviewing the investment advice from an affiliated company.

109.    While facially, the Bank has in place a system of review for each investment option, via the EPIC, by appointing its own executives and those of its affiliates, as well as relying on the advice of its own affiliate, JPMIM, the Bank has undermined the system so that a true impartial review of all investment options is not possible.  Instead, company bias has been "baked into" the system, leading to higher fees paid to the Bank, its affiliates and business partners, all to the detriment of the Plan's participants.

110.    JPMIM is also the fund manager of one of the investment options in the Plan, the Small Cap Core Fund.  The other JPMorgan Chase branded investments are managed by the Bank itself.  Because the fees for these investments are charged as a percentage of the assets under management, JPMorgan Chase affiliates are incentivized not to reduce fees or to critically review the Plan's portfolio to ensure that the costs associated with the investment options are reasonable or that the investment options themselves are performing well.  This conflict of interest is in no way minimized by the use of the EPIC, the Named Fiduciary, which is comprised of JPMorgan Chase executives.

111.    The Bank utilizes a department, the Global Investment Management Solutions – Global Multi-Asset Group, as the fund manager for the Target Date and several fixed income investment options in the Plan's portfolio.  Although this is characterized as a department within the Bank in the Fee Disclosures given to Plan participants, this group is a part of JPMIM.

112.     As described on their website[3], JPMIM is a sophisticated investment manager.

> J.P. Morgan Global Institutional is distinguished by its capital markets knowledge, global investment expertise and the long-term, proactive partnerships it establishes with clients.  Our investment strategies span equity, fixed income, real estate, private equity, hedge funds, infrastructure and asset allocation.

See https://am.jpmorgan.com/us/institutional/about-us.

113.     That capital markets knowledge is defined as:

> Our seasoned strategists translate macro trends and connect the markets with clients and their portfolios across varying economic cycles and regions.   We share insightful, ongoing thought leadership, including original research, commentary, and analyses of financial and economic environments and their impact on client portfolios.   We provide access to J.P. Morgan's entire global organization, including business leaders, subject matter experts, solutions and strategies.

See id.

114.     Despite this expertise, and the use in the portfolio of more sophisticated investment vehicles like collective trusts, the investment manager failed to recommend the removal of expensive, actively managed funds in favor of a passively-managed index fund, the change in format of two of the Bank's own mutual funds into a commingled or separate account, or the negotiation of a lower investment management rate from BlackRock in light of the fact that BlackRock was at all times during the Class Period managing at least $3 billion of the Plan's assets.

115.     The Bank and BlackRock have a longstanding business arrangement, in which BlackRock passively manages all the index fund investments of the investment products

---

[3] The website describes the expertise and services of J.P. Morgan Asset Management, the brand for the asset management business of JPMorgan Chase and its affiliates worldwide.  In the United States, that affiliate is JPMIM.   See https://am.jpmorgan.com/us/institutional/about-us.   J.P. Morgan Global Institutional is another brand name used by the asset management businesses of JPMorgan Chase.

managed by the Bank and JPMIM.  This business arrangement, in which BlackRock receives management fees while lending its expertise to products that the Bank and JPMIM market and sell under their own names, also prevented the Bank, the EPIC, and JPMIM from critically reviewing the fees or performance of the BlackRock branded investments.

116.    These products include the Target Date Funds included in the Plan for the entirety of the Class Period.  Although constructed and maintained by the Asset Management Solutions – Global Multi-Asset Group at the Bank, the funds within the Target Date Funds are mostly index funds managed by BlackRock.  Taken in addition to the seven other BlackRock managed funds in the Plan, BlackRock makes up about half of the investment options in the portfolio.

117.    This flooding of the Plan with BlackRock investment options is the result of a business arrangement between BlackRock and JPMorgan Chase and/or its affiliates, whereby in return for access to the Plan, BlackRock shared management or performance fees to the Bank and/or an affiliate.

