## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Terre Beach, Antoinette Fondren, Ferdinand Orellana, William Stirsman, Sean Daly, and James C. Monaghan, individually and on behalf of themselves and all others similarly situated, | Civil Action No.: 1:17-cv-00563-JMF |
| Plaintiffs, | |
| vs. | |
| JPMorgan Chase Bank, National Association, JPMorgan Chase & Company, Compensation & Management Development Committee of the Board of Directors for JPMorgan Chase & Company, the Selection Committee, the Employee Plans Investment Committee, J.P. Morgan Investment Management Inc., Head of Human Resources for JPMorgan Chase & Co., Chief Financial Officer for JPMorgan Chase & Co., Benefits Director of JPMorgan Chase & Co., Stephen B. Burke, Lee R. Raymond, William C. Weldon, John C. Donnelly, Marianne Lake, Bernadette J. Branosky, Thelma Ferguson, and John Does 1-20, | |
| Defendants. | |

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs Terre Beach ("Beach"), Antoinette Fondren ("Fondren"), Ferdinand Orellana ("Orellana"), William Stirsman ("Stirsman"), Sean Daly ("Daly"), and James C. Monaghan ("Monaghan"), by and through their attorneys, on behalf of the JPMorgan Chase 401(k) Savings Plan (the "Plan"), themselves, and all others similarly situated, allege the following.

## INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132 against JPMorgan Chase Bank, National Association (the "Bank"), JPMorgan Chase & Company ("JPMorgan Chase"), the Compensation & Management Development Committee of the Board of Directors for JPMorgan Chase & Company (the "CMDC"), the Selection Committee, the Employee Plans Investment Committee (the "EPIC"), J.P. Morgan Investment Management Inc. ("JPMIM"), Head of Human Resources for JPMorgan Chase & Co., Chief Financial Officer for JPMorgan Chase & Co., Benefits Director of JPMorgan Chase & Co., Stephen B. Burke, Lee R. Raymond, William C. Weldon, John C. Donnelly, Marianne Lake, Bernadette J. Branosky, Thelma Ferguson, and John Does 1-20 (collectively "Defendants").

2.      Plaintiffs were participants in the Plan during the Class Period (defined below), during which time the Plan's fiduciaries breached their duties of loyalty and prudence to the Plan and its participants by, among other things, retaining unduly expensive Plan investment options, managed by JPMorgan Chase affiliates and/or business partners, despite having access to less expensive investment options that performed just as well, if not better, than the proprietary or the affiliated options at issue.  The fiduciaries' failure to properly evaluate the Plan's investment portfolio for both reasonable expenses and performance levels, regardless of affiliation to JPMorgan Chase, led thousands of Plan participants to pay higher than necessary fees for both proprietary investment options and certain other options for years substantially diluting their retirement holdings.  During the Class Period, Defendants committed further statutory violations by engaging in conflicted transactions expressly prohibited by ERISA and receiving Plan assets for their own benefit in contravention to the interests of the Plan and its participants.

2

3.     401(k) plans confer benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan is limited to the investment options selected by the plan's fiduciaries.  Defendants cost the Plan participants millions of dollars, while enriching themselves in blatant self-dealing by, *inter alia*, allowing higher than necessary fees to continue to be paid on their own proprietary, overly expensive options in managed by JPMorgan Chase affiliates and/or business partners, and maintaining the Plan's investments in those options during the Class Period, in violation of their fiduciary duty to continuously review the Plan's investment options and make timely changes, if so warranted, to ensure that the Plan's investment options remained prudent at all times.

4.     Plaintiffs allege that the Defendants identified as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to them and to the other Plan participants and beneficiaries in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Defendants' utilization and retention of proprietary mutual funds and their failure to use the Plan's bargaining power, as a result of its massive assets (valued between $14.64 billion and $20.94 billion during the Class Period), to secure lower fees on the investment options in the Plan, and consequently, in Plaintiffs' portfolios.

5.     Specifically, Plaintiffs allege that the Defendants named in Count I breached their fiduciary duties to Plaintiffs and members of the Class by failing to prudently and loyally manage the Plan's investments by:  (1) failing to adequately review the Plan's investment portfolio to ensure that each investment option was prudent, in terms of both cost-effectiveness and performance, without regard to the particular option's affiliation with JPMorgan Chase; (2) retaining the Bank's proprietary mutual funds, as well as those of its affiliates, in the Plan's

investment portfolio, despite the availability of nearly identical lower cost and better performing investment options; (3) failing to affect a timely reduction in fees on twenty different Plan investment options, most of them being proprietary funds; and (4) failing to consider and offer commingled accounts, separate accounts, or collective trusts, despite their far lower fees, for the benefit of the Plan, in lieu of the Bank's proprietary mutual funds.  These actions/inactions cost Plan participants millions of dollars and run directly counter to the express purpose of ERISA pension plans, including 401(k) plans, designed to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.    Plaintiffs' Count II alleges that certain of the Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were failing to manage the Plan and its investment portfolio in a prudent and loyal manner as required by ERISA.

7.    Plaintiffs' Count III alleges that Defendants breached their duty to provide adequate disclosures to Plan participants regarding the holdings, fees and expenses of certain Plan investment options and the designated investment alternatives and their respective fees and expenses by: (1) failing to properly identify to plan Participants the investments and their risks within the Target Date Funds; (2) failing to provide the accurate sum of the fees of the various investments within the Target Date Funds; (3) failing to disclose designated investment alternatives with similar strategies and their fees and expenses; and (4) failing to disclose the arrangements between the Plan Sponsor and BlackRock Institutional Trust Company, N.A. ("BlackRock") which led to the inclusion of these investment options in the Plan.

8.    Plaintiffs' Counts IV and V allege, respectively, that Defendants JPMorgan Chase, the Bank, and JPMIM violated ERISA's prohibited transaction rules, which bar fiduciaries and certain parties in interest such as JPMIM here, which provides Plan-related investment services, from receiving Plan assets for their own benefit.  These prohibited transactions took place when JPMIM, in its role as the Plan's investment advisor, recommended certain investment options under its management to be included in the Plan, and employees of JPMorgan Chase, in their authority as members of the EPIC, accepted those recommendations, without paying heed to whether these investment choices were reasonable or prudent, thereby conferring a windfall benefit to JPMIM, an affiliate of the Plan Sponsor, as well as to the Bank, the Plan Sponsor and Trustee.

9.    Plaintiffs' Count VI alleges that Defendants the Bank, the CMDC, the Selection Committee, the EPIC and the Plan Administrator Defendants are liable for their knowing participation in the fiduciary breaches of other defendants as co-fiduciaries.

10.    Plaintiffs' Count VII alleges that JPMorgan Chase, the Bank, and JPMIM are liable for their actual or constructive knowledge of the breaches of fiduciary duties in Counts I, III, and IV, and they are liable as non-fiduciaries to disgorge the ill-gotten gains and/or provide other equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and the Supreme Court's decision in *Harris Trust & Sav. Bank v. Salomon smith Barney Inc.*, 530 U.S. 238 (2000).

11.    This action seeks to recover losses to the Plan for which Defendants are liable pursuant to ERISA §§ 404, 409 and 502, 29 U.S.C. §§ 1104, 1109 and 1132.  Because Plaintiffs' claims apply to the Plan, inclusive of all participants with accounts invested in the challenged proprietary and/or affiliated funds during the Class Period, and because ERISA specifically

5

authorizes participants such as Plaintiffs to sue for relief to the Plan for breaches of fiduciary duty such as those alleged herein and engagement in prohibited transactions, Plaintiffs bring this action as a class action on behalf of the Plan and all of its participants and beneficiaries during the proposed Class Period.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

13.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in, or reside in, and have significant contacts with, this District, and because ERISA provides for nationwide service of process.

14.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### **Plaintiffs**

15.     Plaintiff Beach is a citizen and resident of Plainfield, Illinois.  Plaintiff is a current participant of the Plan.  While a participant, Beach invested in the Target Date 2020 Fund.  Through her investment in this Target Date Fund (which itself is made up of other investment

options), Plaintiff was also invested in BlackRock- managed investment options, as well as other options available in the Plan, such as the High Yield Bond Fund managed by Columbia Management Investment Advisers, LLC.

16.    Plaintiff Fondren is a citizen and resident of Chicago, Illinois.  Plaintiff is a current participant of the Plan.  While a participant, Fondren invested in the Target Date 2030 Fund.  Through her investment in this Target Date Fund (which itself is made up of other investment options), Plaintiff was also invested in BlackRock-managed investment options, as well as additional options otherwise available in the Plan.

17.    Plaintiff Orellana is a citizen and resident of Far Rockaway, New York.  Plaintiff was a participant in the Plan during the Class Period.  While a participant, Orellana invested in the Core Bond Fund, the Mid Cap Growth Fund, the Small Cap Core Fund, the Target Date 2045 (which itself is made up of other investment options), as well as other options otherwise available in the Plan.  Through his investment in the Target Date Fund, Plaintiff was also invested in BlackRock-managed investment options, as well as additional options otherwise available in the Plan.

18.    Plaintiff Stirsman is a citizen and resident of Bradenton, Florida.  Plaintiff was a participant in the Plan during the Class Period.  While a participant, Stirsman invested in the Core Bond Fund.

19.    Plaintiff Daly is a citizen and resident of Downers Grove, Illinois.  Plaintiff Daly was a participant in the Plan during the Class Period.  While a participant, Plaintiff Daly invested in the Large Cap Growth Index Fund, the Large Cap Value Index Fund, the S&P 500 Index Fund, and the Target Date 2050 Fund.  Through his investment in the Target Date Fund (which

itself is made up of other investment options), Plaintiff was also invested in BlackRock-managed investment options, as well as additional options otherwise available in the Plan.

20.     Plaintiff Monaghan is a citizen and resident of North Salem, New York.  Plaintiff was a participant in the Plan during the Class Period.  While a participant, Monaghan invested in the Large Cap Growth Index Fund, as well as additional options otherwise available in the Plan. Through his investment in the Target Date Fund, Plaintiff was also invested in BlackRock-managed investment options, as well as other options otherwise available in the Plan.

21.     Plaintiffs did not have knowledge of all material facts (including, among other things, the cost of the Plan investments relative to the alternative investments available to, but not offered by the Plan) required to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for selecting, monitoring, or removing the Plan investments, because this information is solely within the possession of Defendants prior to discovery.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Defendants**

**(a)     Company**

22.     Defendant JPMorgan Chase Bank, National Association (defined above as the "Bank") is the Plan Sponsor and is a national banking association with retail branches in 23 states, as well as foreign branches and subsidiaries in numerous countries.  The Bank is headquartered in Columbus, Ohio.  The Bank is also the "Trustee of the [Plan] Trust."  *See*

JPMorgan Chase 401(k) Savings Plan Document, Effective January 1, 2016, attached hereto as Exhibit 1, at § 13.1.  The Plan Document provides that "[a]ll of the funds of the Plan shall be held as [the Trust]," and that "[n]o part of the Trust…may be used for, or diverted to, any purpose other than for the exclusive benefit of Participants, Former Participants and Beneficiaries…"  *Id.*, § 13.3.  The Bank is also the fund manager of a number of the investment options in the Plan, including the Target Date Funds, for which it receives fee income.  Accordingly, the Bank is a Plan fiduciary, as it has exercised discretionary authority or control over Plan management, and/or exercised authority or control respecting the management or disposition the Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan.  Additionally, the Bank is a Plan fiduciary to the extent it has rendered any investment advice with regard to the Plan, for a fee or other compensation, direct or indirect, with respect to any Plan investments, or has had any authority or responsibility to do so.

23.    Defendant Bank is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it has exercised discretionary authority or control over Plan management, and/or exercised authority or control respecting the management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan.

24.    Defendant JPMorgan Chase & Company (defined above as ("JPMorgan Chase") is a global financial services firm with worldwide operations and a Plan employer.[1]  It is the corporate parent of the Bank, which is its wholly-owned, primary banking subsidiary.  JPMorgan Chase is incorporated in Delaware and has its headquarters in New York, New York.

