UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TERRE BEACH, *et al.*, individually and on behalf
of themselves and all others similarly situated,

                          Plaintiffs,

                  v.

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, JPMORGAN CHASE &
COMPANY, *et al.*,

                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Case No. 17-CV-00563-JMF

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Susan L. Saltzstein
James R. Carroll (*pro hac vice*)
Michael S. Hines (*pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
susan.saltzstein@skadden.com
james.carroll@skadden.com
michael.hines@skadden.com

Counsel for Defendants
JPMorgan Chase Bank, National Association, JPMorgan
Chase & Company, Compensation & Management
Development Committee of the Board of Directors for
JPMorgan Chase & Company, the Selection Committee,
the Employee Plans Investment Committee, J.P. Morgan
Investment Management Inc., Head of Human
Resources for JPMorgan Chase & Co., Chief Financial
Officer for JPMorgan Chase & Co., Benefits Director of
JPMorgan Chase & Co., Terry Belton, Bernadette
Branosky, Corrine Burger, Sally Durdan, Thelma
Ferguson, Tom Horne, Bei Ling, Pablo Sanchez, Erik
Umlauf, David Watson, Michael Weinbach, Stephen B.
Burke, Lee R. Raymond, William C. Weldon, John C.
Donnelly, Marianne Lake, and John Does 1-20

Dated:  November 5, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................... 3

    A.    The Plan .................................................................................................. 3

    B.    The Subject Funds ................................................................................. 4

    C.    The Named Plaintiffs ............................................................................ 7

ARGUMENT ........................................................................................................................ 9

I.    CLASS CERTIFICATION IS INAPPROPRIATE
BECAUSE THE NAMED PLAINTIFFS ARE
INCAPABLE OF SERVING AS CLASS REPRESENTATIVES ....................... 9

    A.    Binding Arbitration Agreements Preclude Mr. Daly, Ms. Fondren,
And Mr. Monaghan From Serving As Class Representatives, And
Bar Other Unnamed Participants From Participating In Any Class ..................... 10

        1.    Plaintiffs' Claims Are Within The
Scope Of The Binding Arbitration Agreements ........................................ 10

        2.    The Binding Arbitration Agreements Apply Notwithstanding
That Plaintiffs Purport To Seek Relief For The Entire Plan .................... 12

    B.    Plaintiffs' Lack Of Knowledge About The Litigation
And Their Failure To Supervise Class Counsel Renders Them
Inadequate Representatives Of Putative Class Members' Interests ..................... 14

    C.    Mr. Monaghan Cannot Serve As A Class
Representative Because He Is Not A Member Of The Proposed Class ............... 17

II.    THE SUBJECT FUNDS IN PLAINTIFFS' PROPOSED
CLASS DEFINITION MUST BE SUBSTANTIALLY
NARROWED TO AVOID STANDING AND TYPICALITY ISSUES ......................... 17

    A.    Subject Funds In Which No Named Plaintiff Invested
Should Be Excluded, Because Plaintiffs Lack Standing To
Assert Claims In Connection With Funds In Which They Did Not Invest .......... 18

        1.    Plaintiffs Lack Article III Standing With
Respect To Funds In Which They Did Not Invest .................................... 18

        2.    Plaintiffs Also Lack Class Standing With
Respect To Funds In Which They Did Not Invest .................................... 19

    B.    The Core Bond Fund And Small Cap Core Fund
Should Be Excluded, Because Plaintiffs' Claims With
Respect To Those Funds Are Atypical Where Putative Class Members
Were Subject To Different Fee Structures During The Relevant Period .............. 22

C.      At A Minimum, The Time Periods Following The Core Bond Fund And
        The Small Cap Core's Fee Elimination, And The Target Date Funds' Fee
        Reduction, Should Be Excluded From The Proposed Class Definition ...............25

CONCLUSION......................................................................................................................25

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*American Express Co. v. Italian Colors Restaurant*,
    570 U.S. 228 (2013)......................................................................................................2, 13

*Avilez v. Pinkerton Government Services, Inc.*,
    596 F. App'x 579 (9th Cir. 2015)...........................................................................11

*Bell v. Pension Committee of ATH Holding Co., LLC*,
    No. 15-cv-02062, 2018 WL 4385025 (S.D. Ind. Sept. 14, 2018).................................3, 23

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)..................................................................................................9

*Comer v. Micor, Inc.*,
    436 F.3d 1098 (9th Cir. 2006) ...............................................................................13

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
    No. 16-cv-01900, 2017 WL 3524682 (S.D.N.Y. Aug. 15, 2017)........................10, 11, 13

*Dezelan v. Voya Retirement Insurance & Annuity Co.*,
    No. 16-cv-01251, 2017 WL 2909714 (D. Conn. July 6, 2017) .........................................21

*Ducharme v. DST System, Inc.*,
    No. 17-cv-00022 (W.D. Mo. June 23, 2017) ....................................................................10

*Fuller v. SunTrust Banks, Inc.*,
    No. 11-cv-00784 (N.D. Ga. June 27, 2018) (ECF No. 222).........................................21, 22

*General Telephone Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982)..................................................................................................17

*Gladstone Realtors v. Village of Bellwood*,
    441 U.S. 91 (1979)..................................................................................................18

*Halldorson v. Wilmington Trust Retirement & Institutional Services Co.*,
    182 F. Supp. 3d 531 (E.D. Va. 2016) ...........................................................................11

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999)..................................................................................................19

*In re Initial Public Offering Securities Litigation*,
    471 F.3d 24 (2d Cir. 2006)........................................................................................9

*Korea Week, Inc. v. Got Capital, LLC*,
    No. 15-cv-06351, 2016 WL 3049490 (E.D. Pa. May 27, 2016)........................................11

*In re Kosmos Energy Ltd. Securities Litigation*,
　　299 F.R.D. 133 (N.D. Tex. 2014) ................................................................15

*LaRue v. DeWolff, Boberg & Associates, Inc.*,
　　552 U.S. 248 (2008) ......................................................................................13

*Leber v. Citigroup 401(k) Plan Investment Committee*,
　　323 F.R.D. 145 (S.D.N.Y. 2017) ..................................................................25

*Long Island Head Start Child Development Services, Inc. v. Economic Opportunity Commission of Nassau County, Inc.*,
　　710 F.3d 57 (2d Cir. 2013)......................................................................11, 19

*Mahon v. Ticor Title Insurance Co.*,
　　683 F.3d 59 (2d Cir. 2012).............................................................................18

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
　　473 U.S. 614 (1985) ......................................................................................12

*Moreno v. Deutsche Bank Americas Holding Corp.*,
　　No. 15-cv-09936, 2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017) ...................25

*Munro v. University of Southern California*,
　　896 F.3d 1088 (9th Cir. 2018) .......................................................................12

*Munro v. University of Southern California*,
　　No. 16-cv-06191 (C.D. Cal. Oct. 22, 2018) (ECF No. 96)..............................12

*Munro v. University of Southern California*,
　　No. 16-cv-06191, 2017 WL 1654075 (C.D. Cal. Mar. 23, 2017)....................12

*Pablo v. ServiceMaster Global Holdings Inc.*,
　　No. 08-cv-03894, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ...................14

*Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc.*,
　　714 F. Supp. 2d 475 (S.D.N.Y. 2010).............................................................17

*Ranzy v. Extra Cash of Texas, Inc.*,
　　No. 09-cv-03334, 2011 WL 13257274 (S.D. Tex. Oct. 14, 2011) ..................11

*Retirement Board of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon*,
　　775 F.3d 154 (2d Cir. 2014)............................................................................20

*Scott v. New York City District Council of Carpenters Pension Plan*,
　　224 F.R.D. 353 (S.D.N.Y. 2004) ....................................................................14