118.    As a result, the investment management fees paid by Plan participants for over 70% of the Plan's options can be represented by the following graphic:



119.   In 2015, JPMorgan Chase was investigated by the Securities Exchange Commission ("SEC") for the similar improper steering of clients' assets by the Bank's asset-management unit into proprietary investments in order to generate fees for itself rather than recommending the best product for its clients' needs.  *See* Neil Weinberg, *JPMorgan Execs Said Deposed in SEC Asset-Management Probe*, Mar. 31, 2015, Bloomberg.com, available at http://www.bloomberg.com/news/articles/2015-03-31/jpmorgan-execs-said-deposed-in-sec-asset-management-probe; *JPMorgan under investigation over fund sales*, Bloomberg News, May 6, 2015, available at http://www.investmentnews.com/article/20150506/FREE/150509962/jpmorgan-under-investigation-over-fund-sales.

120.    In December 2015, the SEC announced that both the Bank and an affiliate, J.P. Morgan Securities LLC, had agreed to pay $267 million and admit wrongdoing in failing to disclose their conflict of interest to clients.   The Bank also agreed to pay an additional $40 million penalty to the U.S. Commodity Futures Trading Commission related to those same activities.   *See J.P. Morgan to Pay $267 Million for Disclosure Failures*, Dec. 18, 2015, available at https://www.sec.gov/news/pressrelease/2015-283.html.

121.    In announcing this settlement, Andrew J. Ceresney, Director of the SEC Enforcement Division said[4]:

> Firms have an obligation to communicate all conflicts so a client can fairly judge the investment advice they are receiving.   These J.P. Morgan subsidiaries failed to disclose that they preferred to invest client money in firm-managed mutual funds and hedge funds, and clients were denied all the facts to determine why investment decisions were being made by their investment advisors.

*Id*.

122.    Among the wrongdoing found by the SEC and admitted to by the Bank, the Bank did not disclose its preference to invest into third-party managed hedge-funds that shared management or performance fees called "retrocessions" with a Bank affiliate.   *Id*.

123.    Upon information and belief, Plaintiff believes a similar arrangement existed between BlackRock and the Bank for the BlackRock options in the Fund.   Because Plan participants are limited to the menu selected, using BlackRock for half of the options ensured that BlackRock would receive significant management fees from Plan participants, and in turn, share them with JPMorgan Chase and/or its affiliates.

---

[4] J.P. Morgan does not have any duty to put its **clients'** interest before its own in providing brokerage or investment advice, **but** it has fiduciary duties towards an ERISA beneficiary/plan participant.   Mere disclosure of a conflict of interest to a beneficiary is not sufficient under ERISA, which mandates that a fiduciary consider the beneficiaries' interest before its own and also mandates a duty of loyalty.

124.    While the SEC investigation was ongoing in 2015, a comprehensive review of the Plan's investment options into its own proprietary and BlackRock investment options was finally undertaken by the EPIC.  As a result, a series of changes to both the proprietary and BlackRock options began to be instituted in the fourth quarter, beginning in November 2015.  The result was that fees were reduced significantly for each Bank, JPMIM or BlackRock managed investment option in the Plan's portfolio.

125.    As each one of these investment options was managed either by the Bank, an affiliate, or its business associate BlackRock, the management fee reductions which began on November 6, 2015 and ended on April 1, 2016 were within the capabilities of Defendants to undertake prior to November 6, 2015.

126.    Upon information and belief, the changes were not made at an earlier time however, because there was no standardized, routine, critical review of the Plan investment options by impartial, unbiased EPIC members, and/or the Defendants were incentivized not to undertake such a review because they and/or affiliated companies were profiting from the higher fees.

127.    As a result, Plaintiff and the Plan's participants were overcharged for investment options managed by the Bank, JPMIM, and BlackRock by at least $34.4 million since 2010.

**(b)    Mid Cap Value and Mid Cap Growth Funds**

128.    Prior to November 6, 2015, the Plan offered two investment options in the Mid Cap Asset Class:  a Mid Cap Value Fund managed by Earnest Partners, LLP; and a Mid Cap Growth Fund managed by JPMIM.  Upon information and belief, the Mid Cap Value Fund was a separately managed account while the Mid Cap Growth Fund was a mutual fund.