---

[1] A "Plan employer" is an employer who has authorized its participation, and that of its employees, in the Plan.

In addition, JPMorgan Chase is the indirect owner of JPMIM. As a Plan employer and owner of fiduciary entities, JPMorgan Chase is a "party in interest" pursuant to 29 U.S.C. § 1002(14).

26. Defendants Bank and JPMorgan Chase (collectively, the "Company Defendants") were fiduciaries of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they have exercised discretionary authority or control over Plan management and/or exercised authority or control over management or disposition of Plan assets and/or have discretionary authority or discretionary responsibility in the administration of the Plan.

**(b)    Compensation & Management Development Committee**

26. The Defendant Compensation & Management Development Committee ("CMDC") is a committee of the Chase Board which is directly authorized by the Bank Board to provide oversight to the Plan, and is a fiduciary of the Plan. Its functions include:

- Appointing members of the Selection Committee, which is in turn charged with the appointment of members of the EPIC, as discussed below;

- Delegating authority to appoint the Plan Administrator for employee benefit plans subject to ERISA, such as the Plan, to the Head of Human Resources and the Chief Financial Officer, who together comprise Defendant Selection Committee;

- Approving the Fiduciary Rules;

- Approving the compensation of any Named Fiduciary who is not an employee; and

- Receiving reports regarding the operation of the Plan.

*See* Charter of the Compensation & Management Development Committee, *available at* https://www.jpmorganchase.com/corporate/About-JPMC/compensation-committee-charter.htm#Auth

27.    During the Class Period, the CMDC appointed two JPMorgan Chase executives, the Director/Head of Human Resources and the Chief Financial Officer, who together comprise Defendant Selection Committee, responsible for appointing members of the EPIC and the Plan Administrator.

28.    Defendant Stephen B. Burke ("Burke") is a director on the Chase Board, and a member of the CMDC, where he delegates the authority to appoint the Plan Administrator and receives reports regarding the operation of the Plan, a position he has held since 2004.

29.    Defendant Lee R. Raymond ("Raymond") is a director on the Chase Board, and a member of the CMDC, where he delegates the authority to appoint the Plan Administrator and receives reports regarding the operation of the Plan, a position he has held since 2001. Defendant William C. Weldon ("Weldon") is a member of the CMDC, where he delegates the authority to appoint the Plan Administrator and receives reports regarding the operation of the Plan, a position he has held since 2005.  He is also a director and chairman of the Bank Board, a position he has held since 2013.

30.    Defendants Burke, Raymond, and Weldon, are collectively referred to herein as the "CMDC Defendants."

31.    Each of the CMDC Defendants was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because as discussed below, each exercised discretionary authority or control to appoint and monitor Plan fiduciaries who have exercised discretionary authority or control over Plan management, and/or have exercised authority or

11

control respecting the management or disposition of Plan assets, and/or have discretionary authority or discretionary responsibility in the administration of the Plan.

### (c)    Selection Committee Defendants

32.    Defendant Selection Committee is a Named Fiduciary under the Plan.  The Selection Committee is comprised of the Chief Financial Officer and Director/Head of Human Resources for the Bank, Defendant John C. Donnelly ("Donnelly"), who upon information and belief, also fill those roles at JPMorgan Chase.  The sole duty of the Selection Committee is to appoint members of the Employee Plans Investment Committee (defined above as "EPIC").  *See* Exhibit 1, at § 12.2(a).

33.    During the Class Period, Donnelly served on the Selection Committee because he was the Head of Human Resources for JPMorgan Chase and the Bank.  He was also given delegated authority by the CMDC to appoint the Plan Administrator.

34.    During the Class Period, Defendant Marianne Lake ("Lake") served on the Selection Committee because she was the chief financial officer of JPMorgan Chase and the Bank.  She is also the chief executive officer, the chief financial officer, president and member of the board of directors for the Bank.  She was also delegated authority by the CMDC to appoint the Plan Administrator.

35.    Defendants Donnelly and Lake, along with any other members of the Selection Committee, and the Selection Committee itself, are collectively referred to herein as the "Selection Committee Defendants."

36.    Each of the Selection Committee Defendants was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority or control to appoint and monitor Plan fiduciaries, namely the members

of EPIC and the Plan Administrator, who, as discussed below, have exercised discretionary authority or control over Plan management, and/or have exercised authority or control respecting the management or disposition of Plan assets, and/or have discretionary authority or discretionary responsibility in the administration of the Plan.

### (d)    Investment Defendants

37.    Defendant Employee Plans Investment Committee (defined above as "EPIC") is a Named Fiduciary under the Plan.  EPIC has the "exclusive power to manage, invest and reinvest (including the power to acquire and dispose of) assets of the Plan."  *See* JPMorgan Chase 401(k) Savings Plan Document, Effective January 1, 2016, at § 12.2(b).

38.    EPIC also has the power to appoint the trustee and any investment manager of all or a portion of the Plan's assets, as well as establish the investment policy and funding policy of the Plan.  Upon information and belief, the members of the EPIC are all employees of JPMorgan Chase.

39.    Defendant Thelma Ferguson ("Ferguson") is the Region Head for Chase Commercial Banking and a member of the EPIC.  In her role as a member of the EPIC, she has the responsibility of reviewing, adding, or removing all investment options in the Plan.

40.    Defendant J.P. Morgan Investment Management Inc. (identified above as JPMIM) is a registered investment advisor organized under the laws of Delaware and headquartered in New York, New York.   JPMIM together with other SEC-registered investment advisers, affiliated foreign investment advisers, and the investment management divisions of the Bank, comprise J.P. Morgan Asset Management, which is the marketing name of the investment management businesses of JPMorgan Chase.  JPMIM is a wholly owned subsidiary of JPMorgan Asset Management Holdings, Inc., which itself is a wholly owned subsidiary of JPMorgan

Chase.  JPMIM is the investment advisor of the Plan, as appointed by the Plan Administrator, and receives compensation in connection with mutual fund investments in the Plan.  JPMIM is also the Fund Manager for the Small Cap Core Fund, a current investment option in the Plan, and the Mid Cap Growth Fund, a former investment option in the Plan, and as such, collected fees from Plan assets invested in these products.  JPMIM is a functional fiduciary under 19 U.S.C. § 1002(21)(A) because it provides investment management services to the Plan.  JPMIM is also a "party in interest" pursuant to 29 U.S.C. § 1002(14) due to its provision of services to the Plan.

42.    Defendant EPIC, as well as all individual members of the EPIC during the Class Period including, but not limited to Defendant Ferguson, and Defendant JPMIM, are collectively referred to herein as the "Investment Defendants."

42.    The Investment Defendants were fiduciaries of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they have exercised discretionary authority or control over Plan management, and/or have exercised authority or control respecting the management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan .  Additionally, JPMIM is a Plan fiduciary to the extent it has rendered any investment advice with regard to the Plan, for a fee or other compensation, direct or indirect, with respect to any Plan investments, or has had any authority or responsibility to do so.

### (e)    Plan Administrator Defendants

43.    Defendant Benefits Director is the Plan Administrator and a Named Fiduciary. Upon information and belief, the Benefits Director is a senior executive of JPMorgan Chase and may also be known as the Compensation and Benefits Executive.  In his/her role as the Plan Administrator, the Benefits Director "shall have the authority to jointly control and manage, as a

Named Fiduciary, the operation and administration of the Plan." *See* Exhibit 1, at § 12.1.  The

Plan Administrator is also responsible for other duties relating to the management and

administration of the Plan, including:

- Furnishing, publishing and filing all plan descriptions, annual reports and reports of Participants' benefits rights;

- Maintaining records regarding all such material; and

- Approving payment of all reasonable administrative expenses.

44.    The Plan Administrator is also authorized under the Plan's governing documents

to disregard any instruction that…"(e) result in a prohibited transaction described in Section 406

of ERISA or Section 4975 of the Code." *Id.* at § 6.4.

45.    Defendant Bernadette J. Branosky ("Branosky") is the current Benefits Director at

JPMorgan Chase and the Plan Administrator.  In her role as Plan Administrator, Defendant

Branosky signed the Plan's Forms 5500 filed with the Department of Labor ("DOL") for the plan

years ending in 2010 through 2015.

46.    As Plan Administrator, the Benefits Director of JPMorgan Chase exercised

discretionary authority with respect to management and administration of the Plan.

47.    The Plan Administrator, and any individual acting on behalf of the Plan

Administrator, including Defendant Branosky, are collectively referred to herein as the "Plan

Administrator Defendants."

48.    The Plan Administrator Defendants were each a fiduciary of the Plan, within the

meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he or she has exercised

discretionary authority or control over Plan management, and/or has exercised authority or

control respecting the management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan.

**(f)    Additional "John Doe Defendants"**

49.    To the extent that there are additional officers and employees of the Bank, JPMorgan Chase, or JPMIM, who were fiduciaries of the Plan during the Class Period, including members of the EPIC and/or Selection Committee, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-20 include other individuals, including, but not limited to, JPMorgan Chase officers and employees, who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

**THE PLAN**

50.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

51.    The Plan's original effective date was January 1, 1958. Upon information and belief, it has been restated several times since then, particularly with regard to the acquisition and folding-in of other banks and their own 401(k) retirement plans.

52.    All employees who are U.S. dollar-paid, regularly paid and scheduled to work more than 20 hours a week and employed by JPMorgan Chase, or one of its subsidiaries which

has adopted the Plan, are eligible to participate in the Plan. An employee becomes an eligible participant as of the first day of employment for full-time employees, or as of the first of the month following the completion of 60 days of service for part-time employees. *See* JPMorgan Chase 401(k) Savings Plan Summary Plan Description dated January 1, 2016 ("SPD"), attached hereto as Exhibit 2, at 6.

53.    Eligible employees are automatically enrolled 31 days following their eligibility date at a rate of 3% of ongoing compensation, defined as the base salary or regular pay of the employee, unless they specifically opt out or elect to enroll earlier. Each year, the contribution rate will increase by 1% up to a total contribution rate of 5%. The default investment choice is the appropriate Target Date Fund based on the employee's age and assumed retirement date of 65. *See* SPD, at 7.

54.    Eligible employees may contribute up to 50% of their ongoing compensation on a combined before-tax and/or after-tax basis, up to the legal limits imposed by the Internal Revenue Service. *Id.* at 9. Plan participants are always 100% vested in their own contributions. *Id.* at 13.

55.    JPMorgan Chase provides matching contributions up to 5% of ongoing compensation, following the completion of one year of service for employees making less than $250,000 a year. *Id.* at 9-11. Plan participants are vested in matching contributions following three years of total service. *Id.* at 13.

56.    As alleged above, members of the CMDC are appointed by the Board of Directors for JPMorgan Chase, and the CMDC has been named by the Board of Directors for the Bank to have oversight of the Plan. In turn, the CMDC, appointed the Head of Human Resources and the Chief Financial Officer, who together comprise the Selection Committee, responsible for

appointing the Plan Administrator and members of the EPIC, which oversees all investments of the Plan, including those at issue in this action.

## CLASS ACTION ALLEGATIONS

57.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the proposed class (the "Class") defined as follows:

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between January 25, 2011 and the present (the "Class Period).

58.    The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of Plan participants and beneficiaries.

59.    Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs' claims, and the claims of all Class members, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all Class members have been similarly affected by Defendants' wrongful conduct.

60.    There are questions of law and fact common to the Class and these questions predominate over questions affecting individual Class members.  Common legal and factual questions include, but are not limited to:

> A.    Whether certain of the Defendants identified herein are fiduciaries of the Plan;
>
> B.    Whether certain of the Defendants identified herein breached their fiduciary duties of loyalty and prudence with respect to the Plan;

18

C.      Which certain of the Defendants identified herein had a duty to monitor the other fiduciaries of the Plan;

D.      Whether the monitoring Defendants failed to adequately monitor the Plan's fiduciaries to ensure the Plan was being managed in compliance with ERISA;

E.      Whether certain of the Defendants identified herein engaged in prohibited transactions under ERISA § 406;

F.      Whether certain of the Defendants identified herein otherwise violated ERISA;

G.      The proper form of equitable and injunctive relief;

H.      The amount of losses suffered by the Plan as a result of Defendants' fiduciary breaches and prohibited transactions;

I.      Whether certain of the Defendants identified herein are liable to disgorge unjust profits to Plaintiffs and/or the Plan as a result of their fiduciary breaches or prohibited transactions, and if so, the proper measure of the sums to be disgorged.