*Spano v. The Boeing Co.*,
    633 F.3d 574 (7th Cir. 2011) ..................................................................21, 23, 24

*Taveras v. UBS AG*,
    612 F. App'x 27 (2d Cir. 2015) ..............................................................3, 18, 19

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)...............................................................................9

*Troudt v. Oracle Corp.*,
    325 F.R.D. 373 (D. Colo. 2018) ......................................................................21

*In re UBS ERISA Litigation*,
    No. 08-cv-06696, 2014 WL 4812387 (S.D.N.Y. Sept. 29, 2014) ..............18, 19

*Vengurlekar v. Silverline Technologies, Ltd.*,
    220 F.R.D. 222 (S.D.N.Y. 2003) ................................................................22, 23

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................................9

*Weisman v. Darneille*,
    78 F.R.D. 669 (S.D.N.Y. 1978) .......................................................................14

## **STATUTES**                         **PAGE(S)**

15 U.S.C. § 80a-1 ..................................................................................................4

15 U.S.C. § 80a-8 ..................................................................................................4

15 U.S.C. § 80a-16 ................................................................................................4

15 U.S.C. § 80a-24 ................................................................................................4

15 U.S.C. § 80a-29 ................................................................................................4

29 U.S.C. §§ 1132 ...............................................................................................13

## PRELIMINARY STATEMENT

This lawyer-driven lawsuit purports to challenge as "unreasonably high" the fees of investment options in the JPMorgan Chase 401(k) Savings Plan ("Plan") that are as low as ***six basis points annually*** (*i.e.*, six cents annually for every hundred dollars invested).  But despite declaring that they have personal knowledge of those fees, none of the Plaintiffs could state what those fees even were, or articulate why any fees were "unreasonably high," instead testifying that those fees were high because their lawyers told them so.  (*E.g.*, Fondren Tr. 72:19-76:19 (Hines Decl. Ex. 1)[1].)  Indeed, Plaintiffs were satisfied with the Plan until they were contacted by lawyers through advertisements on Facebook.  (*E.g.*, Stirsman Tr. 112:23-115:25 (Hines Decl. Ex. 2).)  They now rely exclusively on their attorneys' discretion in pursuing relief on behalf of potentially hundreds of thousands of unnamed Plan participants.  (*E.g.*, Daly Tr. 85:8-86:22, 160:16-20 (Hines Decl. Ex. 3).)

While Plaintiffs assert that their claims under the Employee Retirement Income Security Act of 1974 ("ERISA") are "of the type routinely certified" as class actions (Br. at 1), they fail to address unique flaws that make this case ill-suited for class treatment.  Consequently, Plaintiffs' motion should be denied -- or, at a minimum, their proposed class should be substantially narrowed -- for a number of independent reasons.

As an initial matter, class certification is inappropriate because none of the named Plaintiffs -- Sean Daly, Antoinette Fondren, James Monaghan, Ferdinand Orellana, and William Stirsman -- are capable of serving as class representatives.  *First*, three of the five named Plaintiffs (Mr. Daly, Ms. Fondren, and Mr. Monaghan) are contractually barred from

---

[1]     Citations in the form "Hines Decl." are to the Declaration Of Michael S. Hines, submitted herewith, and citations in the form "Br." are to Plaintiffs' Memorandum Of Law In Support Of Their Motion For Class Certification (ECF No. 96).

representing a class, or participating in a class action in any capacity, by virtue of having entered into binding arbitration agreements.  Those agreements, which are to be "rigorously enforce[d] according to their terms," *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013), require Mr. Daly, Ms. Fondren, and Mr. Monaghan to arbitrate claims such as those asserted here on an individual basis.  Moreover, Plan participants subject to arbitration agreements also cannot be members of any class.  Consequently, in addition to the inability of Mr. Daly, Ms. Fondren, and Mr. Orellana to serve as class representatives, any class should exclude all participants who are contractually bound to arbitrate claims on an individual basis.

*Second*, Plaintiffs will not adequately represent putative class members because their deposition testimony -- across the board -- reveals an utter abdication of control of the litigation to counsel and a lack of knowledge about this case.  Plaintiffs have not participated in any decisions about the litigation, do not know who they are representing, and have not even reviewed key documents (such as the complaint) before their attorneys filed them.  And, despite having executed identical declarations that attest to their belief that the Plan's investment options charged "unreasonably high" fees, Plaintiffs are unable to, even in general terms, articulate why those fees are too high, or what an acceptable fee would be.  *Third*, Mr. Monaghan cannot serve as a class representative because he is not even a member of the proposed class, having invested in none of the Subject Funds.[2]

---

[2]     The funds identified in Plaintiffs' proposed class definition -- the Growth and Income Fund, Mid Cap Value Fund, Mid Cap Growth Fund, Small Cap Core Fund, Core Bond Fund, and the Target Date Funds (ten in total), together representing fifteen out of thirty-six investment options available in the Plan during the relevant period -- are referred to as the "Subject Funds." Notwithstanding the complaint's allegations about Defendants' purportedly improper relationship with BlackRock (*e.g.*, Second Am. Compl. ¶¶ 120-29) (ECF No. 55)), no BlackRock funds are included as "Subject Funds."

Even if one or more of the named Plaintiffs are determined to be adequate class representatives, in addition to excluding participants subject to arbitration agreements, Plaintiffs' proposed class definition should be further narrowed for at least two reasons. *First*, Plaintiffs lack standing to pursue claims in which they did not personally invest. As the Second Circuit has held, "[a]n ERISA plan participant lacks standing to sue for ERISA violations that cause injury to a plan but not individualized injury to the plan participant." *Taveras v. UBS AG*, 612 F. App'x 27, 29 (2d Cir. 2015). Because *no* Plaintiff invested in eight of the fifteen Subject Funds, those funds should be excluded from any class definition.

*Second*, Plaintiffs have not borne their burden of establishing typicality under Federal Rule of Civil Procedure 23(a), where -- contrary to their assertion that "the same fee structures . . . applied to *all* participants" (Br. at 14-15) -- different fee arrangements applied with respect to the Core Bond Fund and Small Cap Core Fund during the relevant period. Critically, partway through the relevant period, JPMorgan absorbed *all* investment management fees with respect to those two funds, undermining -- at least from that point forward -- Plaintiffs' claim that putative class members paid "unnecessarily high fees" in connection with those Plan investment options. (Br. at 2.) "[I]ncluding a time period covering two different fee structures within the class" destroys typicality. *Bell v. Pension Comm. of ATH Holding Co., LLC*, No. 15-cv-02062, 2018 WL 4385025, at *4 (S.D. Ind. Sept. 14, 2018). Plaintiffs' proposed class definition should be further modified so that participants who were subject to the no-fee arrangement, or to a reduced-fee arrangement with respect to the Target Date Funds, are excluded from any class.

## BACKGROUND

### A.  The Plan

The Plan is a "defined contribution" 401(k) plan through which all eligible Company employees may contribute tax-deferred savings to individual participant accounts.

3

(401(k) Savings Plan Summary Plan Description (Jan. 1, 2016) at 6-7 ("SPD") (Hines Decl. Ex. 6).)  Each participant is responsible for allocating his or her contributions into any investment option made available under the Plan.  (*See id.* at 14-18.)  The Plan is comprised of a broad array of eight index funds in the form of commingled trusts, four investment products actively managed by JPMorgan in the form of separate accounts or commingled trusts and for which the investment management fees are paid by JPMorgan (not by Plan participants), seven separate accounts actively-managed by third-party managers, ten target date funds, and the JPMorgan Chase Common Stock Fund.[3]  (Investment Fund Profiles (June 1, 2016) ("2016 Fund Profiles") (Hines Decl. Ex. 7).)  The Plan's investment options reflect a variety of investment strategies and risk/return profiles; consequently, the management fees charged by those options vary as well, currently ranging from 0.00% (in the case of options for which JPMorgan absorbs the investment management fees) to 0.62%. (*See generally id*.)