129.    Both of the Mid Cap Funds were actively managed funds which sought to beat the market indexes.  As a result of the active management, they had high fees for the Plan portfolio which were well above the median.  In fact, the Mid Cap Growth Fund was by far the most expensive option in the Plan, charging 93 basis points[5], and the Mid Cap Value Fund was the fourth most expensive option, charging 42 basis points, as can be seen in the following chart:



130.    On November 6, 2015, the EPIC removed both the Mid Cap Growth Fund and the Mid Cap Value Fund from the Plan, and replaced them with the S&P 400 Mid Cap Index Fund run by State Street Bank and Trust Company.  Plan participants were given notice in October 2015 of the coming change.  Those with investments in Mid Cap Growth Fund and the Mid Cap Value Fund had the option of choosing a new allocation for those investments or, if they did

---

[5] In fact, the Mid Cap Growth Fund's annual expense ratio was between 111 and 120 basis points, but with waivers, the charge to Plan participants was 93 basis points.  However, waivers in expenses are not guaranteed and can be revoked at any time, meaning that despite the past charges, at any time while participants were invested in this option, charges could be increased.  An investigation of actively-managed alternatives within the marketplace would have revealed that numerous actively-managed mid-cap growth mutual funds from companies such as Vanguard, T. Rowe Price, and Prudential were available that would have offered comparable or superior investment management services with costs that were at least thirty percent lower than those charged by the Mid Cap Growth Fund.  Even less expensive collective trust and separate account options were available.

nothing, their investments in the Mid Cap Funds would be automatically mapped to the new Mid Cap Fund.

131.    The S&P 400 Mid Cap Index Fund charged annual fees of 4 basis points, which was both a result of the passively managed nature of the fund as well as the fact that the Plan had over a half a billion invested in the Mid Cap asset class investments that the new fund would be replacing.   The sheer amount of the assets under management allowed the Plan, through its Administrator, to secure a very low cost alternative without sacrificing performance.

132.    As the S&P 400 Mid Cap Index Fund is a passively managed fund which merely tracks the performance of the S&P 400 Mid Cap Index, its performance is similar to that of the index itself.  Although the Fund within the Plan was a Plan-specific fund, State Street-managed Mid Cap Index Funds have been outperforming their benchmark consistently for years.

133.    For example, the SSgA S&P Mid Cap Index Securities Lending Series Fund outperformed its benchmark in both the near and long term as of June 30, 2012,[6] as illustrated below:

---

[6] Data on collective investment trusts is generally not publically available.   However, the positive performance of the SSgA S&P Mid Cap Index Fund has continued in subsequent years, tracking the performance of the subject index.

## Performance

| Total Returns | Fund | Benchmark |
|---|---|---|
| Q2 2012 | -4.88% | -4.93% |
| YTD | 7.97% | 7.90% |
| 1 Year | -2.22% | -2.33% |
| 3 Year | 19.41% | 19.36% |
| 5 Year | 2.62% | 2.55% |
| 10 Year | N/A | N/A |
| Inception to Date (Dec 2004) | 6.83% | 6.77% |
| Best Year Since Inception (2009) | 37.32% | 37.38% |
| Worst Year Since Inception (2008) | -36.14% | -36.23% |

134.    A reasonable and timely investigation into the alternatives available to the Plan would have revealed this information.

135.    As a result of the belated change, Plan participants who invested in the Mid Cap Value Fund saw the expenses on their invested money drop 90%, from 42 to 4 basis points. Plan participants invested in the Mid Cap Growth Fund saw expenses on their invested money decrease from 93 basis points to 4 basis points, a 96% fee reduction.



136.    A prudent and impartial fiduciary would have reviewed the Plan's portfolio as well as investigated the availability of lower-cost alternatives within the marketplace, and which would have resulted in replacement of the actively managed Mid Cap asset class funds with the Mid Cap Index fund years before the Plan ultimately made this change.[7]   Their imprudent and disloyal failure to review the portfolio and make these changes sooner cost Plan participants millions in unnecessary fees.