61.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

62.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of

separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

63. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

64. As described herein, during the Class Period, upon information and belief, certain of the Defendants were fiduciaries of the Plan (while others were parties-in-interest), either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

65. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

66. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or

other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

67.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan; and/or

(e)     they rendered investment advice for a fee or other compensation, direct or indirect, with respect to the Plan's investment options.

68.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence.

69.     The duty of loyalty also includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons.   As noted in an Advisory Opinion 88-16A by the Department of Labor:

> … in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

1988 WL 222716, at *3 (Dec. 19, 1988).

70.     During the Class Period, the Defendants acted in the interests of the Bank, to the detriment of the Plan and its participants and beneficiaries, by including and retaining in the Plan proprietary mutual fund investments, or those managed by the Bank's affiliates, that were more expensive than necessary and not justified on the basis of their economic value to the Plan.

71.     Not only did the Defendants include these investments out of self-interest, they failed to disclose the conflict of interest to Plaintiffs and members of the Class.

72.     Pursuant to 29 U.S.C. § 1104(a)(1)(B), ERISA also mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments including the monitoring and minimization of administrative expenses.

73.     During the Class Period, upon information and belief, Defendants failed, *inter alia*, to have an independent system of review in place to ensure that Plan participants were being charged appropriate and reasonable fees for both proprietary and non-proprietary investment options.

## SUBSTANTIVE ALLEGATIONS

A.    **Overview**

74.    The Bank is the U.S. consumer and commercial banking business arm of JPMorgan Chase, which is a global financial services business with over $2.4 trillion in assets.

75.    The Bank established and maintained the Plan for the benefit of the employees of JPMorgan Chase, the Bank, and certain of their subsidiaries.  The Plan included a number of investment options, including mutual funds, many of which as alleged herein were unduly expensive given the bargaining power commensurate with the Plan's massive assets (valued between $14.64 billion and $20.94).

76.    Each investment option within the Plan charged certain fees, to be paid by deductions from the pool of assets under management.  For passively managed investments, such as the ones at issue here, designed to mimic a market index such as the Standard & Poor's 500 Index, securities were purchased to match the mix of companies within the index.  Because they are simply a mirror of an index, these funds are supposed to offer both diversity of investment and comparatively low fees.

77.    By contrast, actively managed investments, containing a mix of securities selected in the belief they will beat the market, are typically associated with higher fees, to account for the work of investment managers and analysts.

78.    Under 29 U.S.C. § 1104(a)(1)(C), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA") § 7.  "The Restatement …

instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/ebsa/publications/401k_employee.html (last visited January 25, 2017) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan."). As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on your investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1190 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

79. Nor is a reduction in a Plan participant's account balance merely academic. Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. *See* Brandon, Emily, The Top 10 Sources of Retirement Income, *available at* http://money.usnews.com/money/blogs/planning-to-retire/2014/05/13/the-top-10-sources-of-retirement-income ("'The 401(k) is the major source people think they are going to rely on.'"). Although at all times 401(k) accounts are fully funded, that does not prevent Plan participants from losing money on poor investment selection choices of Plan Sponsors and Administrators, whether due to poor performance, high fees, or both.

80. In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting

24

investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See "A Look at 401(k) Plan Fees*," *supra.*

81.    The duty to evaluate and monitor fees and investment costs includes fees paid directly by Plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.   *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at 4.   "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 5.

82.    Because the investment choices for Plan participants are limited, Plan fiduciaries are responsible for taking into account the reasonableness of any expense ratio when selecting a mutual fund or any other investment option for the Plan.

83.    On average, there are lower expense ratios for 401(k) participants than those for other investors.  *See The Economics of Providing 401(k) Plans*, at 11.  This is because ERISA mandates the monitoring of investments so that prudent and impartial plan sponsors continually evaluate performance and fees, resulting in the necessary competition to lower investment fees among mutual funds.   Furthermore, the large average account balances of 401(k) plans, especially the largest ones with over a $1 billion in assets managed, such as the Plan here, lead to economies of scale and special pricing within mutual funds.  *See id* at 10.

84.    This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000.  In fact, these expense ratios have fallen 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds.  *See id.* at 1.

85.     The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years.[2]

FIGURE 7

**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

| | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
| | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*Id.* at 12.

86.     Prudent and impartial plan fiduciaries thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

87.     This is especially critical because while higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely

---

[2] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management.  Actively managed funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?*

*Hardly*, The Washington Post, *available at* https://www.washingtonpost.com/news/get-

there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P

Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top

quartile in performance and found most did not replicate performance from year to year).

Conversely, mutual funds with the worst performance tend to continue to perform poorly in the

future.  Jonathan B. Berk, Jing Xu, *Persistence and Fund Flows of the Worst Performing Mutual*

*Funds*,           at           6,           (2004)           *available*           *at*

http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.421.2127&rep=rep1&type=pdf

(attributing continuing poor mutual fund performance to less responsive investors who do not

pull their capital from the funds, causing the fund manager to change strategies).

88.     One of the key findings in a study conducted by *Morningstar* was that:

> Actively managed funds have generally underperformed their
> passive counterparts, especially over longer time horizons, and
> experienced high mortality rates (*i.e.* many are merged or closed).
> In addition, the report finds that failure tends to be positively
> correlated with fees (*i.e.* higher cost funds are more likely to
> underperform or be shuttered or merged away and lower-cost
> funds were likelier to survive and enjoyed greater odds of success).

*See* Morningstar's Active/Passive Barometer: A new yardstick for an old debate, at 2 (June

2015)                              *available*                              *at*

http://corporate.morningstar.com/US/documents/ResearchPapers/MorningstarActive-

PassiveBarometerJune2015.pdf.

89.     As a result, plan fiduciaries such as Defendants here, must be continually mindful

of investment options to ensure they do not unduly risk plan participants' savings, and do not

charge unreasonable fees.  Some of the best investment vehicles to achieve these goals are

collective trusts, which pool plan participants' investments further and provide lower fee alternatives than even institutional and 401(k) plan specific shares of mutual funds. However, even collective trusts, commingled accounts, and separate accounts,[3] must be continually evaluated to ensure that plan participants are not paying higher fees than necessary with respect to their investments.

90.    Plan fiduciaries must also be wary of conflicts of interest that arise when they retain proprietary funds as investment options for the plans they administer. The inherent conflict of interest in such situations can cause proprietary funds to be selected when they are not prudent investment options, and can cause those same funds to remain as investment options despite their excessive fees.

91.    In fact, one recent Pension Research Council working paper found in a study of such situations that "[a]ffiliated funds are more likely to be added and less likely to be removed from 401(k) plans" especially for the worst performing funds. *See* Pool, Veronika, Clemons Sialm, and Irina Stefenescu, *It Pays to Set the Menu: Mutual Fund investment Options in 401(k) Plans*, at 2 (May 2015), available at https://www.federalreserve.gov/econresdata/feds/2014/files/201496pap.pdf.

92.    The fact that fiduciaries may have "superior information about their own proprietary funds" does not correlate to improved performance. *Id* at 3. "[A]ffiliated funds that rank poorly based on past performance but are not deleted from the menu do not perform well in the subsequent year" and thus "the decision to retain poorly-performing affiliated funds is not driven by information about the future performance of these funds." *Id*. at 3, 26.

---

[3] Collective trusts, commingled accounts, and separate accounts are all investment options which, unlike mutual funds, are not subject to certain regulations by the federal government. As a result, these options have less administrative fees and are often significantly cheaper alternatives to mutual funds.

93.    Given the vulnerability of plan participants, who are presented a menu of very limited choices but who are dependent on the retirement income earned by those choices, plan fiduciaries must be particularly vigilant about the selection and maintenance of affiliated, and/or proprietary funds in their 401(k) plans.

**B.    Defendants' Breaches of Fiduciary Duty**

**(1)    Defendants Breached their Fiduciary Duties by Failing to Minimize Expenses and Allowing Excessively-Costly Investments to Remain in the Plan for Years**

94.    The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor plan investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015).  In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."  *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

95.    The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ."  135 S. Ct. at 1828 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)).  The official comment explains that "'[m]anaging' embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments."  *Id*. § 2 comment.

96.    As described *supra*, one of the responsibilities of the Plan's fiduciaries is to utilize and retain investment options which have reasonable and not excessive fees for the performance and quality of service received, and to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007).  *See also* Restatement

(Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing Plan investments to determine whether any of the Plan's investments are "improvident," or if there is a "superior alternative investment" to any of the Plan's holdings.  *See Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

97.    As the amount of assets under management approaches and exceeds $1 billion, economies of scale dictate that lower cost investment options will be available to defined contribution plans.  When large plans, which those with over $1 billion in assets clearly are (such as the Plan here), have options which approach the retail cost of shares for individual investors or simply have options that are more expensive than the average institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

98.    Because economies of scale make mutual fund alternatives such as collective trusts and separate accounts more attractive, these alternatives have become the norm in larger plans.  As of 2012, among the plans with over $1 billion of assets under management, more assets were held in collective trusts than in mutual funds.  *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 21, 23 (Dec. 2014), *available at* https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.  In plans with over $5 billion in assets, such as the Plan, as of 2015 88% of assets were held in separate accounts or collective trusts.  *See* Robert Steyer, *Use of CITs in DC Plans Booming, Rises 68% since 2008*, PENSIONS & INVESTMENTS    (Feb.    22,    2016),    *available    at*

http://www.pionline.com/article/20160222/PRINT/302229985/use-of-cits-in-dc-plans-booming-

rises-68-since-2008.

      (a)      **Heavy Use of Proprietary Funds Cost Plan Participants Millions in Excessive Fees**

99.    According to the Plan's Form 5500s filed with the Department of Labor during the Class Period, from years 2010 through 2015, approximately half of all its investment options were proprietary investment vehicles managed by the Bank, or by another subsidiary of JPMorgan Chase.  Similarly, seven investment vehicles[4] were managed by BlackRock, which received compensation via investment management fees and other payments from the Plan for its management of these funds.  At all times during the Class Period, approximately 72% of the Plan's portfolio was being managed either by a JPMorgan Chase affiliate, or by companies such as BlackRock, which maintain lucrative business arrangements with JPMorgan Chase and its affiliates.

100.    As noted above, during the Class Period, the total assets under the management of the Plan's portfolio ranged between $14.64 billion and $20.94 billion, qualifying the Plan as a "jumbo plan," readily capable of accessing a variety of investment products, including collective trusts, comingled account and separate accounts, and securing the lowest fees on the market while also being provided the highest level of service.

101.    A single committee comprised of JPMorgan Chase executives, the EPIC, is responsible for the review and selection or removal of all the investment options available for the $20.9 billion in assets under the management of the Plan as of December 31, 2015.  Because

---

[4] The Emerging Market Equity Index Fund, International Small Cap Index Fund, International Large Cap Index Fund, Large Cap Growth Index Fund, Large Cap Value Index Fund, S&P 500 Index Fund, and Small Cap Index Fund.

each member of the EPIC is also a JPMorgan Chase employee, they have an inherent conflict of interest in impartially reviewing the investment advice from an affiliated company.

102.    While facially, the Bank has in place a system of review for each investment option, via the EPIC, by appointing its own executives and those of its affiliates to oversee the Plan's investments, as well as relying on the investment advice of its own affiliate, JPMIM, the Bank has undermined the system so that a true impartial review of all investment options is not possible.  Instead, company bias has been "baked into" the system, leading to higher fees paid to the Bank, its affiliates and business partners, all to the detriment of the Plan's participants.