**B.     The Subject Funds[4]**

The Subject Funds have evolved over the course of the relevant period.  For example, their fees have been reduced or eliminated altogether, the format of the funds has changed, and some have been removed from the Plan outright.

---

[3]      Unlike commingled trusts or separately managed accounts, mutual funds are subject to extensive regulation by the U.S. Securities and Exchange Commission ("SEC") under the Investment Company Act, 15 U.S.C. §§ 80a-1, *et. seq*.  Among other things, mutual funds are governed by boards that include independent directors, *see* 15 U.S.C. § 80a-16; registered with the SEC; and provide detailed shareholder communications such as prospectuses and annual reports, *see* 15 U.S.C. §§ 80a-8, 24, 29.  Commingled trusts and separate accounts, by contrast, are not subject to SEC regulations and disclosure rules.

[4]      *See generally* Fee Disclosure Notice (Nov. 2017) (Hines Decl. Ex. 8); Fee Disclosure Notice (Nov. 2016) (Hines Decl. Ex. 9); Investment Fund Profiles (Jan. 15, 2015) (Hines Decl. Ex. 10); Fee Disclosure Notice (Nov. 2014) (Hines Decl. Ex. 11); Investment Fund Profiles (Dec. 31, 2013) (Hines Decl. Ex. 12; Investment Fund Profiles (Aug. 2012) (Hines Decl. Ex. 13); Investment Fund Profiles (July 1, 2011) (Hines Decl. Ex. 14).

*Core Bond Fund*.  The Core Bond Fund is a Plan investment option managed by a JPMorgan affiliate.  From the beginning of the relevant period through March 10, 2016, it was offered in a mutual fund format and its investment management fee ranged from 0.35% to 0.41%.  Effective March 11, 2016, the fund was converted to a commingled fund and the Company began to pay the fund's investment management fees on behalf of participants, meaning that participants who chose to invest in this fund did not pay any associated investment management fees.  (*See* Fund Change Bulletin (Feb. 2016) at 2 (Hines Decl. Ex. 15).)  Mr. Orellana and Mr. Stirsman invested in this fund at times during the relevant period.  (Add. A.)[5]

*Growth and Income Fund*.  The Growth and Income Fund was a Plan investment option that was managed by a JPMorgan affiliate during the relevant period.  From the beginning of the relevant period through June 13, 2013, its investment management fee ranged from 0.64% to 0.65%.  Effective June 14, 2013, the fund was eliminated from the Plan investment lineup. (*See* Financially Fit Bulletin (May 2013) (Hines Decl. Ex. 16).)  Not a single named Plaintiff invested in this fund during the relevant period.  (Add. A.)

*Mid Cap Growth Fund*.  The Mid Cap Growth was a Plan investment option that was managed by a JPMorgan affiliate during the relevant period.  From the beginning of the relevant period through November 5, 2015, its investment management fee ranged from 0.90% to 0.99%.  Effective November 6, 2015, the fund was eliminated from the Plan investment lineup and replaced with the S&P 400 Index Fund, managed by State Street, an unaffiliated third party. (*See* Fund Change Bulletin (Sept. 2015) (Hines Decl. Ex. 17).)  Mr. Orellana invested in this fund during the relevant period.  (Add. A.)

---

[5]     Citations in the form "Add. A" are to Addendum A, attached hereto.

*Mid Cap Value Fund*.  The Mid Cap Value Fund was a Plan investment option that was managed by an unaffiliated third party, Earnest Partners.  From the beginning of the relevant period through November 5, 2015, its investment management fee was 0.42%.  Effective November 6, 2015, the fund was eliminated from the Plan investment lineup and replaced with the S&P 400 Index Fund, managed by State Street, an unaffiliated third party.  (*See id.*)  Not a single named Plaintiff invested in this fund during the relevant period.  (Add. A.)

*Small Cap Core Fund*.  The Small Cap Core Fund is a Plan investment option that has been managed by a JPMorgan affiliate during the relevant period.  From the beginning of the relevant period through December 17, 2015, it was offered in a mutual fund format and its investment management fee ranged from 0.80% to 0.83%.  Effective December 18, 2015, the fund was converted to a separate account format and the Company began to pay the fund's investment management fees on behalf of participants, meaning that participants who chose to invest in this fund did not pay any associated investment management fees.  (*See* JPMorgan Chase & Co. Memorandum (Nov. 2015) (Hines Decl. Ex. 18).)  Mr. Orellana invested in this fund during the relevant period.  (Add. A.)

*Target Date Funds*.  The Target Date Funds comprise ten Plan investment options (the Target Date Income Fund, Target Date 2015 Fund, Target Date 2020 Fund, Target Date 2025 Fund, Target Date 2030 Fund, Target Date 2035 Fund, Target Date 2040 Fund, Target Date 2045 Fund, Target Date 2050 Fund, and Target Date 2055 Fund).  The funds' glide path (*i.e.*, how the funds' asset allocation changes over time as participants progress toward a target retirement date) is managed by an affiliate of JPMorgan Chase.  The funds invest in other funds managed by a JPMorgan Chase affiliate, as well as unaffiliated third parties BlackRock, State Street, and Columbia.  While individual Target Date Funds' fees differ, their investment

6

management fees have ranged from 0.06% to 0.11%.  Those fees compensate only the third parties that manage the funds' underlying investments; fees associated with managing the glide path and the underlying affiliated funds are absorbed by the Company.  The Target Date Funds' fees were reduced from a maximum of 0.11% to a maximum of 0.09% effective April 1, 2016. (Message from Human Resources (May 26, 2016) (Hines Decl. Ex. 19).)  The Target Date 2055 Fund was added as a Plan investment option effective January 12, 2015.  (Fund Change Bulletin (Dec. 2014) (Hines Decl. Ex. 20).)  At times during the relevant period, Mr. Daly invested in the Target Date 2050 Fund, Ms. Fondren invested in the Target Date 2030 Fund, Mr. Orellana invested in the Target Date 2045 Fund, and Mr. Stirsman invested in the Target Date 2015 Fund. (Add. A.)  No Plaintiff invested in any of the other Target Date Funds.  (*See id.*)

C.    **The Named Plaintiffs**

*Sean Daly*.  Mr. Daly -- who "skimm[ed]" the complaint, perhaps only after it was filed -- is a former Company employee and a former Plan participant.  (*See* Daly Decl. ¶¶ 3, 5 (ECF No. 97-26); Daly Tr. 76:19-77:17.)  When Mr. Daly joined the Company in April 2012, he agreed to arbitrate claims, such as the ones at issue here, on an individual basis, and to refrain from participating in a class action in any capacity.  (Sean Daly Offer Letter at -3244-45 (Apr. 4, 2012) (Hines Decl. Ex. 21).)  Nonetheless, he seeks to represent a class of participants who invested in the fifteen Subject Funds -- though he himself invested in only one Subject Fund (the Target Date 2050 Fund).  (Daly Decl. ¶ 5.)

*Antoinette Fondren*.  Ms. Fondren -- who similarly does not recall reviewing the complaint before it was filed -- is a former Company employee and a former Plan participant. (Fondren Decl. ¶¶ 3, 5 (ECF No. 97-23); Fondren Tr. 84:6-14.)  Like Mr. Daly, Ms. Fondren entered into a binding arbitration agreement when she joined the Company on May 26, 2010. (Antoinette Fondren Offer Letter at 3 (May 24, 2010) (Hines Decl. Ex. 22).)  Also like Mr. Daly,

7

Ms. Fondren is prohibited from seeking to represent a class, and, similarly, has invested in only one Subject Fund (the Target Date 2030 Fund).  (Fondren Decl. ¶ 5.)