(c)    **Small Cap Core Fund**

137.    Prior to December 18, 2015, the Plan offered the Small Cap Core Fund as a mutual fund investment option.  This investment option was managed by JPMIM and charged annual expenses of 83 basis points[8].  Included in these expenses were recordkeeping fees of 35 basis points paid to J.P. Morgan Retirement Plan Services ("RPS"), and later, to Empower Retirement.

138.    Before the changes to the Mid Cap asset class investment options, the Small Cap Core Fund was the second most expensive option in the Plan's portfolio.  Following the Mid Cap asset class changes, the Small Cap Core Fund became the most expensive option in the portfolio, as shown in the following chart:

---

[7] Their imprudence and disloyalty is demonstrated by the conduct of fiduciaries of similarly-sized plans: as of the end of 2014, among the over 740 defined-contribution plans with over $1 billion in assets, only one plan held the JPMorgan Mid Cap Growth mutual fund – the Plan.  Because of how separate accounts are reported on Form 5500s, it is not possible to discern whether any other plans with over $1 billion in assets were invested in the EARNEST Partners Mid Cap Value separate account.

[8] In fact, the Small Cap Core Fund's annual expense ratio was between 115 and 121 basis points, but with waivers, the charge to Plan participants was 82 to 83 basis points.  However, as noted above waivers in expenses are not guaranteed and can be revoked at any time, meaning that despite the past charges, at any time while participants were invested in this option, charges could be increased up to 120 basis points.



139.    As of December 19, 2015, the Small Cap Core Fund was transformed from a mutual fund format to a separate account format.  In so doing, the Fund greatly reduced administration and recordkeeping fees.  Further, JPMorgan Chase began to pay the remaining investment manager costs so that these expenses would not be charged to the Fund or to Plan participants.

140.    As a result, the annual expenses for this investment decreased from 82 basis points to zero, a 100% fee reduction.



141.    A prudent and impartial fiduciary would have reviewed the Plan's portfolio and conducted a reasonable investigation of marketplace alternatives to the Small Cap Core Fund, which would have led to a significant reduction in the fees paid by Plan participants – through a lower-cost alternative or a switch to a collective trust or separate account structure[9] – years before the December 2015 fee reductions took place.

142.    For example, had Defendants performed a reasonable investigation of alternatives to the Small Cap Core Fund, given the amount of assets held in the Small Cap Core Fund, they would have discovered that they could have:  (i) utilized a passively-managed small cap mutual fund that would have cost at least ten times less than the fees within the Small Cap Core Fund; (ii) utilized actively-managed small cap blend mutual funds from companies such as Vanguard and Dimensional Fund Advisors that cost at least 25 percent less than the Small Cap Core Fund; and (iii) hired numerous investment advisors including Massachusetts Financial Services, Columbia Management, and Goldman Sachs Asset Management, to manage a separate account holding small company stocks that would have cost at least 25 percent less than the fees charged by the Small Cap Core Fund.

143.    The failure of the Plan's fiduciaries to review the portfolio, conduct a reasonable investigation of alternatives, and act upon this information sooner cost Plan participants millions in unnecessary fees.

       **(d)    Core Bond Fund**

144.    Prior to March 11, 2016, the Plan offered the Core Bond Fund as a mutual fund investment option.   This investment option was managed by JPMIM and charged annual

---

[9] For example, JPMIM offered the U.S. QDV Small Cap Core Separate Account at a cost of 65 basis points for the first $50 million under management for most of the Class Period.

expenses of 36 basis points[10], making the Core Bond Fund the fourth most expensive investment option in the Plan shortly before its removal, as shown in the following chart:



145.    As of March 12, 2016, the Core Bond Fund was transformed from a mutual fund format to a commingled account format.  This was accomplished by changing the investment from the R6 share class of the JPMorgan Core Bond Fund, as managed by JPMIM, to units of the Commingled Pension Trust Fund (Core Bond), as managed by the Bank.  The commingled fund invested in "substantially similar intermediate and long-term debt securities as the mutual fund." *See* Fund Change Bulletin dated February 2016, at 2.