103.    JPMIM is also the fund manager of one of the investment options in the Plan, the Small Cap Core Fund.  The other JPMorgan Chase branded investments are managed by the Bank itself.  Because the fees for these investments are charged as a percentage of the assets under management, JPMorgan Chase affiliates are not incentivized to reduce fees, or to critically review the Plan's portfolio to ensure that the costs associated with the investment options are reasonable.  This conflict of interest is in no way minimized by the use of the EPIC, the Named Fiduciary, which is comprised of JPMorgan Chase executives.

104.    The Bank utilizes a department within itself, the Global Investment Management Solutions – Global Multi-Asset Group, as the fund manager for the Target Date and several fixed income investment options in the Plan's portfolio.  Although this department is characterized as a department within the Bank in the Fee Disclosures given to Plan participants, this group is a part of JPMorgan Chase's investment management business, working in conjunction with JPMIM.

105.    As described on their website[5], JPMIM is a sophisticated investment manager.

---

[5] The website describes the expertise and services of J.P. Morgan Asset Management, the brand for the asset management business of JPMorgan Chase and its affiliates worldwide.  In the United States, that

> J.P. Morgan Global Institutional is distinguished by its capital markets knowledge, global investment expertise and the long-term, proactive partnerships it establishes with clients.  Our investment strategies span equity, fixed income, real estate, private equity, hedge funds, infrastructure and asset allocation.

*See* https://am.jpmorgan.com/us/institutional/about-us.

106.    That capital markets knowledge is defined as:

> Our seasoned strategists translate macro trends and connect the markets with clients and their portfolios across varying economic cycles and regions.   We share insightful, ongoing thought leadership, including original research, commentary, and analyses of financial and economic environments and their impact on client portfolios.   We provide access to J.P. Morgan's entire global organization, including business leaders, subject matter experts, solutions and strategies.

*See id.*

107.    Despite this purported expertise, and the use in the Plan's portfolio of more sophisticated investment vehicles like collective trusts, JPMIM failed to recommend, with regard to the Plan, measures that would enhance the cost-efficiency of the Plan's investment options, such as the removal of expensive, actively managed funds in favor of a passively-managed index fund, changing the format of two of the Bank's own mutual funds into a commingled or separate account, or negotiating a lower investment management rate from BlackRock in light of the fact that BlackRock was at all times during the Class Period managing at least $3 billion of the Plan's assets.

108.    The Bank and BlackRock have a longstanding business arrangement, in which BlackRock passively manages all the index fund investments of the investment products managed by the Bank and JPMIM.  Moreover, on or around January 25, 2017, BlackRock

---

affiliate is JPMIM.   *See* https://am.jpmorgan.com/us/institutional/about-us.    J.P. Morgan Global Institutional is another brand name used by the asset management businesses of JPMorgan Chase.

moved $1 trillion of its assets under management to the Bank and its affiliates, from which JPMorgan Chase affiliates stand to earn tens of millions of dollar annually in fees.[6]    This business arrangement, in which BlackRock receives management fees while lending its expertise to products that the Bank and JPMIM market and sell under their own names, also prevented the Bank, the EPIC, and JPMIM from critically reviewing the fees or performance of the BlackRock branded investments.

109.    These products include the Target Date Funds included in the Plan for the entirety of the Class Period.  Although constructed and maintained by the Asset Management Solutions – Global Multi-Asset Group at the Bank, the investments within the Target Date Funds are mostly funds managed by BlackRock.  Taken in addition to the seven other BlackRock managed funds in the Plan, discussed *supra*, BlackRock managed options make up about half of the investment options in the Plan's portfolio.

110.    This flooding of the Plan with BlackRock investment options was the result of a business arrangement between BlackRock and JPMorgan Chase and/or its affiliates, whereby in return for access to the Plan, BlackRock shared management or performance fees with the Bank and/or an affiliate.

111.    As a result, the investment management fees paid by Plan participants for over 70% of the Plan's options were directed to the Bank, or its affiliates and/or business partners, as represented by the following graphic:

---

[6] *See* Sabrina Willmer, Charles Stein & Hugh Son, *BlackRock's $1 Trillion JPMorgan Move Shows Cost Strategy*, Bloomberg, Jan. 25, 2017, *available at* https://www.bloomberg.com/news/articles/2017-01-25/blackrock-to-move-1-trillion-to-jpmorgan-from-state-street.



112.    In 2015, JPMorgan Chase was investigated by the Securities Exchange Commission ("SEC") for the similar improper steering of the clients' assets by the Bank's asset-management unit into proprietary investments in order to generate fees for itself rather than recommending the best product for its clients' needs.  *See* Neil Weinberg, *JPMorgan Execs Said Deposed in SEC Asset-Management Probe*, Mar. 31, 2015, Bloomberg.com, *available at* http://www.bloomberg.com/news/articles/2015-03-31/jpmorgan-execs-said-deposed-in-sec-asset-management-probe; *JPMorgan under investigation over fund sales*, Bloomberg News, May 6,                            2015,                        *available*                        *at* http://www.investmentnews.com/article/20150506/FREE/150509962/jpmorgan-under-investigation-over-fund-sales.

113.    In December 2015, the SEC announced that both the Bank and an affiliate, J.P.

Morgan Securities LLC, had agreed to pay $267 million and admit wrongdoing in failing to

disclose their conflict of interest to clients.   The Bank also agreed to pay an additional $40

million penalty to the U.S. Commodity Futures Trading Commission related to those same

activities.   *See J.P. Morgan to Pay $267 Million for Disclosure Failures*, Dec. 18, 2015,

*available at* https://www.sec.gov/news/pressrelease/2015-283.html.

114.    In announcing this settlement, Andrew J. Ceresney, Director of the SEC

Enforcement Division said[7]:

> Firms have an obligation to communicate all conflicts so a client can fairly
> judge the investment advice they are receiving.   These J.P. Morgan
> subsidiaries failed to disclose that they preferred to invest client money in
> firm-managed mutual funds and hedge funds, and clients were denied all
> the facts to determine why investment decisions were being made by their
> investment advisors.

*Id.*

115.    Among the wrongdoing found by the SEC and admitted to by the Bank, the Bank

did not disclose its preference to invest into third-party managed hedge-funds that shared

management or performance fees called "retrocessions" with a Bank affiliate.   *Id.*

116.    Upon information and belief, a similar arrangement existed between BlackRock

and the Bank for the BlackRock managed options in the Plan.   Because Plan participants are

limited to the investment menu selected for them, using BlackRock for half of the Plan's

investment options ensured that BlackRock would receive significant management fees from

---

[7] J.P. Morgan does not have any duty to put its ***clients'*** interest before its own in providing brokerage or
investment advice, ***but*** it has fiduciary duties towards an ERISA beneficiary/plan participant.
Furthermore, the mere disclosure of a conflict of interest to a beneficiary is not sufficient under ERISA,
which mandates that a fiduciary consider the beneficiaries' interest before its own and also mandates a
duty of loyalty.

Plan participants, and in turn, move a significant portion its own assets under management to the custody of JPMorgan Chase and/or its affiliates.

117.    While the SEC investigation was ongoing in 2015, a comprehensive review of the Bank's proprietary options and BlackRock managed options in the Plan was finally undertaken by the EPIC.  As a result, a series of changes to both the proprietary and BlackRock options began to be instituted in the fourth quarter, beginning in November 2015.  The result was that fees were reduced significantly for each Bank, JPMIM or BlackRock managed investment option in the Plan's portfolio.

118.    As each one of these investment options was managed either by the Bank, an affiliate, or its business partner BlackRock, the management fee reductions which began on November 6, 2015 and ended on April 1, 2016 were within the capabilities of Defendants to undertake prior to November 6, 2015.

119.    Upon information and belief, the changes were not made at an earlier time however, because there was no standardized, routine, critical review of the Plan investment options by impartial, unbiased fiduciaries, and/or the Defendants were incentivized not to undertake such a review because they and/or the affiliated companies were profiting from the higher fees charged to the Plan.  Throughout the Class Period, Defendants with the responsibility to do so (as alleged herein) could have selected non-affiliated investment options comparable to the proprietary and/or affiliated options discussed below, at a significantly reduced cost to Plan participants, but they chose not to do so because of their imprudent, disloyal, and self-interested practice of favoring investment options managed by the Bank or its affiliates or third-party funds in which the Bank was self-interested or otherwise conflicted.

120.   As a result, Plaintiffs and the Plan participants were overcharged for investment options managed by the Bank, JPMIM, and BlackRock by at least $34.4 million since 2010.

**(b)   Mid Cap Value and Mid Cap Growth Funds**

121.   Prior to November 6, 2015, the Plan offered two investment options in the Mid Cap Asset Class:  a Mid Cap Value Fund managed by Earnest Partners, LLP; and a Mid Cap Growth Fund managed by JPMIM.  Upon information and belief, the Mid Cap Value Fund was a separately managed account while the Mid Cap Growth Fund was a mutual fund.  During the Class Period, the Plan had between $301 million and $584 million in Plan assets invested in the Mid Cap Growth Fund, and between $290 million and $525 million in Plan assets invested in the Mid Cap Value Fund.

122.   The Mid Cap Growth Fund was managed by JPMIM and charged approximately 93 basis points per year.  Approximately 59 basis points of these fees were paid to JPMIM on a periodic basis for serving as the fund's investment adviser.  The remaining fees within the fund were paid to JPMorgan Distribution Services, Inc. and JPMorgan Funds Management Inc. — both wholly owned subsidiaries of JPMorgan Chase—on periodic basis for the provision of administrative and shareholder servicing agent services.

123.   Both of the Mid Cap Funds were actively managed funds which sought to beat the market indexes.  As a result of the active management, they had high fees for the Plan portfolio which were well above the median.  In fact, the Mid Cap Growth Fund was by far the most expensive option in the Plan, charging 93 basis points[8], and the Mid Cap Value Fund was the fourth most expensive option, charging 42 basis points, as can be seen in the following chart:

---

[8] In fact, the Mid Cap Growth Fund's annual expense ratio was between 111 and 120 basis points, but with waivers, the charge to Plan participants was 93 basis points.  However, waivers in expenses are not guaranteed and can be revoked at any time, meaning that despite the past charges, at any time while Plan participants were invested in this option, charges could be increased.  An investigation of actively-



124.    On November 6, 2015, the EPIC removed both the Mid Cap Growth Fund and the Mid Cap Value Fund from the Plan, and replaced them with the S&P 400 Mid Cap Index Fund run by State Street Bank and Trust Company.  Plan participants were given notice in October 2015 of the coming change.  Those with investments in Mid Cap Growth Fund and the Mid Cap Value Fund had the option of choosing a new allocation for those investments or, if they did nothing, their investments in the Mid Cap Funds would be automatically mapped to the new Mid Cap Fund.

125.    The S&P 400 Mid Cap Index Fund charged annual fees of 4 basis points, which was both a result of the passively managed nature of the fund as well as the fact that the Plan had over a half a billion invested in the Mid Cap asset class investments that the new fund would be replacing.  The sheer amount of the assets under management allowed the Plan, through its fiduciaries, to secure a very low cost alternative without sacrificing performance.

---

managed alternatives within the marketplace would have revealed that numerous actively-managed mid-cap growth mutual funds from companies such as Vanguard, T. Rowe Price, and Prudential were available that would have offered comparable or superior investment management services with costs that were at least thirty percent lower than those charged by the Mid Cap Growth Fund.  Even less expensive collective trust and separate account options were available.

126.    As the S&P 400 Mid Cap Index Fund is a passively managed fund which merely tracks the performance of the S&P 400 Mid Cap Index, its performance is similar to that of the index itself.  Although the Fund within the Plan was a Plan-specific fund, State Street-managed Mid Cap Index Funds have been outperforming their benchmark consistently for years.