*James Monaghan*.  Mr. Monaghan was employed at the Company from March 2011 until January 2014.  (Monaghan Decl. ¶ 3 (ECF No. 105).)  Like Mr. Daly and Ms. Fondren, Mr. Monaghan entered into a binding arbitration agreement prohibiting him from serving as a class representative.  (James C. Monaghan Offer Letter (Apr. 4, 2011) (Hines Decl. Ex. 23).)[6]  Moreover, while Mr. Monaghan declares that he invested in "the Target Date Fund," (Monaghan Decl. ¶ 5), he testified at his deposition that he invested in *none* of the Subject Funds, and therefore is not even a member of the putative class.  (Monaghan Tr. 57:14-23, 103:15-104:16 (Hines Decl. Ex. 5).)

*Ferdinand Orellana*.  Mr. Orellana was employed at the Company from August 2008 until January 2014.  (Orellana Decl. ¶ 3 (ECF No. 97-24).)  Mr. Orellana is a former Plan participant who invested in four of the fifteen Subject Funds -- the Core Bond Fund, Mid Cap Growth Fund, Small Cap Core Fund, and Target Date 2045 Fund.  (*Id.* ¶ 5.)  Even though his declaration faults Defendants for retaining funds with purportedly unreasonably high fees in the Plan, Mr. Orellana -- who is employed as a financial advisor -- was unable to state at his deposition what an "unreasonably high" fee would be, or whether a fee of *zero* basis points would still be unreasonably high.  (Orellana Tr. 176:6-179:21 (Hines Decl. Ex. 4).)

*William Stirsman*.  Mr. Stirsman is a former Company employee and a former Plan participant.  (*See* Stirsman Decl. ¶¶ 3, 5 (ECF No. 97-25).)  Mr. Stirsman invested in the Core Bond Fund and the Target Date 2015 Fund.  (*Id.* ¶ 5; Add. A.)

---

[6]     Both Ms. Fondren and Mr. Monaghan signed a letter acknowledging that they had read and agreed to be bound by the binding arbitration agreement, which could be accessed online. (Declaration Of Robie Childers ("Childers Decl.") ¶ 2, submitted herewith.)

## ARGUMENT

Plaintiffs must "affirmatively demonstrate [their] compliance" with each requirement of Federal Rule of Civil Procedure 23, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), by offering "evidentiary proof" to satisfy each requirement by a preponderance of the evidence, *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).  Plaintiffs' evidentiary proffer is subject to a "rigorous analysis" by this Court, which "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim."  *Wal-Mart*, 564 U.S. at 351.  "[T]he obligation to make such determinations is not lessened" by such overlap, "even [where] a merits issue . . . is identical with a Rule 23 requirement."  *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).  If Plaintiffs do not meet their burden with respect to any element, class certification must be denied.

## I.     CLASS CERTIFICATION IS INAPPROPRIATE BECAUSE THE NAMED PLAINTIFFS ARE INCAPABLE OF SERVING AS CLASS REPRESENTATIVES

Each Plaintiff's bid to serve as class representative is fatally flawed in at least one respect, making class certification inappropriate.  *First*, Mr. Daly, Ms. Fondren, and Mr. Monaghan are subject to arbitration agreements prohibiting them from serving as class representatives or otherwise participating in a class action.  Neither those Plaintiffs nor other participants subject to similar agreements may participate in any class.  *Second*, lack of knowledge about or control over the litigation being conducted in their own names renders all named Plaintiffs inadequate representatives of any putative class.  *Third*, Mr. Monaghan cannot serve as a class representative for the additional reason that he is not a member of the proposed class, having invested in *none* of the Subject Funds.

9

A.   **Binding Arbitration Agreements Preclude Mr. Daly, Ms. Fondren, And Mr. Monaghan From Serving As Class Representatives, And Bar Other Unnamed Participants From Participating In Any Class**

1.   **Plaintiffs' Claims Are Within The Scope Of The Binding Arbitration Agreements**

Mr. Daly, Ms. Fondren, and Mr. Monaghan are contractually prohibited from representing a class, having expressly agreed to arbitrate the claims asserted in this case individually, and to refrain from participating in a class action in any capacity.  As noted, those Plaintiffs contractually agreed to resolve any "employment-related claims" through "final and binding arbitration . . . . on an individual basis."  Moreover, they also agreed not to participate in a class action in any capacity, "expressly waiv[ing] any right . . . to submit, initiate, or participate in a representative capacity or as a plaintiff, claimant or member in a class action."  (Binding Arbitration Agreement (Feb. 1, 2011) ¶¶ 1, 2, 4 ("2011 BAA"); Binding Arbitration Agreement (May 5, 2009) ¶¶ 1, 2, 4 ("2009 BAA") (Childers Decl. Exs. A, B).)  These binding arbitration agreements are applicable here.

*First*, Plaintiffs' ERISA claims are "employment-related claims" within the scope of the arbitration agreement.  As Judge Pauley recently held in enforcing a similar agreement, "claims arising under ERISA necessarily relate to a party's employment," since the statute was "designed to protect the compensation and benefits that a worker derives directly from an employment relationship."  *Cooper v. Ruane Cunniff & Goldfarb Inc.*, No. 16-cv-01900, 2017 WL 3524682, at *3 (S.D.N.Y. Aug. 15, 2017); *see also Ducharme v. DST Sys., Inc.*, No. 17-cv-00022, transcript of oral argument at 27 (W.D. Mo. June 23, 2017) (ECF No. 59) (finding ERISA breach of fiduciary duty claim to be employment-related and dismissing putative class action based on substantially similar arbitration agreement).  Accordingly, Judge Pauley found that the claims at issue were subject to arbitration, even though ERISA claims were not

enumerated in the agreement.  2017 WL 3524682, at *3.  Similarly, here, even though ERISA

claims are not explicitly identified, Plaintiffs' claims are "employment-related" because they

arise out of the Plan, in which Plaintiffs participated solely by virtue of their employment.

   *Second*, although the arbitration agreements exclude "claims for [ERISA]

*benefits*," (2011 BAA ¶ 3; 2009 BAA ¶ 3 (emphasis added)), that exclusion is inapplicable here.

As Judge Pauley reasoned in finding a similar provision inapplicable, "[plaintiff] does not allege

that any of the [d]efendants denied him *benefits* under the [p]lan, nor does he seek clarification

or enforcement of those *benefits*.  Rather, his claims are premised on the mismanagement of

funds contributed on his behalf under the [p]lan."  2017 WL 3524682, at *5 (emphasis added).[7]

So, too, here.  Because Mr. Daly, Ms. Fondren, and Mr. Monaghan have agreed to individually

arbitrate the claims at issue here, they are barred from serving as class representatives.  *E.g.*,

*Korea Week, Inc. v. Got Capital, LLC*, No. 15-cv-06351, 2016 WL 3049490, at *1 (E.D. Pa.

May 27, 2016) (denying motion to certify class where named plaintiffs who signed agreement

containing class action waiver could not "adequately represent the absent class members");

*Ranzy v. Extra Cash of Texas, Inc.*, No. 09-cv-03334, 2011 WL 13257274, at *8 (S.D. Tex. Oct.