146.    The change in the investment led to the elimination of fees.  As stated by the notice sent to Plan participants, "[i]n evaluating whether to continue to invest in, or make a new investment in, the Core Bond Fund subsequent to this change, participants should understand that the investment management fees/annual expenses will no longer be charged against the Fund's performance." *Id.*

---

[10] In fact, the Core Bond Fund's annual expense ratio was between 41 and 48 basis points, but with waivers, the charge to Plan participants was 35 to 36 basis points.  However, as noted above, waivers in expenses are not guaranteed and can be revoked at any time.

147.   As a result, the annual expenses for this investment decreased from 36 basis points to zero, a 100% fee reduction.



148.   A prudent and impartial fiduciary would have reviewed the Plan's portfolio and investigated alternatives to the Core Bond Fund prior to the March 2016 fee reduction.  Such a review and investigation would have revealed the availability of lower-cost alternatives in the marketplace, including the possibility of utilizing a separate account structure also managed by JPMIM.  The Plan fiduciaries' failure to review the portfolio, conduct a reasonable investigation of alternatives to the Core Bond Fund, and act upon this information has cost the Plan's participants millions in unnecessary fees.

149.   Based upon the published fee schedules of JPMorgan Investment Management Inc., and given the amount of money in the fund, the Plan's fiduciaries could have hired JPMorgan to manage this money in a separate account structure for at least 40 percent less than participants were charged within the Core Bond Fund.  Several other high-caliber fixed income active managers such as Baird Advisors and Metropolitan West (as well as many others) would have provided similar investment management services in a separate account structure for at

least a 40 percent discount, given the amount of assets held in the Core Bond Fund and these firms published fee schedules.   Actively managed mutual funds from companies such as Vanguard, SEI, and Dimensional Fund Advisors would have similarly cost at least 40 percent less than the amount Plan participants paid in the JPMorgan Core Bond Fund prior to the 2016 price reduction.

150.    The failure of the Plan Sponsor, the Plan Administrator, and EPIC to review the portfolio, investigate alternatives to the Core Bond Fund, and act upon this information sooner cost Plan participants millions in unnecessary fees.

### (e)      Target Date Funds and BlackRock Managed Funds

151.    Prior to April 1, 2016, the Plan offered a variety of investment options managed by BlackRock in collective trust vehicles, including the index fund investments which were a part of the Target Date Funds[11] actively managed by the Bank.   These investments had annual expenses of 7 to 18 basis points, but included over half the investment options in the Plan as can been seen by the following chart:

---

[11] Target Date Funds are investment options which have a "mix of underlying investment funds across a broad range of asset classes."   *See* JPMorgan Chase 401(k) Savings Plan Investment Fund Profiles, attached hereto as Exhibit 3, at 11.  They are fully diversified investments that seek a total return for a particular target date of retirement.  Included in these funds are investments in index funds.  Although the Bank, via its Global Investment Management Solutions – Global Multi-Asset Group actively managed the Target Date Funds, BlackRock passively managed the index funds included in the investments of the Target Date Funds.



152.   BlackRock thus managed well over $3 billion of the Plan's assets at all times during the Class Period.

153.   As of April 1, 2016, investment management fees for all of the BlackRock managed investments and for all of the Target Funds were *reduced by 18% to as much as 40%*, depending on the investment, as illustrated in the following chart:



154.    Despite being able to do so earlier because of their knowledge of asset management through their business, the Plan Sponsor, the Plan Investment Advisor, and the EPIC were able to leverage the sizable investments in BlackRock managed investments long before this belated cost reduction, to negotiate and receive more favorable investment management fees.

155.    Moreover, the market information available to large institutional investors such as the Plan prior to the April 2016 changes demonstrate that lower cost but otherwise identical investments to the BlackRock products within the Plan's portfolio were available years earlier.

156.    As an example, as of June 30, 2012, the following funds were available from State Street Global Advisors in a collective trust vehicle, which have lower fees than both the prior and the current fees charged by the BlackRock products held by the Plan:



157.    As of June 30, 2012, given the hundreds of millions of dollars held in each of the BlackRock products, the Plan's fiduciaries could have utilized State Street collective trust options at the much lower fee levels shown above.