127.    For example, the SSgA S&P Mid Cap Index Securities Lending Series Fund outperformed its benchmark in both the near and long term as of June 30, 2012,[9] as illustrated below:

### Performance

| Total Returns | Fund | Benchmark |
| --- | --- | --- |
| Q2 2012 | -4.88% | -4.93% |
| YTD | 7.97% | 7.90% |
| 1 Year | -2.22% | -2.33% |
| 3 Year | 19.41% | 19.36% |
| 5 Year | 2.62% | 2.55% |
| 10 Year | N/A | N/A |
| Inception to Date (Dec 2004) | 6.83% | 6.77% |
| Best Year Since Inception (2009) | 37.32% | 37.38% |
| Worst Year Since Inception (2008) | -36.14% | -36.23% |

128.    A reasonable and timely investigation into the alternatives available to the Plan would have revealed this information.[10]

---

[9] Data on collective investment trusts is generally not publically available.  However, the positive performance of the SSgA S&P Mid Cap Index Fund has continued in subsequent years, tracking the performance of the subject index.

[10] Notably, other significantly less expensive non-affiliated investment options than the Mid Cap Value Fund and the Mid Cap Growth Fund were also available during the Class Period. For example,  the Vanguard Mid-Cap Growth Index Fund Admiral shares (VMGMX) – a passively managed mutual fund with similar investment strategies – has an annualized expense ratio of 8 basis points, more than 90% less than what was charged by the Mid Cap Growth Fund, while the Vanguard Mid-Cap Value Index Fund Admiral Shares (VMVAX) – a passively managed mutual fund with similar investment strategies – has an annualized expense rate of 8 basis points, almost 81% less than what was charged by the Mid Cap Value Fund.

129.    As a result of the belated change, Plan participants who invested in the Mid Cap Value Fund saw the expenses on their invested money drop 90%, from 42 to 4 basis points. Plan participants invested in the Mid Cap Growth Fund saw expenses on their invested money decrease from 93 basis points to 4 basis points, a 96% fee reduction.



130.    A prudent and impartial fiduciary would have reviewed the Plan's portfolio as well as investigated the availability of lower-cost alternatives within the marketplace, which would have resulted in replacement of the actively managed Mid Cap asset class funds with the Mid Cap Index Fund years before the Plan ultimately made this change.[11]    Defendants' imprudent, disloyal, and self-interested failure to review the Plan's investment portfolio and make these changes sooner cost Plan participants millions in unnecessary fees.

---

[11] Defendants' imprudence and disloyalty is further demonstrated by the investment related decision-making of fiduciaries of similarly-sized plans:  as of the end of 2014, among the over 740 defined-contribution plans with over $1 billion in assets, only one plan held the JPMorgan Mid Cap Growth mutual fund – the Plan.  Because of how separate accounts are reported on Form 5500s, it is not possible to discern whether any other plans with over $1 billion in assets were invested in the EARNEST Partners Mid Cap Value separate account.

(c)     **Small Cap Core Fund**

131.    Prior to December 18, 2015, the Plan offered the Small Cap Core Fund as a mutual fund investment option.  During the Class Period, the Plan had between $355 million and $597 million in Plan assets invested in the Small Cap Core Fund.  This investment option was managed by JPMIM and charged annual expenses of 83 basis points.[12]  Approximately 65 basis points of these annual fees were paid to JPMIM on a periodic basis for serving as the fund's investment adviser.  The remaining fees within the fund were paid to JPMorgan Distribution Services, Inc. and JPMorgan Funds Management Inc. —both wholly owned subsidiaries of JPMorgan Chase—on a periodic basis for the provision of administrative and shareholder servicing agent services.

132.    Before the changes to the Mid Cap asset class investment options, the Small Cap Core Fund was the second most expensive option in the Plan's portfolio.  Following the Mid Cap asset class changes, the Small Cap Core Fund became the most expensive option in the portfolio, as shown in the following chart:

---

[12] In fact, the Small Cap Core Fund's annual expense ratio was between 115 and 121 basis points, but with waivers, the charge to Plan participants was 82 to 83 basis points.  However, as noted above waivers in expenses are not guaranteed and can be revoked at any time, meaning that despite the past charges, at any time while participants were invested in this option, charges could be increased up to 120 basis points.



133.    As of December 19, 2015, the Small Cap Core Fund was transformed from a mutual fund format to a separate account format.  In so doing, the Fund greatly reduced administration and record-keeping fees.  Further, JPMorgan Chase began to pay the remaining investment manager costs so that these expenses would not be charged to the Fund or to Plan participants.

134.    As a result, the annual expenses for this investment decreased from 82 basis points to zero, a 100% fee reduction.



135.    In all other respects, the Small Cap Core Fund remains substantially the same, including with respect to its investment strategies.

136.    A prudent and impartial fiduciary would have reviewed the Plan's portfolio and conducted a reasonable investigation of marketplace alternatives to the Small Cap Core Fund, which would have led to a significant reduction in the fees paid by Plan participants – through a lower-cost alternative or a switch to a collective trust or separate account structure[13] – years before the December 2015 fee reductions took place.

137.    For example, had Defendants performed a reasonable investigation of alternatives to the Small Cap Core Fund, given the amount of assets held in the Small Cap Core Fund, they would have discovered that they could have:  (i) utilized a passively-managed small cap mutual fund that would have cost at least ten times less than the fees within the Small Cap Core Fund; (ii) utilized actively-managed small cap blend mutual funds from companies such as Vanguard and Dimensional Fund Advisors that cost at least 25 percent less than the Small Cap Core Fund; and (iii) hired numerous investment advisors including Massachusetts Financial Services, Columbia Management, and Goldman Sachs Asset Management, to manage a separate account holding small company stocks that would have cost at least 25 percent less than the fees charged by the Small Cap Core Fund.

138.    The failure of the Plan's fiduciaries to review the portfolio, conduct a reasonable investigation of the investment alternatives, and act upon this information sooner, cost Plan participants millions in unnecessary fees.

---

[13] For example, JPMIM offered the U.S. QDV Small Cap Core Separate Account at a cost of 65 basis points for the first $50 million under management for most of the Class Period.

    (d)    **Core Bond Fund**

139.    Prior to March 11, 2016, the Plan offered the Core Bond Fund as a mutual fund investment option.  During the Class Period, the Plan has between $360 million and $472 million in Plan assets invested in the Core Bond Fund.  This investment option was managed by JPMIM and charged annual expenses of between 35 and 40 basis points[14], 29 basis points of which were paid to JPMIM for acting as the fund's investment adviser.  The remainder of the expenses was paid to JPMorgan Distribution Services, Inc. and JPMorgan Funds Management Inc.—both wholly owned subsidiaries of JPMorgan Chase—on a periodic basis for the provision of administrative and shareholder servicing agent services.  The Core Bond Fund was the fourth most expensive investment option in the Plan shortly before its removal, as shown in the following chart:



140.    As of March 12, 2016, the Core Bond Fund was transformed from a mutual fund format to a commingled account format.  This was accomplished by changing the investment

---

[14] In fact, the Core Bond Fund's annual expense ratio was between 41 and 48 basis points, but with waivers, the charge to Plan participants was less.  However, as noted above, waivers in expenses are not guaranteed and can be revoked at any time.

from the R6 share class of the JPMorgan Core Bond Fund, as managed by JPMIM, to units of the Commingled Pension Trust Fund (Core Bond), as managed by the Bank. The commingled fund invested in "substantially similar intermediate and long-term debt securities as the mutual fund." *See* Fund Change Bulletin dated February 2016, at 2.

141.    The change in the investment led to the elimination of fees. As stated by the notice sent to Plan participants, "[i]n evaluating whether to continue to invest in, or make a new investment in, the Core Bond Fund subsequent to this change, participants should understand that the investment management fees/annual expenses will no longer be charged against the Fund's performance." *Id.*

142.    As a result, the annual expenses for this investment decreased from 36 basis points to zero, a 100% fee reduction.



143.    A prudent and impartial fiduciary would have reviewed the Plan's portfolio and investigated alternatives to the Core Bond Fund prior to the March 2016 fee reduction. Such a review and investigation would have revealed the availability of lower-cost alternatives in the marketplace, including the possibility of utilizing a separate account structure also managed by

JPMIM.  The Plan fiduciaries' failure to review the portfolio, conduct a reasonable investigation of alternatives to the Core Bond Fund, and act upon this information has cost the Plan participants millions in unnecessary fees.

144.    Based upon the published fee schedules of JPMorgan Investment Management Inc., and given the amount of money in the fund, the Plan's fiduciaries could have hired JPMorgan to manage this money in a separate account structure for at least 40 percent less than participants were charged within the Core Bond Fund.  Several other high-caliber fixed income active managers such as Baird Advisors and Metropolitan West (as well as many others) would have provided similar investment management services in a separate account structure for at least a 40 percent discount, given the amount of assets held in the Core Bond Fund and these firms published fee schedules.  Actively managed mutual funds from companies such as Vanguard, SEI, and Dimensional Fund Advisors would have similarly cost at least 40 percent less than the amount Plan participants paid in the JPMorgan Core Bond Fund prior to the 2016 price reduction.[15]

145.    Defendants' failure to review the portfolio, investigate alternatives to the Core Bond Fund, and act upon this information sooner cost Plan participants millions in unnecessary fees.

(e)    **Target Date Funds and BlackRock Managed Funds**

146.    Prior to April 1, 2016, the Plan offered a variety of investment options managed by BlackRock in collective trust vehicles, including the index fund investments which were a

---

[15] Another non-affiliated investment option comparable to the Core Bond Fund that Defendants could have selected was the Vanguard Total Bond Market Index Fund Admiral Shares (VBMFX) – a passively managed fund with similar investment strategies – which had an annualized expense ratio of 6 basis points, 85% less than what was charged by the Core Bond Fund.

part of the Target Date Funds[16] actively managed by the Bank.    These investments had annual

expenses of 7 to 18 basis points, but included over half the investment options in the Plan as can

been seen by the following chart:



147.    BlackRock thus managed well over $3 billion of the Plan's assets at all times

during the Class Period.

148.    As of April 1, 2016, investment management fees for all of the BlackRock

managed investments and for all of the Target Funds were *reduced by 18% to as much as 40%*,

depending on the investment, as illustrated in the following chart:

---

[16] Target Date Funds are investment options which have a "mix of underlying investment funds across a broad range of asset classes."  *See* JPMorgan Chase 401(k) Savings Plan Investment Fund Profiles, attached hereto as Exhibit 3, at 11.  They are fully diversified investments that seek a total return for a particular target date of retirement.  Included in these funds are investments in index funds.  Although the Bank, via its Global Investment Management Solutions – Global Multi-Asset Group actively managed the Target Date Funds, BlackRock passively managed the index funds included in the investments of the Target Date Funds.



149.    Despite being able to do so earlier because of their knowledge of asset management through their business, the Plan's fiduciaries were able to leverage the sizable investments in BlackRock managed investments long before this belated cost reduction, to negotiate and receive more favorable investment management fees.

150.    Moreover, the market information available to large institutional investors such as the Plan prior to the April 2016 changes demonstrate that lower cost but otherwise identical investments to the BlackRock products within the Plan's portfolio were available years earlier.

151.    As an example, as of June 30, 2012, the following funds were available from State Street Global Advisors in a collective trust vehicle, which have lower fees than both the prior and the current fees charged by the BlackRock products held by the Plan:



152.    As of June 30, 2012, given the hundreds of millions of dollars held in each of the BlackRock products, the Plan's fiduciaries could have utilized State Street collective trust options at the much lower fee levels shown above.

153.    Moreover, because all of these options are passively managed, tracking the same index funds, their performance would have been similar.  In fact, State Street Index funds tend to outperform their benchmarks slightly (by approximately a tenth of a percent, on average), making them ideal investment options for large plan such as the Plan here.

154.    This belated fee reduction is particularly crucial for those Plan participants invested in the Target Date Funds, which, as noted above, are the default investment for anyone who contributes to the Plan and does not make their own election.  Participants in these Target Date Funds saw their fees decrease between 18% for those in the Target Date Income Fund all the way to 30% for those in the Funds with Target Dates from 2040 to 2055.  Had this fee change occurred several years earlier, as it would have if the Plan's fiduciaries had acted

prudently and loyally as ERISA mandates, participants would have enjoyed millions of dollars of additional retirement benefits.

155.    A prudent and loyal fiduciary would have reviewed the Plan's portfolio and investigated the investment alternatives within the marketplace so as to leverage the size of the Plan's investment in BlackRock managed investment vehicles much sooner.