14, 2011) (denying motion to certify class without reaching Rule 23 factors where named

plaintiff signed agreement containing class action waiver).  Participants who entered into

agreements "expressly waiv[ing] any right" to "participate . . . as a . . . member in a class action"

(2011 BAA ¶ 4) also must be excluded from any class.  *See, e.g.*, *Avilez v. Pinkerton Gov't

Servs., Inc.*, 596 F. App'x 579, 579-80 (9th Cir. 2015).

---

[7]  *See also Long Island Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of
Nassau Cty., Inc.*, 710 F.3d 57, 66 (2d Cir. 2013) (distinguishing between a "claim for benefits"
and a "claim for recovery of 'losses to the plan'"); *Halldorson v. Wilmington Trust Ret. & Inst.
Servs. Co.*, 182 F. Supp. 3d 531, 542 (E.D. Va. 2016) (finding that prohibited transaction claims
were not claims for "vested benefits" and therefore were encompassed by release agreement).

### 2.      The Binding Arbitration Agreements Apply Notwithstanding That Plaintiffs Purport To Seek Relief For The Entire Plan

That Plaintiffs purport to seek relief that will inure to the benefit of the Plan as a whole does not make the arbitration agreements inapplicable.  To the extent that Plaintiffs attempt to rely on *Munro v. University of Southern California*, 896 F.3d 1088 (9th Cir. 2018), that case is neither binding nor persuasive.[8]  *Munro* declined to enforce arbitration agreements signed by participants in a retirement plan "[b]ecause the parties consented only to arbitrate claims brought on their own behalf, and because the [plaintiffs'] present claims [were] brought on behalf of the [p]lans."  *Id.* at 1092.  The Ninth Circuit endorsed the district court's reasoning that "[j]ust as a participant suing on behalf of a plan under [ERISA] § 502(a)(2) cannot waive a plan's right to pursue claims, a participant cannot waive a plan's right to file its claims in court."  *Munro v. Univ. of S. Cal.*, No. 16-cv-06191, 2017 WL 1654075, at *5 (C.D. Cal. Mar. 23, 2017), *aff'd*, 896 F.3d 1088 (9th Cir. 2018).

There are at least two critical flaws in this reasoning.  *First*, an agreement to arbitrate a claim is different in kind than an agreement to release a claim altogether, and the two agreements implicate fundamentally different concerns.  A release has the potential to deprive the plan and its participants of *any* recovery; an arbitration agreement, on the other hand, simply requires that the plaintiff bring his or her claims in a particular forum, while preserving the plaintiff's and the plan's substantive rights.  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.").  Thus, an arbitration agreement -- unlike a release agreement -- affects only procedure, not substance.

---

[8]      Proceedings in *Munro* are currently stayed pending disposition of the defendants' cert petition by the U.S. Supreme Court.  No. 16-cv-06191 (C.D. Cal. Oct. 22, 2018) (ECF No. 96).

*Second*, the cause of action under ERISA §§ 502(a)(2) and (a)(3) -- under which Plaintiffs proceed -- belongs to *individuals*, not to the Plan.  29 U.S.C. §§ 1132(a)(2), (a)(3) (civil action may be brought "by the Secretary, or by a participant, beneficiary or fiduciary" under (a)(2) or "by a participant, beneficiary, or fiduciary" under (a)(3)); *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008) (holding that ERISA § 502(a)(2) authorizes suits brought by a plaintiff in his or her individual capacity); *Comer v. Micor, Inc.*, 436 F.3d 1098, 1103 (9th Cir. 2006) ("[T]he cause of action [for breach of fiduciary duty under ERISA] belong[s] to the individual plaintiff.").  As such, the plain language of the arbitration agreements at issue here -- whereby Plaintiffs agreed to individually arbitrate all employment-related claims "that I now have or in the future may have" (2011 BAA ¶ 2; 2009 BAA ¶ 2) -- encompasses claims brought under ERISA §§ 502(a)(2) and (a)(3).  Indeed, the "Excluded Claims" section of the agreements makes no mention of any carve-out for individual causes of action that seek broader relief for an ERISA plan as a whole.  Reading such an exemption into the agreement would effectively vitiate its class-action waiver provision and contravene the Supreme Court's guidance that arbitration agreements are to be "rigorously enforce[d] according to their terms."  *Italian Colors*, 570 U.S. at 233 (internal quotation marks omitted).  Instead, as Judge Pauley reasoned, Plaintiffs' ERISA claims are employment disputes properly subject to arbitration, and, therefore, Mr. Daly, Ms. Fondren, and Mr. Monaghan are contractually disabled from participating in this action -- as class representatives or otherwise.  *Cooper*, 2017 WL 3524682, at *5.  Similarly, absent putative class members who are subject to binding arbitration agreements may not take part in any class.

Moreover, the inclusion in any class of Plan participants who are subject to arbitration agreements would inject individualized issues into the litigation, such that common issues would not predominate, as required under Rule 23(b)(3).  For example, individualized

13

inquiries would be required into whether each participant is subject to a valid and binding arbitration agreement and whether that participant is eligible to take part in any class relief. *See, e.g.*, *Pablo v. ServiceMaster Glob. Holdings Inc.*, No. 08-cv-03894, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011) (denying motion for class certification where "a significant portion of this litigation would be devoted to discovering which class members signed [arbitration] agreements and enforcing those agreements").   Class certification is therefore inappropriate.

**B.      Plaintiffs' Lack Of Knowledge About The Litigation
And Their Failure To Supervise Class Counsel Renders Them
Inadequate Representatives Of Putative Class Members' Interests**

Plaintiffs' deficient knowledge about the litigation and their failure to supervise class counsel renders them inadequate representatives of the interests of putative class members. Rule 23 requires that named plaintiffs -- as fiduciaries of the class -- have sufficient "knowledge of and involvement in the class action" to protect the due process rights of absent class members. *Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 355 (S.D.N.Y. 2004). To discharge this duty, named plaintiffs "must possess a minimal degree of knowledge regarding the action" and must be "sufficiently familiar with the case as to exercise independent control over the attorney." *Id.*   Plaintiffs who will not "check the otherwise unfettered discretion of counsel" are inadequate representatives of the interests of absent class members. *See Weisman v. Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978).

*First*, Plaintiffs are relying exclusively on counsel's unfettered discretion in conducting this litigation.   Indeed, Plaintiffs testified that they are not meaningfully exercising any independent judgment in litigating this case:

- All Plaintiffs testified that they had not engaged in any independent investigation of the allegations in their complaint:  for example, Mr. Orellana agreed that he is not personally "doing anything at all to understand whether the allegations [he has] made in this case are truthful" and Mr. Daly similarly agreed that he relied on counsel's "unfettered discretion" to verify the accuracy of his own complaint's allegations, but has no idea what counsel

14

has done in this respect.  (Orellana Tr. 110:6-13; Daly Tr. 149:17-150:6, 172:13-173:18; *see also* Fondren Tr. 137:9-139:10; Monaghan Tr. 44:14-47:9; Stirsman Tr. 112:9-19.)

- Four Plaintiffs testified that they are not supervising counsel at all:  for example, Mr. Stirsman agreed that he was not "supervising [his] lawyers in this case in any way" and that he was "trusting in [his] lawyers' discretion to do what's best for the class," and testified that "as far as consulting before [counsel] makes any decisions, I don't think they do."[9]  (Stirsman Tr. 101:7-16; 134:18-24; *see also* Daly Tr. 85:8-86:22, 160:16-20; Fondren Tr. 148:5-152:16; Orellana Tr. 206:15-207:23.[10])  In fact, although Mr. Stirsman testified that a class representative has a duty to "make decisions relevant to the case," he stated that he has made no such decisions, nor has he done anything to protect the interests of absent class members prior to his deposition.  (Stirsman Tr. 41:12-21, 44:4-16.)  He had not even searched for documents in his possession relevant to the litigation, nor did his attorneys ask him to do so.[11]  (*Id.* at 52:1-22.)