158.    Moreover, because all of these options are passively managed, tracking the same index funds, their performance would have been similar.  In fact, State Street Index funds tend to outperform their benchmarks slightly (by approximately a tenth of a percent, on average), making them ideal investment options for large plan such as the Plan here.

159.    This belated fee reduction is particularly crucial for those Plan participants invested in the Target Date Funds, which, as noted above, are the default investment for anyone who contributes to the Plan and does not make their own election.  Participants in these Target Date Funds saw their fees decrease between 18% for those in the Target Date Income Fund all the way to 30% for those in the Funds with Target Dates from 2040 to 2055.  Had this fee change occurred several years earlier, as it would have if the Plan's fiduciaries had acted prudently and loyally as ERISA mandates, participants would have enjoyed millions of dollars of additional retirement benefits.

160.    A prudent and loyal fiduciary would have reviewed the Plan's portfolio and investigated alternatives within the marketplace so as to leverage the size of the Plan's investment in BlackRock managed investment vehicles much sooner.

161.    Alternatively, if the EPIC, JPMIM, or the Bank had looked at the available information regarding lower-cost alternatives with similar performance prior to the SEC's investigation of their self-dealing with client money, Plan participants would have seen a reduction in fees years sooner.

162.    The Plan fiduciaries' failure to review the portfolio and make these changes sooner cost Plan participants millions in unnecessary, overly-expensive fees.

**(2)     Defendants Breached their Fiduciary Duty by Failing to Use All the Tools Available to Reduce Fees While Providing the Same Investments**

163.    As explained by the Wall Street Journal, collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds, and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and can neither advertise nor issue formal prospectuses.  As a result, their costs are much lower, with little or no administrative costs, and little or no marketing or advertising costs.  *See* Powell, Robert, *Not Your Normal Nest Egg*, The Wall Street Journal, Mar. 17, 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.    Collective trusts fees in fact can be between 15 to 60 basis points lower than the same asset class mutual fund.

164.    Another feature of collective trusts is that they are customizable to a particular employer.  "Plan sponsors can work with banks and trust companies to create a target-date fund that has a specific asset allocation or glide path built around its workforce and employee-benefit package." *Id*.

165.    Defendants were at all times during the Class Period aware of the benefits of collective trust vehicles compared to mutual funds.  Most of the investments within the Plan were in fact collective trusts.  The only mutual fund options were three proprietary funds:  the Core Bond Fund; the Mid Cap Growth Fund; and the Small Cap Core Fund.   These three funds had some of the highest fees in the Plan's entire portfolio.

166.    Rather than use their unique position and expertise to benefit the Plan and its participants by offering these same asset class investments in a collective trust, separate account,

or commingled account, Defendants instead opted to offer the higher cost proprietary mutual funds because of the benefit they returned to Defendants and their affiliated companies.

167.    Belatedly, each of these options was either removed from the Plan's investment menu or transformed into a separate or commingled account, reducing fees paid by participants by 90% to 100%.

168.    The decision to keep the proprietary mutual funds as investment options instead of offering these investments in alternative investment vehicles cost the Plan's participants millions of dollars in excess fees over the course of the Class Period.

169.    Defendants also failed to remove duplicative investments from the Plan. Prudent management of a plan's investments requires removal of unnecessary or duplicative funds, especially where one of the funds has significantly higher costs than the other because investors are likely to falsely "diversify" by splitting an investment between multiple investments in the same asset class.[12]

170.    For example, at all times during the Class Period there were five Large Cap Domestic Equity investment options. Within that group, there were two Large Cap Value investment options and two Large Growth investment options, with one option being significantly more expensive than the other. This only encouraged Plan participants to falsely diversify by splitting their investment and unnecessarily paying higher fees.