156.    Alternatively, if the Defendants had looked at the available information regarding lower-cost alternatives with similar performance prior to the SEC's investigation of their self-dealing with client money, Plan participants would have seen a reduction in fees years sooner.

157.    The Plan fiduciaries' failure to review the portfolio and make these changes sooner cost Plan participants millions in unnecessary, overly-expensive fees.

**(2)    Defendants Breached their Fiduciary Duty by Failing to Use All the Tools Available to Reduce Fees While Providing the Same Investments**

158.    As explained by the Wall Street Journal, collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds, and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and can neither advertise nor issue formal prospectuses.  As a result, their costs are much lower, with little or no administrative costs, and little or no marketing or advertising costs.  *See* Powell, Robert, *Not Your Normal Nest Egg*, The Wall Street Journal, Mar. 17, 2013, *available at* http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.    Collective trusts fees in fact can be between 15 to 60 basis points lower than the same asset class mutual fund.

159.    Another feature of collective trusts is that they are customizable to a particular employer.  "Plan sponsors can work with banks and trust companies to create a target-date fund

that has a specific asset allocation or glide path built around its workforce and employee-benefit package." *Id.*

160. Defendants were at all times during the Class Period aware of the benefits of collective trust vehicles compared to mutual funds. Most of the investments within the Plan were in fact collective trusts. But given the massive size of the Plan, as fiduciaries, Defendants could have garnered much lower fees for the collective trusts. The only mutual fund options were three proprietary funds: the Core Bond Fund; the Mid Cap Growth Fund; and the Small Cap Core Fund. These three funds had some of the highest fees in the Plan's entire portfolio.

161. Rather than use their unique position and purported investment expertise to benefit the Plan and its participants by offering these same asset class investments in a collective trust, separate account, or commingled account, Defendants instead opted to offer the higher cost proprietary mutual funds because of the benefit they returned to Defendants and their affiliated companies.

162. Belatedly, each of these options was either removed from the Plan's investment menu or transformed into a separate or commingled account, reducing fees paid by participants by 90% to 100%.

163. The decision to keep the proprietary and/or affiliated mutual funds as Plan investment options instead of offering these investments in alternative investment vehicles cost the Plan's participants millions of dollars in excess fees over the course of the Class Period.

164. Defendants also failed to remove duplicative investments from the Plan. Prudent management of a plan's investments requires removal of unnecessary or duplicative funds, especially where one of the funds has significantly higher costs than the other because investors

are likely to falsely "diversify" by splitting an investment between multiple investments in the same asset class.[17]

165.    For example, at all times during the Class Period there were five Large Cap Domestic Equity investment options.   Within that group, there were two Large Cap Value investment options and two Large Growth investment options, with one option being significantly more expensive than the other.   This only encouraged Plan participants to falsely diversify by splitting their investment and unnecessarily paying higher fees.

### (3)    Defendants Breached their Fiduciary Duty to Avoid Conflicts of Interest and Engaged in Prohibited Transactions

166.    By retaining the mutual funds run by affiliated companies, Defendants have acted at all times in the interest of JPMorgan Chase and/or its affiliates, such as the Bank, and have not acted solely in the interests of the Plan participants as is required of a fiduciary under ERISA, who has a duty to serve the Plan loyally with an "eye single" to the Plan.   *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993); *John Blair Comm. Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 2 F. 3d 360, 367 (2nd Cir. 1994); 29 U.S.C. § 1104(a)(1)(B).

167.    Defendants have a conflict of interest that prevented them from carrying out their fiduciary duties as required by ERISA.   Despite this conflict of interest, Defendants have failed to appoint non-conflicted fiduciaries who could carry out their duties to protect the Plan participants in a manner consistent with ERISA or to take other appropriate steps to address the conflict.

---

[17] Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes? An Experiment on Mutual Fund Choice*, 162 U. PA. L. REV. 605, 623, 636-38 (2014).   *See also* James J. Choi, *et al.*, *Why Does the Law of One Price Fail? An Experiment on Index Mutual Funds*, 23 Rev. Fin. Stud. 1405 (2010).

168.    As previously discussed, JPMorgan Chase is both a fiduciary of the Plan and a party in interest, with the ability to change the Plan and the duty to monitor those whom it appoints to administer and service the Plan.  Its employees comprise the membership of the EPIC, which selects and maintains investment options within the Plan, as well as that of the Selection Committee.  Its employee is the Plan Administrator.  Further, it is also a party in interest, by virtue of being of a Plan employer.

169.    Similarly, the Bank is a fiduciary of the Plan, being, among other things, the Plan Sponsor and possessing the ability to change the Plan and the duty to monitor those whom it appoints to administer and service the Plan.  The Bank is also a party in interest, being a Plan employer, and providing services to the Plan, including that of Plan Trustee and as an investment manager of several investment options.

170.    JPMIM is also a fiduciary of the Plan, by virtue of its status as the Plan's Investment Advisor.   JPMIM is also a party in interest, managing the Core Bond Fund, while at the same time being entangled with the Bank's internal department for investment management.[18]

171.    By placing Bank and/or JPMIM-managed investment options within the Plan and then maintaining them, JPMorgan Chase, the Bank and JPMIM all engaged in prohibited transactions because they received assets from the Plan.  JPMorgan Chase, through its employees on the EPIC, directed that Bank and/or JPMIM-managed investment options be placed in and maintained in the Plan.  The Bank and JPMIM recommended these investment options to the EPIC and then received fee income from the Plan assets allocated to these investment options.  JPMorgan Chase then subsequently received a portion of this fee income when payments were made to it from its subsidiaries, the Bank and JPMIM.

---

[18] Upon information and belief, JPMIM may also be a Plan employer.

**(4)    Defendants Failed to Accurately Disclose the Identity, Risks and Fees of Designated Investment Alternatives Within the Plan**

172.    ERISA imposes a duty on plan administrators to provide to plan participants on a "regular and periodic basis" sufficient information regarding "fees and expenses, and regarding designated investment alternatives, including fees and expenses attendant thereto," so that participants can make informed decisions regarding their individual accounts.  29 C.F.R. § 2550-404a-5(a).

173.    In order to satisfy this requirement, a plan administrator must accurately disclose (1) the "identification of any designated investment alternatives offered under the plan," (2) the "identification of any designated investment managers," (3) "an explanation of any fees and expenses for general plan administrative services…not reflected in the total annual operation expenses of any designated investment alternatives," (4) "at least quarterly, a statement" reflecting the dollar amount and nature of those administrative expenses "actually charged," (5) "the name of each designated investment alternative," and (6) the "shareholder-type" fees and "the total annual operating expenses of the investment expressed as a percentage" fee, otherwise known as an expense ratio. 29 C.F.R. § 2550-404a-5(b)-(d).

174.    For designated investment alternatives that are registered under the Investment Company Act of 1940 (*i.e.* mutual funds), the annual operating expenses are that of all asset-based charges before waivers and reimbursements.  For designated investment alternatives that are not registered under the Investment Company Act of 1940 (*i.e.* collective investment trusts, separate accounts, etc.), the annual operating expenses are the sum of "the management fees…that reduce the alternative's rate of return," "the distribution and/or servicing fees…that

reduce the alternative's rate of return," and "any other fees or expenses….that reduce the alternative's rate of return, excluding brokerage costs."   29 C.F.R. § 2550-404a-5(h)(5)(ii).

175.   At all times during the Class Period, the Target Date Funds within the Plan were not only designated investment alternatives, they were the default investment alternatives for Plan participants.  These Funds were managed by the Bank as separate account "Fund of Funds," investing the Fund assets in other investment options in order to achieve a total return as of the date listed in the Fund's title.

176.   The underlying investments, their fees and expenses, and the accurate total of those fees and expenses of the Target Date Funds were never fully disclosed to Plan participants as required by ERISA.  While a listing of the Top 25 Holdings in each fund was available, the full names, managers, expenses and fees of these investments were not disclosed to Plan participants during the Class Period.

177.   For example, in 2015, the Plan documents disclosed that the Target Date 2020 Fund invested in "Developed Real Estate Index Fd F."  While also disclosing that BlackRock managed all index "funds" within the Target Date Funds, every other listed index "fund" in Target Date 2020's disclosure designates that Fund as a BlackRock Fund.  .

178.   Similarly, the disclosure also states that the Target Date 2020 Fund invested in "Columbia Instl High Yield Fixed Income."  It is not clear if this is the same high yield bond fund available as a designated investment alternative to Plan participants as a separate, core investment.  However, the institutional separate account offered by Columbia Management Investment Advisers, LLC as a designated investment alternative as a core investment had an annual expense of 36 basis points, far higher than the 9 basis points listed for investment in the Target Date 2020 Fund.  If they are the same underlying investment, it has not been made clear

56

to Plan participants in these vague disclosures how investment in the Target Date Fund would only cost 9 basis points while including an investment that costs other Plan participants 36 basis points.

179.    To the extent that the Plan Administrator merely relied in good faith on the information provided to it by the Bank, the investment manager of the Target Date Funds, the Bank is thus liable for these same omissions and ambiguities.

180.    The Plan Administrator also failed to accurately and clearly disclose the administrative expenses charged to Plan participants as required by ERISA.  Instead of clearly describing what, if any, administrative expenses were charged to Plan participants' individual accounts on a quarterly basis, the account statements instead included the following ambiguous language:

> No individual participant or administrative fees were charged during the period listed.

> Some of the plan's administrative fees were paid from the total annual operating expenses of one or more of the plan's investments.  Those amounts could include shareholding servicing fees, 12b-1 fees, sub-transfer agent fees or similar amounts.

*See* Exhibit 4, at 2.

181.    Taken together, this "disclosure" seems to indicate that some Plan participants did pay for the Plan's administrative expenses via "baked-in" fees on some of the designated investment alternatives within the Plan.  The amount of those fees, on which investment options they applied, and for what services they paid are all obscured.  Moreover, this "disclosure" conflates administrative fees, such as recordkeeping fees, with fees normally associated with individual investments, like 12b-1 fees.  Such ambiguity is clearly a violation of ERISA disclosure requirements.

## CLAIMS FOR RELIEF UNDER ERISA

182.    At all relevant times, Defendants were either fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) or parties in interest.

183.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

184.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through the misuse of the plan assets by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

185.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and their beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

186.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other things:

> (a)    The duty to conduct an independent and thorough investigation into, and continually to monitor the prudence of all the plan's investment

alternatives, and to make changes to the investment selections or otherwise address the characteristics of investments that have become imprudent, *Tibble v. Edison Int'l*, 575 U.S. ---, 135 S. Ct. 1823, 1828 (2015);[19]

(b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves, their affiliates, or third parties, *Bierwirth*, 680 F.2d at 271;

(c)     The duty to be cost-conscious in incurring reasonable costs in the management of an ERISA plan, when monitoring, and reviewing investments, and in devising and implementing strategies for the investment and management of plan assets, *Tibble*, 135 S. Ct. 1823, 1825 (where "petitioners claimed that a large institutional investor with billions of dollars, like the [p]lan, can obtain materially identical lower priced institutional-class mutual funds that are not available to a retail investor," the Court noted that "[a] plaintiff may allege that a fiduciary breached the

---

[19] "Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset."  *Id.* at 1823.  *See also* Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994) (the duty of prudent investing applies both to "investing and managing trust assets. . . ."). The official comment explains that "'[m]anaging' embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id.* § 2 cmt. 7B U.L.A. 21 (1995).

duty of prudence by failing to properly monitor investments and remove imprudent ones," and allowed the claims to proceed.)[20];

(d)    The duty to avoid transactions prohibited under ERISA § 406, 29 U.S.C. §1106[21]; and

(e)    The duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

187.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he

---

[20] The Restatement of Trusts makes clear that cost consciousness is fundamental to prudence in the investment function. *See* Restatement (Third) of Trusts, § 88 cmt. a. Section 88 of the Restatement cites Section 7 of the Uniform Prudent Investor Act, providing that "[w]asting beneficiaries' money is not prudent." *Id.* Accordingly, in addressing cost consciousness, the Restatement points out that fiduciaries must perform a thorough and objective cost comparison of viable investment alternatives. *Id.* § 90 cmt. h(2) and cmt. m.