- Four Plaintiffs testified that they had no input into the decision to retain an expert:  for example, Ms. Fondren testified that she was unaware that counsel had engaged Ms. Cynthia Jones and did not participate in the decision to hire her or any other expert.  (Fondren Tr. 145:9-148:4; *see also* Daly Tr. 73:17-74:2; Orellana Tr. 139:13-140:22; Stirsman Tr. 119:16-120:13.)

- Three Plaintiffs testified that they do not know how much has been in incurred in legal fees to date:  for example, Mr. Daly testified that he has "no idea" how much has been incurred and has not sought to find out, nor does he believe that he is required to monitor those fees because he doesn't "know what would be prudent."  (Daly Tr. 157:10-160:15; *see also* Fondren Tr. 160:3-161:2; Stirsman Tr. 35:4-11.)

- Three Plaintiffs testified that they had no complaints about the Plan until being contacted by counsel:  for example, Ms. Fondren testified that "[p]rior to consulting [her] attorneys, [she] was not aware" that there was anything wrong with the Plan.  (Fondren Tr. 131:4-15; *see also* Daly Tr. 65:3-71:7; Stirsman Tr. 112:23-115:25.)

---

[9]      Mr. Stirsman also declined to travel to the jurisdiction where he chose to file suit in order to be deposed, preferring instead to be deposed close to home in Florida, because he "just didn't want to come to New York."  (Stirsman Tr. 25:5-27:9.)  Mr. Stirsman's refusal to travel in order to participate in the litigation indicates that he "lacks the incentive needed to fulfill [his] fiduciary duties and vigorously prosecute the claims filed" on behalf of unnamed Plan participants.  *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 149-50 (N.D. Tex. 2014) (finding proposed class representative inadequate where she did not attend class certification hearing and sought to be excused from attending court-ordered mediation).

[10]      Mr. Monaghan did not offer testimony either way on this topic.  The same is true with regard to Plaintiffs whose deposition testimony is not specifically cited in connection with the other examples.

[11]      Mr. Orellana also testified that he "shredded" documents relevant to this litigation despite understanding his obligation to preserve them.  (Orellana Tr. 197:11-198:12.)

*Second*, Plaintiffs lack basic knowledge about fundamental details of the litigation being conducted in their own names, including what class of individuals they seek to represent. Even though the crux of Plaintiffs' case is that Plan participants paid "unnecessarily high fees," (Br. at 2), Plaintiffs are unable to articulate what it means for a fee to be "unnecessarily high." For example:

- No Plaintiff could articulate why the fees of the Subject Funds are too high: for example, Mr. Monaghan testified that he has no personal understanding of what makes certain investment options' fees "unreasonable," as attested in his declaration, while Ms. Fondren did not know what the purportedly "unreasonable" fees even were. (Monaghan Tr. 44:14-47:9; Fondren Tr. 72:19-76:19, 121:4-15; *see also* Daly Tr. 53:8-54:11; Stirsman Tr. 67:17-70:14.) Mr. Orellana testified that, even though his current job as a financial advisor requires him to understand various investment products' fees so as to make investment recommendations to individuals, he does not know what makes a fee too high. (Orellana Tr. 91:9-93:11.)

- No Plaintiff understands exactly who they are seeking to represent: Ms. Fondren, Mr. Monaghan, Mr. Orellana, and Mr. Stirsman do not appreciate that they are seeking to represent a class of only certain participants who invested in the Subject Funds, rather than *all* Plan participants. (Fondren Tr. 117:22-118:7; Monaghan Tr. 26:12-28:6; Orellana Tr. 212:2-19; Stirsman Tr. 138:19-40:7.) And while Mr. Daly understands that only certain Subject Funds are at issue here, he was unable to name any but "the target date funds." (Daly Tr. 54:19-55:8.) Plaintiffs' brief similarly conflates putative class members with *all* Plan participants. (*See, e.g.*, *id.* at 13 (arguing that numerosity is satisfied because "there were between 266,439 and 301,076 participants in the Plan"); *id.* at 3 n.6 (stating that Plaintiffs are "prosecut[ing] claims on behalf of the Plan and *all* participants" (emphasis added)).

- Mr. Stirsman and Mr. Monaghan apparently believe that their complaint centers on the Subject Funds' underperformance, rather than fees: for example, Mr. Stirsman believes that the only way the Plan did not serve the best interests of Plan participants is that it did not "perform up to expectations" and that Defendants were required to provide participants with the best performing funds possible. (Stirsman Tr. 15:4-17:22; *see also* Monaghan Tr. 48:12-50:10.)

Thus, Plaintiffs' own deposition testimony establishes that they would inadequately represent the interests of unnamed Plan participants, and, accordingly, they may not represent a class here.

16

**C.    Mr. Monaghan Cannot Serve As A Class
Representative Because He Is Not A Member Of The Proposed Class**

Mr. Monaghan is not qualified to serve as a class representative for the further,

independent reason that he did not invest in *any* Subject Fund.  (*See* Add. A.)  As Mr. Monaghan

testified at his deposition -- consistent with his account statements -- the only Plan investment

options in which he has invested are the Large Cap Growth Index Fund, Stable Value Fund, and

JPMorgan Chase Common Stock Fund.  (Monaghan Tr. 57:14-23, 103:15-104:16.)

Consequently, Mr. Monaghan is not a member of the proposed class and as such may not

represent it, either.  *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) ("[A] class

representative must be part of the class.").

**II.    THE SUBJECT FUNDS IN PLAINTIFFS' PROPOSED
CLASS DEFINITION MUST BE SUBSTANTIALLY
NARROWED TO AVOID STANDING AND TYPICALITY ISSUES**

Even if any named Plaintiff is determined to be an adequate class representative --

and they should not be -- Plaintiffs' proposed class definition should be substantially narrowed.

*First*, participants subject to binding arbitration agreements are contractually prohibited from

being class members.  (*See supra* Argument Part I.A.)  *Second*, Plaintiffs lack standing to assert

claims concerning funds in which not one of them ever invested, such that the Growth and

Income Fund, Mid Cap Value Fund, and Target Date Income, 2020, 2025, 2035, 2040, and 2055

Funds should be excluded from any class definition.  *Third*, the Core Bond Fund and Small Cap

Core Fund should also be excluded, as Plaintiffs' claims with respect to those funds are atypical

due to the presence of different fee structures during the relevant period.  As a result, to the

extent that any class is certified, it should only include participants not subject to arbitration

agreements and who invested in one or more of the Mid Cap Growth Fund, Target Date 2015

Fund, Target Date 2030 Fund, Target Date 2045 Fund, or Target Date 2050 Fund.

17

A.     **Subject Funds In Which No Named Plaintiff Invested
Should Be Excluded, Because Plaintiffs Lack Standing To
Assert Claims In Connection With Funds In Which They Did Not Invest**

Standing "is a threshold question -- antecedent to class certification -- that

requires plaintiffs to have been personally injured, and plaintiffs . . . have no standing to assert

claims in relation to funds in which [they] did not personally invest." *Pub. Emps.' Ret. Sys. of

Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 480-81 (S.D.N.Y. 2010) (internal

quotation marks omitted).  Although there are fifteen Subject Funds at issue here, Plaintiffs

collectively invested in only *seven* of those funds, leaving eight Subject Funds in which no

Plaintiff invested.  (Add. A.)  Plaintiffs accordingly lack both constitutional and class standing

with respect to those eight funds, such that no class may be certified with respect to those funds.