**(3)    Defendants Breached their Fiduciary Duty to Avoid Conflicts of Interest**

171.    By selecting and retaining the mutual funds run by affiliated companies, Defendants have acted at all times in the interest of the Bank, and have not acted solely in the

---

[12] Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes? An Experiment on Mutual Fund Choice*, 162 U. PA. L. REV. 605, 623, 636-38 (2014). *See also* James J. Choi, *et al.*, *Why Does the Law of One Price Fail? An Experiment on Index Mutual Funds*, 23 Rev. Fin. Stud. 1405 (2010).

49

interests of the Plan's participants as is required of a fiduciary under ERISA, who are required to serve the Plan loyally with an "eye single" to the Plan.  *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993); *John Blair Comm. Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 2 F. 3d 360, 367 (2nd Cir. 1994); 29 U.S.C. § 1104(a)(1)(B).

172.    Defendants have a conflict of interest that prevented them from carrying out their fiduciary duties in a manner consistent with ERISA.  Despite this conflict of interest, Defendants have failed to appoint fiduciaries who could carry out their duties to protect the Plan's participants in a manner consistent with ERISA or to take other appropriate steps to address the conflict.

## CLAIMS FOR RELIEF UNDER ERISA

173.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

174.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

175.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

176.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and their beneficiaries, for the exclusive purpose of providing benefits

to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and family with such

matters would use in the conduct of an enterprise of a like character and with like aims.

177.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose and prudence and are the "highest known to the law."

*Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other things:

(a)     The duty to conduct an independent and thorough investigation into, and

continually to monitor the merits of all the investment alternatives to a

plan; and

(b)     A duty to avoid conflicts of interest and to resolve them promptly when

they occur.  A fiduciary must always administer a plan with an "eye

single" to the interests of the participants and beneficiaries, regardless of

the interests of the fiduciaries themselves or the plan sponsor;

178.     ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary,"

provides, in pertinent part, that:

[I]n addition to any liability which he may have under any other
provision of this part, a fiduciary with respect to a plan shall be
liable for a breach of fiduciary responsibility of another fiduciary
with respect to the same plan in the following circumstances: (A) if
he participates knowingly in, or knowingly undertakes to conceal,
an act or omission of such other fiduciary, knowing such an act or
omission is a breach; (B) if, by his failure to comply with section
404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his
specific responsibilities which give rise to his status as a fiduciary,
he has enabled such other fiduciary to commit a breach; or (C) if
he has knowledge of a breach by such other fiduciary, unless he
makes reasonable efforts under the circumstances to remedy the
breach.

179.    Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## FIRST CLAIM FOR RELIEF
### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

180.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

181.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

182.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments available to the Plan participants were prudent and that such investments were consistent with the purpose of the Plan. Defendants are liable for losses and excessive fees incurred as a result of such investments being imprudent.

183.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.   ERISA § 404(a)(1)(D), 29 U.S.C. §

1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.  *See Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2469 (2014) ("'Trust documents cannot excuse trustees from their duties under ERISA.'") (quotation omitted).

184.    Moreover, ERISA § 404 (a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

185.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, these Defendants knew or should have known that, as described herein, the proprietary mutual funds were not suitable and appropriate investments for the Plan.  The proprietary funds included in the Plan during the Class Period clearly did not serve the Plan's stated purpose because of their excessive fees.  Yet, during the Class Period, despite their knowledge of the imprudence of the investments, Defendants failed to take any meaningful steps to protect Plan participants from the excessive costs.

186.    Defendants also breached their duties to prudently and loyally manage the Plan's assets by failing to remove the unduly expensive Mid Cap Value Fund and to leverage the size of the Plan's investments in BlackRock index funds to get lower investment management prices earlier.  Plan participants thus paid millions more in fees than were necessary during the Class Period.

187.    Defendants additionally breached their duties to prudently and loyally manage the Plan's assets by failing to have in place a method of systematic review both of the Plan's individual investment options and of the portfolio as a whole in order to ensure that the investments were suitable and appropriate for the objectives of the Plan.