[21] ERISA's prohibited transactions rules bar fiduciaries, such as Defendants here, from certain acts because they are "party in interest" violations of ERISA § 406(a), 29 U.S.C. §1106(a). Under ERISA, a "party in interest" included a fiduciary, as well as entities providing any "services" to a plan, among others. *See* ERISA § (3)(14), 29 U.S.C. § 1002(14). ERISA's prohibited transaction rules also bar fiduciaries from certain acts because they are self-interested and therefore become per se violations of ERISA § 406(b), 29 U.S.C. § 1106(b).

makes reasonable efforts under the circumstances to remedy the breach.

188.    Plaintiffs therefore bring this action pursuant to ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties and prohibited transactions by Defendants for violations under ERISA § 404(a)(1), § 404(a)(1)(B), § 405(a), and § 406(a)-(b).

### FIRST CLAIM FOR RELIEF
### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

189.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

190.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or exercised any authority or control respecting the disposition of the Plan's assets.

191.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or exercise *any* authority or control over the disposition of a plan's assets are responsible for ensuring that investment options made available to plan participants are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  Defendants were responsible for ensuring that all investments available to the Plan participants were prudent and that such investments were consistent with ERISA and the purpose of the Plan.  Defendants are liable for losses and excessive fees incurred as a result of such investments being imprudent.

192.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would

otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so. *See Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2469 (2014) ("'Trust documents cannot excuse trustees from their duties under ERISA.'") (quotation omitted).

193. Moreover, ERISA § 404 (a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

194. Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these Defendants knew or should have known that, as described herein, the proprietary mutual funds and/or the affiliated funds were not suitable and appropriate investments for the Plan. The proprietary and/or affiliated funds included in the Plan during the Class Period clearly did not serve the Plan's stated purpose because of their unduly excessive fees. Yet, during the Class Period, despite their knowledge of the imprudence of the investments, Defendants failed to take any meaningful steps to protect Plan participants from the excessive costs.

195. Defendants also breached their duties to prudently and loyally manage the Plan's assets by failing to timely remove the unduly expensive Mid Cap Value Fund, convert the structure of the Small Cap Core Fund, and to leverage the size of the Plan's investments in

BlackRock index funds to obtain the lower investment management prices. Plan participants thus paid millions more in fees than were necessary during the Class Period.

196. Defendants additionally breached their duties to prudently and loyally manage the Plan's assets by failing to have in place a method of systematic review both of the Plan's individual investment options and of the portfolio as a whole in order to ensure that the investments were suitable and appropriate for the objectives of the Plan.

197. Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the self-interest of the Bank or its affiliates, or other interested parties, in retaining the unduly expensive proprietary or affiliated fund investment options and in failing to negotiate lower fees on the Target Date and BlackRock investment vehicles due to the ongoing business relationship between the Bank, JPMIM, and BlackRock. Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

198. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of the retirement investment. Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in the proprietary or affiliated funds and thereby eliminated, or at least reduced, losses to the Plan.

199. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries and Provide Them with Accurate Information**
**(Breaches of Fiduciary Duties in Violation of § 404 by the CMDC and Selection Committee Defendants)**

200.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

201.    At all relevant times, as alleged above, the CMDC and Selection Committee Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

202.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of the CMDC Defendants was to appoint members of the Selection Committee and delegate authority to appoint the Plan Administrator, while the Selection Committee had the duty to appoint members of the EPIC.  These Defendants had the concomitant duty to evaluate, and monitor their appointed fiduciaries, whom fiduciary responsibilities were delegated.

203.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know and reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

204.    The monitoring Defendants named in this Count breached their fiduciary monitoring duties by, among other things, (a) failing to disclose the conflict of interest that existed between the Bank and the proprietary funds, the Bank and JPMIM, and JPMIM and BlackRock, who had a longstanding business arrangement with the Company and profited from

the said relationship; (b) failing to monitor and evaluate the performance of the Plan's fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered significant losses, due to the unduly excessive fees, as a result of the Plan fiduciaries' imprudent actions; (c) failing to monitor and evaluate the costs of the investment options offered by the Plan, such that the Plan lost millions of dollars to the excessive fees; (d) failing to monitor the processes and policies by which the Plan's investments were evaluated, allowing the Plan's assets to remain in the imprudent proprietary or affiliated mutual funds rather than in lower fee, similar investment vehicles or other investment alternatives such as collective trusts and allowing BlackRock to charge higher than reasonable fees during the Class Period; and (e) failing to remove fiduciaries whose performance was inadequate in that they continued to maintain imprudent and excessively costly investments within the Plan, to the detriment of the Plan and Plan participants' retirement savings.

205.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

206.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### THIRD CLAIM FOR RELIEF
### Failure to Provide Disclosures to Participants Regarding Designated Investment Alternatives
### (Violation of § 404(a)-5 by the Plan Administrator Defendants and/or the Bank)

207.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

208.    At all relevant times, as alleged above, the Plan Administrator Defendants were fiduciaries to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

209.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of these Defendants included the responsibility to ensure that Plan participants "are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses thereto, to make informed decisions with regard to the management of their individual accounts."  29 C.F.R. § 2550-404a-5(a).

210.    The Plan Administrator Defendants failed to adequately disclose to Plan participants and beneficiaries in the Plan all information regarding the investment options in the Plan by, among other things, (a) failing to disclose the identity, risks, fees and expenses of the investments in the Target Date Funds, (b) failing to provide the sum of the fees of the various investments within the Target Date Funds, (c) failing to disclose designated investment alternatives within the Plan and their comparable fees, risks, and expenses, and (d) failing to disclose the arrangements between the Plan Sponsor and BlackRock which led to the inclusion of these investments options within the Plan.

211.    As a result of the Plan Administrator Defendants' breaches of fiduciary duty, Plaintiffs and other members of the Class have unknowingly paid excessive fees and lost money on unknown investments throughout the Class Period, losses exacerbated by the designation of the Target Date Funds as the default investment for all Plan participants.

212.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, have paid excessive fees suffered the loss of the returns that would have been earned on the prudent.

213.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## FOURTH CLAIM FOR RELIEF
### Prohibited Transactions
**(Prohibited Transactions with a Party in Interest in violation of 29 U.S.C. § 1106(a)(1) by JPMorgan Chase, the Bank, EPIC, the Plan Administrator and JPMIM)**

214.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

215.     At all relevant times, as alleged above, EPIC has been a fiduciary to the Plan, within the meaning of ERISA § 3(21) (A), 29 U.S.C. § 1002(21)(A).

216.     At all relevant times, as alleged above, the Plan Administrator Defendants have been fiduciaries to the Plan, within the meaning of ERISA § 3(21) (A), 29 U.S.C. § 1002(21)(A).

217.     At all relevant times, JPMorgan Chase has been a fiduciary and/or party in interest of the Plan due to its retention of administrative and managerial power over the Plan through its Board of Directors, as well as because of the fact that the EPIC and Plan Administrator Defendants were comprised of its own high level employees.  As a result, they are a fiduciary of the Plan within the meaning of ERISA § 3(21) (A), 29 U.S.C. § 1002(21)(A).  As a Plan employer and corporate parent for a service provider to the Plan, JPMorgan Chase has also been a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

218.     At all relevant times, the Bank, as the Plan Sponsor, a Plan employer, and as a service provider to the Plan, has been a party in interest under ERISA § 3(14), 29 U.S.C. §

1002(14).  The Bank has also been a fiduciary because they are a Plan trustee and to the extent it

has rendered any investment advice with regard to the Plan, for a fee or other compensation,

direct or indirect, with respect to any Plan investments, or has had any authority or responsibility

to do so.

219.    At all relevant times, JPMIM, as a fiduciary and a service provider for the Plan,

has been a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

220.    Under ERISA 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), a fiduciary shall not cause

a plan to engage in a transaction, if he knows or should know that such transaction constitutes a

direct or indirect furnishing of services between the plan and a party in interest.

221.    Under ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), a fiduciary shall not

cause a plan to engage in a transaction, if he knows or should know that such transaction

constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest of any

assets of the plan.

222.    Defendants EPIC and the Plan Administrator Defendants violated this prohibition

on transactions between the Plan and a party in interest through their actions and omissions in

authorizing or causing the Plan to invest in the unduly expensive investment options managed by

JPMorgan Chase's affiliates, including the Bank and JPMIM, as well as BlackRock, and pay,

directly or indirectly, unduly excessive investment management and other fees in connection

therewith, thereby causing the Plan to engage in transactions that the EPIC knew or should have

known constituted a direct or indirect furnishing of services between the Plan and the parties in

interest, and/or the transfer to, or use by or for the benefit of the parties in interest, of the assets

of the Plan.

223.    As a direct and proximate result of these prohibited transactions, the Plan, Plaintiffs, and other Plan participants and beneficiaries, directly or indirectly paid millions of dollars in fees in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants, and/or unjust profits to the parties in interest.

224.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and/or ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses sustained by the Plan and/or the unjust profits received by JPMorgan Chase, the Bank, JPMIM, or BlackRock, as parties in interest, as a result of these prohibited transactions.

### FIFTH CLAIM FOR RELIEF
### Prohibited Transactions
### (Prohibited Transactions Between the Plan and a Fiduciary in violation of 29 U.S.C. § 1106(b) by JPMorgan Chase, the Bank, EPIC, the Plan Administrator, and JPMIM Defendants)

225.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

226.    At all relevant times, as alleged above, JPMorgan Chase, the Bank, the EPIC, the Plan Administrator Defendants, and JPMIM were fiduciaries to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

227.    Under ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), a fiduciary shall not deal with the assets of the plan in its own interest or for its own account.

228.    Under ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), a fiduciary shall not in its individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants and beneficiaries.

229.    Under ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), a fiduciary shall not receive any consideration for his personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

230.    As alleged above, JPMIM and JPMorgan Chase receive and collect compensation in connection with JPMIM-managed investments in the Plan.  JPMIM is the Fund Manager for the Small Cap Core Fund, a current investment option in the Plan, and the Mid Cap Growth Fund, a former investment option in the Plan, and as such, collected fees from Plan assets invested in these products.  JPMIM dealt with the assets of the Plan in its own interest and for its own accounts, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), and received consideration for its personal account in contravention of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), by receiving and collecting unduly excessive fees, in connection with its fund management services performed for the Plan, to the detriment of the Plan and its participants and beneficiaries. These transactions took place on a periodic basis throughout the Class Period when investment management and other fund-specific fees were deducted from the assets of the Plan and subsequently paid to JPMIM and wholly-owned subsidiaries of JPMorgan Chase.  Accordingly, these payments to JPMIM and to JPMorgan Chase through its subsidiaries constituted prohibited transactions in violation of 29 U.S.C. § 1106(b)(3).

231.    Similarly, the Bank received periodic payments of investment management and other fees related to its role as the investment manager of a number of investment options within the Plan, including the Target Date Funds.  Accordingly, these payments to the Bank and to JPMorgan Chase, through its subsidiary, the Bank constituted prohibited transactions in violation of 29 U.S.C. § 1106(b)(3).

232.    Defendants JPMorgan Chase (as Employers of the members of EPIC and the Plan Administrator Defendants), the Bank (as the Plan trustee and manager of a number of the Plan's funds, including the Target Date Funds), JPMIM (as the investment advisor of the Plan), EPIC (as a Named Fiduciary charged with management of the Plan's assets), and the Plan Administrator Defendants (as a Named Fiduciary charged with operation of the Plan and empowered disregard any instruction that would result in a prohibited transaction), acting on behalf of JPMorgan Chase, violated ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), by retaining the investment options managed by JPMorgan Chase affiliates and/or business partners, such as BlackRock, that generated unduly excessive revenue for JPMorgan Chase's affiliates and/or business partners, despite the availability of less expensive investment options that performed just as well, if not better, than the proprietary or the affiliated options at issue.