1.     **Plaintiffs Lack Article III Standing With
Respect To Funds In Which They Did Not Invest**

To establish Article III standing, a plaintiff must have suffered "a distinct and

palpable" personal injury "*with respect to each asserted claim*."  *Mahon v. Ticor Title Ins. Co.*,

683 F.3d 59, 64 (2d Cir. 2012) (emphasis in original) (quoting *Gladstone Realtors v. Vill. of

Bellwood,* 441 U.S. 91, 100 (1979)).  Consequently, Plaintiffs lack Article III standing to pursue

claims in connection with funds in which they did not personally invest.

Constitutional standing requirements are not relaxed in ERISA cases such as this

one, where plaintiffs seek relief that will purportedly inure to the benefit of the Plan as a whole.

As the Second Circuit has held, "[a]n ERISA plan participant lacks standing to sue for ERISA

violations that cause injury to a plan but not individualized injury to the plan participant."

*Taveras*, 612 F. App'x at 29.  In *Taveras*, the Second Circuit affirmed the dismissal of a putative

class action alleging that defendants breached their fiduciary duties under ERISA by failing to

remove a fund from a 401(k) plan.  *In re UBS ERISA Litig.*, No. 08-cv-06696, 2014 WL

18

4812387, at *2 (S.D.N.Y. Sept. 29, 2014), *aff'd sub nom. Taveras v. UBS AG*, 612 F. App'x 27 (2d Cir. 2015).  The named plaintiff, however, failed to allege whether she had invested in the fund at issue.  *Id.* at *6.  The court held that the district court correctly determined that the plaintiff lacked standing:  her "attempt[] to demonstrate injury-in-fact by showing diminution in the value of [the plan's] assets generally," as opposed to diminution in the value of her own investments, was insufficient to establish individualized harm, as needed to establish constitutional standing.[12]  *Taveras*, 612 F. App'x at 29.

Similarly, here, it is impossible for Plaintiffs to assert a diminution in the value of their own investments when they did not choose to make those investments in the first instance.  Accordingly, Plaintiffs in the aggregate have suffered no constitutionally cognizable injury with respect to funds in which no named Plaintiff invested -- the Growth and Income Fund, Mid Cap Value Fund, Target Date Income Fund, Target Date 2020 Fund, Target Date 2025 Fund, Target Date 2035 Fund, Target Date 2040 Fund, and Target Date 2055 Fund (*see* Add. A) -- and thus do not have the requisite standing to support their claims with respect to those funds.

### 2. Plaintiffs Also Lack Class Standing With Respect To Funds In Which They Did Not Invest

Plaintiffs do not acquire standing merely because they purport to proceed on behalf of other participants.  Rather, a plaintiff may assert a claim on behalf of a class only where

---

[12]     *Taveras* did not address *Long Island Head Start Child Development Services*, 710 F.3d at 57, in which the Second Circuit held that plaintiffs who "assert[] their claims in a derivative capacity" on behalf of a plan have "injury-in-fact sufficient for constitutional standing" by alleging injuries to that plan.  *Long Island Head Start*, 710 F.3d 57, 67 n.5 (2d Cir. 2013).  That case, however, does not govern here, because it addressed a defined-benefit "ERISA plan[] that *managed* assets on behalf of plan participants," rather than a defined-contribution plan like the one at issue here and addressed in *Taveras*, "which does not involve the direct and active management of the participants' assets, but instead simply empower[s] the [plan's] fiduciaries to present investment options to the [plan] participants."  *In re UBS ERISA Litig.*, 2014 WL 4812387, at *7 (discussing *Long Island Head Start*).  Participants in defined-contribution plans have a financial stake only in their individual plan accounts, not in the plan as a whole.  *See generally Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999).

he alleges "(1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 160-61 (2d Cir. 2014) (holding that "[p]laintiffs lack standing to assert claims . . . related to trusts in which they did not invest").

In *Retirement Board*, investors sued trustees of mortgage-backed securities for breach of fiduciary duty based on an alleged failure to take action in the face of defaults on mortgage loans held by the trusts. 775 F.3d at 161. The court rejected the argument that, because the trustees' "policy of 'inaction' in the face of widespread defaults" applied to all trusts at issue, the plaintiff had standing to sue in connection with those trusts in which he had not personally invested: "even proof that [the trustees] *always* failed to act when it was required to do so would not prove [the plaintiffs'] case, because they would still have to show which trusts actually had deficiencies that required [the trustees] to act in the first place." *Id.* at 162. "As a result," the court concluded, "[p]laintiffs' claims do not implicate the 'same set of concerns' as those of absent class members who purchased certificates issued by trusts in which no named [p]laintiff invested." *Id.*

Here, as in *Retirement Board*, Plaintiffs' claims in connection with the Subject Funds in which they have invested -- the Mid Cap Growth Fund, Core Bond Fund, Small Cap Core Fund, and certain target-date funds -- do not implicate the same set of concerns as do claims in connection with Subject Funds in which they have not invested. For example, the funds in which Plaintiffs *have* invested are all managed (at least in part) by a Company-affiliated entity, leading Plaintiffs to lodge allegations of "self-dealing" and "conflict[s] of interest."

20

(Second Am. Compl. ¶¶ 3, 115.)  However, the Mid Cap Value Fund -- a Subject Fund in which

no Plaintiff invested -- was managed by an unaffiliated third-party, Earnest Partners; Plaintiffs

allege no untoward reason for including this unaffiliated option in the Plan.  Thus, the same

purported concerns of self-dealing are absent with respect to the Mid Cap Value Fund.

Further, Plaintiffs will also be required to show that individual funds -- like the

individual trusts in *Retirement Board* -- had deficiencies such that Defendants were required to

take action to remove them from the Plan.  Such a showing calls for specific evidence -- tailored

to each Subject Fund -- concerning the reasonableness of the fund's fees relative to those of

appropriate comparators (among other things).  Thus, claims regarding individual funds are

distinct and depend on different proof.  *See, e.g.*, *Dezelan v. Voya Ret. Ins. & Annuity Co.*, No.

16-cv-01251, 2017 WL 2909714, at *8 (D. Conn. July 6, 2017) (holding that ERISA plaintiff

lacked standing to assert claims on behalf of class in connection with funds she had not invested

in, where her claims required different proof than those of putative class members and therefore

did not implicate same set of concerns).

Even cases that Plaintiffs cite have narrowed class definitions or certified

subclasses so as to align with the named plaintiffs' own investments.  For example, in *Troudt v.

Oracle Corp.*, 325 F.R.D. 373, 380 (D. Colo. 2018), the court declined to certify a class as to

funds in which no named plaintiff invested:  because the relief sought was to be "measured by

the extent of the injury of the individual putative class members who suffered damages as a

result of their investment in a particular fund," plaintiffs who "suffered no such injury are neither

sufficiently typical nor adequate to represent the class."  *Id.* (citing *Spano v. The Boeing Co.*, 633

F.3d 574, 587 (7th Cir. 2011)).  Similarly, in *Fuller v. SunTrust Banks, Inc*., No. 11-cv-00784,

slip op. at 14 (N.D. Ga. June 27, 2018) (ECF No. 222), the court found that, because it would be

"required to determine whether each of the eight [challenged] funds was so deficient that [d]efendants breached their fiduciary duties in offering each fund," separate subclasses for each challenged fund were necessary to address typicality and commonality issues.  "Each class will be represented by one or more named [p]laintiffs who invested in the fund at issue."  *Id.*

Here, by contrast, *no* named Plaintiff is available to represent the claims of putative class members who invested in the Growth and Income Fund, Mid Cap Value Fund, and six of the ten target-date funds (the Target Date Income Fund, Target Date 2020 Fund, Target Date 2025 Fund, Target Date 2035 Fund, Target Date 2040 Fund, and Target Date 2055 Fund), as no Plaintiff invested in those funds.  (*See* Add. A.)  Those funds should accordingly be excluded from Plaintiffs' proposed class definition.