188.    Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the self-interest of the Bank in retaining the excessively expensive proprietary fund investment options and in failing to negotiate lower fees on the Target Date and BlackRock investment vehicles due to the ongoing business relationship between the Bank, JPMIM, and BlackRock.   Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

189.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of the retirement investment.   Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in the proprietary funds and thereby eliminated, or at least reduced, losses to the Plan.

190.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries and Provide Them with Accurate**
**Information**
**(Breaches of Fiduciary Duties in Violation of § 404 by All Defendants except the Plan**
**Administrator and the Investment Defendants)**

191.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

192.    At all relevant times, as alleged above, the Company Defendants and Officer Defendants were fiduciaries to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

193.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of these Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including without limitation, the members of the various Committees, the Plan Administrator and the investment managers and others to whom fiduciary responsibilities were delegated.

194.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a Plan's assets, and must take prompt and effective action to protect a Plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know and reasonably should know that the monitored fiduciaries must have in order to prudently manage a Plan and a Plan's assets.

195.    The Company Defendants and Officer Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to disclose the conflict of interest that existed between the Bank and the proprietary funds, the Bank and the Investment Advisor, and the Investment Advisor and BlackRock, who had a longstanding business arrangement, (b)

failing to monitor and evaluate the performance of the Plan's fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Plan fiduciaries' imprudent actions and omissions, (c) failing to monitor and evaluate the cost of the investment options such that the Plan lost millions of dollars to excessive fees, (d) failing to monitor the processes and policies by which the Plan's investments were evaluated, allowing the Plan's assets to remain the imprudent proprietary mutual funds rather than in lower fee, similar investment vehicles or other investment alternatives such as collective trusts and allowing BlackRock to charge higher than reasonable fees during the Class Period, and (e) failing to remove fiduciaries whose performance was inadequate in that they continued to maintain imprudent and excessively costly investments within the Plan, to the detriment of the Plan and Plan participants' retirement savings.

196.    Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

197.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

198.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**CAUSATION**

199.    The Plan suffered tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in proprietary funds and/or other unduly expensive investment options during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plan's participants.

200.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and its participants would have avoided the losses that they suffered through the Plan's continued investment in the proprietary funds.

**REMEDY FOR BREACHES OF FIDUCIARY DUTY**

201.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

202.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  ERISA Section 409 requires "any person who is a fiduciary … who breaches any of the … duties imposed upon fiduciaries … to make good to such plan any losses to the plan…"  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate …"

203.    With request to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable

alternative investment available.  In this way, the remedy restores the values of the Plan's assets to which they would have been if the Plan had been properly administered.

204.    Plaintiff, the Plan, and the Class are therefore entitled to relief from Defendants in the form of:  (1) monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

205.    Each Defendant is jointly liable for the acts of the other Defendants as co-fiduciary.

## JURY DEMAND

206.    Plaintiff demands a jury.

## PRAYER FOR RELIEF

207.    WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

B.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan

resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets;

C.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to imposition of a constructive trust on any amounts by which any Defendants were unjustly enriched at the expense of the Plan as a result of breaches of fiduciary duty;

D.      An Order that Defendants allocate the Plan's recoveries to the accounts of all affected participants;

E.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

H.      An order awarding pre-judgment interest; and

I.      An Order providing for such other and further relief as the Court deems equitable and just.

Dated:  January 25, 2017

Respectfully submitted,

By:  /s/ Joseph H. Meltzer
Joseph H. Meltzer, Esq. NY Bar No. JM8493
**KESSLER TOPAZ MELTZER**
   **& CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email:   jmeltzer@ktmc.com

Edward W. Ciolko
(*pro hac vice* motion to be filed)
Mark K. Gyandoh
(*pro hac vice* motion to be filed)
Julie Siebert-Johnson
(*pro hac vice* motion to be filed)
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email:  eciolko@ktmc.com
Email:  mgyandoh@ktmc.com
Email:  jsjohnson@ktmc.com

Kai Richter
Carl F. Engstrom
Jacob Schutz
  *admitted in W.D.N.Y.
**NICHOLS KASTER, PLLP**
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
Email: krichter@nka.com
        cengstrom@nka.com
        jschutz@nka.com

***Counsel for Plaintiff***