233.    As a result, during the Class Period, the Plan paid from its assets the unduly excessive investment management fees and other expenses associated with the funds at issue.  In retaining the unduly expensive investment options for the Plan during the Class Period, the Bank, JPMIM, EPIC, and the Plan Administrator Defendants, acted on behalf of, and in the interests of, JPMorgan Chase, and its affiliates and/or business partners, who were unjustly enriched to the detriment of the Plan and its participants and beneficiaries.

234.    These prohibited transactions took place on an ongoing basis throughout the Class Period when fees and expenses were deducted from the assets being held for Plan participants in exchange for services performed by JPMorgan Chase's affiliates and or business partners.

235.    As a direct and proximate result of these prohibited transactions, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments via the payment of excessive investment management and

other fees to JPMorgan Chase's affiliates and/or business partners, and ultimately JPMorgan Chase, in transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants, and/or unjust profits to parties whose interests were adverse to the Plan and its participants.

236.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused as a result of the prohibited transactions, and the unjust profits they allowed to be paid to JPMorgan Chase's affiliates and/or business partners, resulting directly or indirectly from the prohibited transactions.

### SIXTH CLAIM FOR RELIEF
### Co-Fiduciary Liability
### (Violation of ERISA § 405, 29 U.S.C. § 1105 by All Defendants except JPMIM )

237.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

238.    At all relevant times, as alleged above, Defendants the JPMorgan Chase, the Bank, the CMDC, the Selection Committee, the EPIC, and the Plan Administrator Defendants were fiduciaries to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

239.    ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary, in addition to any liability which he or she may have had under any other provision of ERISA, if the he or she knowingly participates in a breach of fiduciary duty of another fiduciary.

240.    Defendant JPMorgan Chase is liable under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1) because of its retention of administrative and managerial power over the Plan through its Board of Directors, as well as because of the fact that the EPIC and Plan Administrator Defendants were comprised of its own high level employees.

241.    Defendant Bank is liable under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), because it managed the assets of the Plan and knew that the fiduciary breaches and prohibited transaction diminished the value of the Plan assets, thereby decreasing the value of Plan participants' retirement savings.

242.    ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes liability on a fiduciary, in addition to any liability which he or she may have had under any other provision of ERISA, if he or she knows of a breach by another fiduciary and fails to remedy it.  Even if the fiduciary merely knows of a breach, he or she had no connection with, he or she must take steps to remedy it.

243.    Defendant CMDC is liable under ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), because it received regular reports, at least annually, on the operation of the Plan which would have shown that fiduciary breaches and prohibited transaction diminished the value of the Plan assets, including the value of the Plan participants' accounts.

244.    ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability if a fiduciary in the administration of his or her fiduciary responsibilities enables another fiduciary to commit a breach, even without knowledge of the other's breach.

245.    Defendant Selection Committee is liable under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), because it is a named fiduciary and it had a duty to monitor and evaluate the members of the EPIC, but failed to do so.

246.    Defendant EPIC is liable under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), because it is a named fiduciary and it selected and retained the investment options in the Plan and knew that the fiduciary breaches and prohibited transactions diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings.

247.    The Plan Administrator Defendants are liable under ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), because they are named fiduciaries and they had joint control and management of the operation and administration of the Plan.

248.    The Defendants named in this Count, each of whom were fiduciaries within the meaning of ERISA, knew of each breach of fiduciary duty or prohibited transaction alleged herein arising from Defendants retention of the unduly expensive affiliated investment options managed by JPMIM, the Bank and BlackRock, participated in each other's violations of ERISA, enabled each other's violations of ERISA, and took no steps to remedy those violations of ERISA.  As such, each is liable for the breaches and prohibited transactions of the others pursuant to § 405(a)(1), (2), and (3), 29 U.S.C. § 1105(a)(1), (2), and (3).

249.    As a direct and proximate result of these prohibited transactions, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments to the imprudently high fees of the affiliated investment options managed by JPMIM, the Bank, and BlackRock.

250.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duty.

## SEVENTH CLAIM FOR RELIEF
### Non-Fiduciary Participation in Counts I, IV and V, pursuant to ERISA § 502(a)(3)
### (Against Defendants JPMorgan Chase, the Bank, and JPMIM)

251.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

252.    Count VII is brought, in the alternative, against Defendants JPMorgan Chase, the Bank, and JPMIM.

74

253.    Defendants JPMorgan Chase, the Bank, and JPMIM had actual or constructive knowledge of and participated in, and/or profited from the breaches of prudence and loyalty alleged in Count One, and the prohibited transaction claims alleged in Counts IV and V, and they are liable to disgorge ill-gotten gains and/or provide other equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and the Supreme Court's decision in *Harris Trust & Sav. Bank v. Salomon smith Barney Inc.*, 530 U.S. 238 (2000).

254.    Neither fiduciary nor party in interest status is required for liability under ERISA where, as here, non-fiduciaries participate in and/or profit from a fiduciary's breach of duty or a prohibited transaction.  Accordingly, Plaintiffs may bring claims against such entities even if they are not found to have fiduciary or party in interest status themselves.

255.    JPMorgan Chase, the Bank, and JPMIM knowingly participated in the fiduciary breaches of prudence and loyalty alleged in Count I because as the Plan employer, Plan Sponsor, and Plan fund manager, respectively, they knew or should have known that these breaches diminished the value of the Plan assets, and/or unjustly enriched the Defendants named in this Count, thereby decreasing the value of the Plan participants' retirement savings accounts.

256.    In regards to Count IV, as alleged above, JPMorgan Chase, the Bank, and JPMIM are parties in interest, and as such, had actual or constructive knowledge of the circumstances that made their transactions with the Plan violations of ERISA § 406(a), 29 U.S.C. § 1106(a).  At all relevant times, JPMorgan Chase and the Bank were the Plan employer and the Plan Sponsor, respectively, and therefore knew or should have known that they were dealing with fiduciaries, namely EPIC and the Plan Administrator Defendants, and that the prohibited transactions diminished the value of the Plan assets, and/or unjustly enriched the Defendants named in this Count, thereby decreasing the value of the Plan participants' retirement savings.  At all relevant

times, JPMIM was an affiliate of JPMorgan Chase and served as an investment adviser for and managed a number of the investment options in the Plan, and therefore knew or should have known that it was dealing with fiduciaries, namely EPIC and the Plan Administrator Defendants, and that the prohibited transactions diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings.

257.    JPMorgan Chase, the Bank, and JPMIM also knowingly participated in the violations of ERISA's prohibited transaction provisions under ERISA § 406(b), 29 U.S.C. § 1106(b) alleged in Count V.  At all relevant times, JPMorgan Chase and the Bank were the Plan employer and the Plan Sponsor, respectively, and therefore knew or should have known that they were dealing with fiduciaries, namely EPIC and the Plan Administrator Defendants, and that the prohibited transactions between (1) the Plan and EPIC, (2) the Plan and the Administrator Defendants, and (3) the Plan and JPMIM, diminished the value of the Plan assets, and/or unjustly enriched the Defendants named in this Count, thereby decreasing the value of the Plan participants' retirement savings.  JPMIM managed a number of investment options in the Plan, and therefore knew or should have known that it was dealing with a fiduciary, namely EPIC, and that the prohibited transactions between (1) the Plan and EPIC, and (2) the Plan and the Administrator Defendants diminished the value of the Plan assets, and/or unjustly enriched the Defendants named in this Count, thereby decreasing the value of the Plan participants' retirement savings.

258.    As a direct and proximate result of the breaches and prohibited transactions alleged in Counts I, IV, and V, and the participation therein by JPMorgan Chase, the Bank, and JPMIM, alleged in this Count, the Plan and its participants lost millions of dollars of their assets that were used to generate the unlawful profits for JPMorgan Chase, the Bank, and JPMIM.

259.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), JPMorgan Chase, the Bank, and JPMIM must disgorge all ill-gotten gains obtained from the breaches of fiduciary duties and prohibited transactions, and provide other appropriate equitable relief.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

260.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

261.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  ERISA Section 409 requires "any person who is a fiduciary … who breaches any of the … duties imposed upon fiduciaries … to make good to such plan any losses to the plan…"  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate …"  In addition, under ERISA § 502(a)(3), a participant may seek to enjoin any act or practice that violates any provision of ERISA or the terms of the plan, to obtain other appropriate equitable relief, including, *inter alia*, disgorgement of profits.

262.    With respect to calculating the plan losses, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the plan's assets to which they would have been if the plan had been properly administered.

263.    Here, the Plan, Plaintiffs, and the other members of the proposed Class are therefore entitled to relief from Defendants in the form of:  (1) monetary payment to the Plan to

make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties and the prohibited transactions alleged above in an amount to be proven at trial, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief, including disgorgement of unjust profits, to remedy the breaches and the conflicted transactions alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

264.    Each Defendant is jointly liable for the acts of the other Defendants as co-fiduciary.

## JURY DEMAND

265.    Plaintiffs demand a jury.

## PRAYER FOR RELIEF

266.    WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A Declaration that the Defendants, and each of them who acted as fiduciaries, have breached their fiduciary duties and engaged in prohibited transactions in violation of ERISA;

B.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties and engagement in conflicted transactions, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets;

C.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to imposition of a constructive trust on any amounts by which any Defendants were unjustly enriched at the expense of the Plan as a result of breaches of fiduciary duty;

D.      An Order that Defendants allocate the Plan's recoveries to the accounts of all affected participants;

E.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

H.      An order awarding pre-judgment interest; and

I.      An Order providing for such other and further relief as the Court deems equitable and just.

Dated:  May 5, 2017                           Respectfully submitted,


                                   By:  /s/ Joseph H. Meltzer
                                        Joseph H. Meltzer, Esq. NY Bar No. JM8493
                                        **KESSLER TOPAZ MELTZER**
                                          **& CHECK, LLP**
                                        280 King of Prussia Road
                                        Radnor, PA 19087
                                        Tel:  (610) 667-7706
                                        Fax:  (610) 667-7056
                                        Email:   jmeltzer@ktmc.com

                                        Edward W. Ciolko
                                        (*pro hac vice* motion to be filed)
                                        Mark K. Gyandoh (*Admitted Pro Hac Vice*)
                                        Julie  Siebert-Johnson  (*Admitted  Pro  Hac Vice*)

280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email:  eciolko@ktmc.com
          mgyandoh@ktmc.com
          jsjohnson@ktmc.com

***Interim Lead Class Counsel***

Kai Richter
Carl F. Engstrom
Jacob Schutz
  *admitted in W.D.N.Y.
**NICHOLS KASTER, PLLP**
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Tel: 612-256-3200
Fax: 612-338-4878
Email: krichter@nka.com
          cengstrom@nka.com
          jschutz@nka.com

David S. Preminger
Tanya Korkhov
**KELLER ROHRBACK L.L.P.**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Tel: 646-380-6690
Fax: 646-380-6692
Email: dpreminger@kellerrohrback.com
          tkorkhov@kellerrohrback.com

Lynn Lincoln Sarko
Derek W. Loeser
Erin M. Riley
Gretchen S. Obrist
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: 206-623-1900
Fax: 206-623-3384
Email: lsarko@kellerrohrback.com
          dloeser@kellerrohrback.com
          eriley@kellerrohrback.com

80

gobrist@kellerrohrback.com

Samuel H. Rudman
Evan J. Kaufman
Andrew L. Schwartz
**ROBBINS GELLER RUDMAN
  & DOWD LLP**
58 South Service Road, Suite 200
Melville, NY 11747
Tel: 631-367-7100
Fax: 631-367-1173
Email: srudman@rgrdlaw.com
        ekaufman@rgrdlaw.com
        aschwartz@rgrdlaw.com

Nancy A. Kulesa (NK 2015)
Shannon L. Hopkins (SH-1887)
Stephanie Bartone
**LEVI & KORINSKY LLP**
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (212) 363-7500
Fax: (866) 367-6510
Email: shopkins@zlk.com
        nkulesa@zlk.com
        sbartone@zlk.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2017 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


By:    /s/ *Joseph H. Meltzer*
    Joseph H. Meltzer, Esq. NY Bar No. JM8493