### B.   The Core Bond Fund And Small Cap Core Fund Should Be Excluded, Because Plaintiffs' Claims With Respect To Those Funds Are Atypical Where Putative Class Members Were Subject To Different Fee Structures During The Relevant Period

A named plaintiff's claims are typical only "where each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove defendants' liability."  *Vengurlekar v. Silverline Techs., Ltd.*, 220 F.R.D. 222, 227 (S.D.N.Y. 2003).  This requirement has not been met here with respect to Plaintiffs' claims in connection with the Core Bond Fund and the Small Cap Core Fund:  the changes made with respect to each of their fee structures during the relevant period -- which Plaintiffs ignore -- means that putative class members' claims arise from courses of events that are different in critical respects, and will necessarily depend on different legal arguments.

The core of Plaintiffs' complaint is that Defendants' purported breach of fiduciary duty caused Plan participants to pay "unnecessarily high fees."  (Br. at 2.)  But, as Plaintiffs concede, Defendants took a number of actions during the relevant period that resulted in

"substantial fee decrease[s]" for participants.  (Br. at 10 n.13.)  In particular, the fees of the Core

Bond Fund and the Small Cap Core Fund, while initially charged to participants, *were entirely*

*absorbed by the Company* beginning in 2015 when those funds were converted from a mutual

fund to separate account or commingled fund format, such that *no* investment management fees

whatsoever were passed on to participants.  (*See supra* Background Part B.)  Thus, it is simply

not the case that, as Plaintiffs argue, "the same fee structures" applied to all putative class

members.  (Br. at 14-15.)  Rather, participants' claims are necessarily impacted by whether they

chose to invest in these funds before or after the fee elimination.  As a result, putative class

members' claims do not all "arise from the same course of events" or depend on the same legal

arguments, as required to establish typicality under Rule 23(a).  *Vengurlekar*, 220 F.R.D. at 227.

In a case involving similar ERISA claims of excessive 401(k) plan-related fees,

another court recently found that different fee structures defeated typicality.  *See Bell v. Pension*

*Comm. of ATH Holding Co., LLC*, No. 15-cv-02062, 2018 WL 4385025, at *4 (S.D. Ind. Sept.

14, 2018).  In *Bell*, the plaintiffs sought to certify a class of participants who were charged

allegedly excessive fees.  *Id.* at *2.  But it was "undisputed that there [were] two fee structures at

issue during the relevant time period for the proposed class."  *Id.* at *4.  For part of the relevant

period, participants were charged an asset-based fee, but midway through the time period, the

plan switched to a flat-fee model.  *Id.*  The court found that the plaintiffs had "ignore[d] the

typicality issues caused by including a time period covering two different fee structures within

the class," since a subset of the proposed class had benefited from the shift to a flat fee and

therefore "would not have suffered the injury typical of the named [p]laintiffs' claim."  *Id.* at *4-

5.  Accordingly, the court declined to certify a class with respect to the named plaintiffs'

excessive fee claims.  *Id.* at *5; *see also Spano*, 633 F.3d at 590 ("[p]recision on [the uniformity

of fees] is essential to ensure that the class representative's claim is typical"; finding that

plaintiffs asserting excessive-fee claims under ERISA failed to demonstrate typicality where

complaint was unclear as to nature of fees charged).

       For similar reasons, the claims with respect to the Core Bond Fund and the Small

Cap Core Fund are atypical.  Only Mr. Orellana and Mr. Stirsman invested in the Core Bond

Fund, but neither did so after it was converted to a commingled fund, and its fees were

eliminated, in March 2016.[13]  Similarly, only Mr. Orellana invested in the Small Cap Core Fund,

but not after it was converted to a separate account, and its fees were eliminated, in December

2015.  (Add. A; Orellana Account Statement.)  As a result, Mr. Orellana and Mr. Stirsman's

claims arise from Defendants' decision to include those funds as mutual fund options in the Plan.

But the claims of other participants who invested in those funds after their conversions -- to the

extent they have any viable claims in connection with no-fee investment options -- arise from

Defendants' decision to offer them at no cost as a commingled fund or separate account.  The

legal argument underpinning Plaintiffs' claims is different, too:  while Plaintiffs assert that

Defendants "failed to prudently evaluate the Plan's investment portfolio with respect to expenses

and performance," which "resulted in Plan participants paying unnecessarily high fees," (Br. at

2), the same argument cannot support other participants' claims, whose investments were subject

to *no* fees whatsoever.  Indeed, in the unlikely event that liability were somehow established,

Plaintiffs' proposed methodology for calculating damages would be inapplicable to those other

participants, as it depends on identifying a comparable "lower fee alternative" to a given Plan

investment option -- nonexistent in the case of the Core Bond commingled fund and the Small

---

[13]    Add. A; Orellana Account Statement (Hines Decl. Ex. 24); Stirsman 2015 Account
Statement (Hines Decl. Ex. 25).

Cap Core separate account.  (Jones Decl. at 4-5 (ECF No. 98).)  Therefore, as in *Bell*, the named

Plaintiffs have suffered atypical injuries.

     **C.**     **At A Minimum, The Time Periods Following The Core Bond Fund And The Small Cap Core Fund's Fee Elimination, And The Target Date Funds' Fee Reduction, Should Be Excluded From The Proposed Class Definition**

     Consistent with Plaintiffs' own deposition testimony, the proposed class definition

should -- at the very least -- be modified so that participants subject to the Core Bond Fund and

Small Cap Core Fund's no-fee structures, and the Target Date Funds' reduced-fee structures (*see*

*supra* Background Part B), are excluded from any certified class.  *First*, as Mr. Daly testified, the

time period after the Target Date Funds' fees were reduced -- April 1, 2016 to the present -- is not

part of Plaintiffs' case, and should be excluded.  (Daly Tr. 130:13-134:5; *see also* Br. at 10 n.13

(noting "significant[]" fee reduction of Target Date Funds effective April 2016).)  *Second*,

putative class members lack standing to complain about purportedly excessive fees in connection

with the Core Bond Fund or the Small Cap Core Fund if they themselves were charged no fees,

let alone "unnecessarily high fees."[14]  (Br. at 2.)  Indeed, Mr. Stirsman testified that the time

period following the elimination of the Core Bond Fund's fees is not a part of Plaintiffs' case.

(Stirsman Tr. 105:20-106:23.)  That time period, too, should be excluded from any class

definition.

### CONCLUSION

     For all of the foregoing reasons, Plaintiffs' Motion should be denied, or, in the

alternative, substantially narrowed as outlined above.

---

[14]     In two cases cited by Plaintiffs, the court modified class definitions to address similar concerns.  *See Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 165 (S.D.N.Y. 2017) (cutting off class period on date when "any conflict of interest was vitiated" due to defendants' sale of their asset-management business to third party); *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15-cv-09936, 2017 WL 3868803, at *10-11 (S.D.N.Y. Sept. 5, 2017) (modifying class definition to include only participants who had invested in challenged funds).

Dated:  November 5, 2018            Respectfully submitted,
        New York, New York

                                   /s/ Susan L. Saltzstein
                                   _____
                                   Susan L. Saltzstein
                                   James R. Carroll (*pro hac vice*)
                                   Michael S. Hines (*pro hac vice*)
                                   SKADDEN, ARPS, SLATE
                                     MEAGHER & FLOM LLP
                                   Four Times Square
                                   New York, New York 10036
                                   (212) 735-3000
                                   susan.saltzstein@skadden.com
                                   james.carroll@skadden.com
                                   michael.hines@skadden.com

                                   *Counsel for Defendants*