UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

TERRE BEACH, *et al.*, individually and on behalf
of themselves and all others similarly situated,       :

        Plaintiffs,   :  Civil Action
                  17-CV-00563-JMF

     v.          :

JPMORGAN CHASE BANK, NATIONAL   :
ASSOCIATION, JPMORGAN CHASE &
COMPANY, *et al.*,         :

        Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    I.      PROCEDURAL HISTORY.................................................................................. 3

          A.     Inception through Discovery, Class Certification, and the Filing of
                Dispositive Motions ................................................................................. 3

          B.     Mediation and Negotiation of the Settlement ............................................. 5

    II.     THE SETTLEMENT TERMS............................................................................... 6

          A.     Monetary Relief ....................................................................................... 6

          B.     Release of Claims .................................................................................... 7

    III.    PRELIMINARY APPROVAL OF SETTLEMENT AND AUTHORIZATION
          OF NOTICE TO THE CLASS ........................................................................... 8

    IV.   CLASS NOTICE AND REACTION TO SETTLEMENT ................................... 8

ARGUMENT ..................................................................................................................... 11

    I.      STANDARD OF REVIEW ................................................................................ 11

    II.     REVIEW OF THE RULE 23(E)(2) AND *GRINNELL* FACTORS
          DEMONSTRATES THAT THE SETTLEMENT WARRANTS FINAL
          APPROVAL ...................................................................................................... 13

          A.     Class Counsel and the Class Representatives Have Adequately
                Represented the Class Satisfying Rule 23(e)(2)(A)................................... 13

          B.     The Settlement is the Product of Arm's-Length Negotiations between
                Experienced Counsel after Extensive Litigation Satisfying Rule
                23(e)(2)(B) .............................................................................................. 14

          C.     The Settlement Provides and Equitably Distributes Significant Relief to
                Class Members Satisfying the Adequacy Factors of Rule 23(e)(2)(C) .... 15

               1.     The Costs, Risk, Delay of Trial and Appeal ................................. 15

                2.     Effectiveness of the Proposed Method of Distributing Relief...... 19

                3.     The Terms of Any Proposed Award of Attorneys' Fees .............. 19

D.      The Settlement Treats Class Members Equitably Satisfying Rule
        23(e)(2)(D) ........................................................................................ 20

E.      The Additional *Grinnell* Adequacy Factors Weigh In Favor of
        Approval .......................................................................................... 23

        1.      Factor 7:  Defendant's Ability to Withstand a Greater
                Judgment ............................................................................. 23

        2.      Factors 8 and 9: Range of Reasonableness of the Settlement
                Fund in Light of the Best Possible Recovery and Attendant
                Risks of Litigation ............................................................... 23

CONCLUSION ................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re AOL Time Warner, Inc. SEC and ERISA Litig.*,
    2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)..............................................................................14

*Brotherston v. Putnam Invs.*, *LLC*,
    2017 WL 2634361 (D. Mass. June 19, 2017) ..........................................................................16

*Brotherston v. Putnam Invs., LLC*,
    907 F.3d 17 (1st Cir. 2018).....................................................................................................16

*Brotherston v. Putnam Invs., LLC*,
    No. 1:15-cv-13825 (D. Mass. Apr. 29, 2020) .........................................................................16

*In re Checking Account Overdraft Litig.*,
    830 F. Supp. 2d 1330 (S.D. Fla. 2011) ...................................................................................24

*Christine Asia Co. v. Jack Yun Ma*,
    2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) .........................................................................23

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)............................................................................................ *passim*

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001)......................................................................................................11

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    279 F.R.D. 151 (S.D.N.Y. 2011) ............................................................................................24

*In re GSE Bonds Antitrust Litig.*,
    2019 WL 6842332 (S.D.N.Y. Dec. 16, 2019) ........................................................2, 12, 14, 25

*In re GSE Bonds Antitrust Litig.*,
    2020 WL 3250593 (S.D.N.Y. June 16, 2020) .........................................................................11

*Hill v. State Street Corp.*,
    2015 WL 127728 (D. Mass. Jan. 8, 2015) ..............................................................................18

*In re IMAX Sec. Litig.*,
    283 F.R.D. 178 (S.D.N.Y. 2012) ............................................................................................24

*Johnson v. Fujitsu Tech. & Business of Am., Inc.*,
    2018 WL 2183253 (N.D. Cal. May 11, 2018) ........................................................................24

*Johnson v. Rausch, Sturm, Israel, Enerson & Hornik, LLP*,
    333 F.R.D. 314 (S.D.N.Y. 2019) ...................................................................15, 20

*Kemp-DeLisser v. Saint Francis Hospital and Medical Center*,
    2016 WL 6542707 (D. Conn. Nov. 3, 2016) ..........................................................18

*Krueger v. Ameriprise*,
    2015 WL 4246879 (D. Minn. July 13, 2015) .........................................................18

*Kruger v. Novant Health, Inc.*,
    2016 WL 6769066 (M.D.N.C. Sept. 29, 2016).......................................................18

*Larson v. Allina Health Sys.*,
    350 F. Supp. 3d 780 (D. Minn. 2018)....................................................................16

*Main v. Am. Airlines, Inc.*,
    248 F. Supp. 3d 786 (N.D. Tex. 2017) ..................................................................16

*Main v. Am. Airlines, Inc.*,
    No. 16-cv-00473 (N.D. Tex. July 7, 2017) ......................................................19, 22

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ..........................................................................18

*Mehling v. New York Life Ins. Co.*,
    246 F.R.D. 467 (E.D. Pa. 2007)............................................................................19

*Moitoso, et al. v. FMR, LLC, et al.*,
    2020 WL 1495938 (D. Mass. Mar. 27, 2020).................................................16, 17

*Moreno v. Deutsche Bank Ams. Holding Corp.*,
    No. 15-cv-9936 (S.D.N.Y. Aug. 14, 2018)......................................................19, 22

*In re Namenda Direct Purchaser Antitrust Litig.*,
    2020 WL 2769223 (S.D.N.Y. May 27, 2020) ..................................................2, 11

*Newbridge Networks Sec. Litig.*,
    1998 WL 765724 (D.D.C. Oct. 23, 1998) .............................................................24

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ..........................................................................15

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019)..................................................................2, 15, 23

*In re Rite Aid Corp. Sec. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa. 2001) ....................................................................24

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
  2016 WL 7494320 (D. Conn. Dec. 30, 2016) ......................................................16

*Sacerdote v. New York Univ.*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018) ........................................................16, 17, 18

*Sims v. BB&T Corp.*,
  No. 15-cv-732 (M.D.N.C. Nov. 30, 2018) ............................................................19

*Terraza v. Safeway Inc.*,
  241 F. Supp. 3d 1057 (N.D. Cal. 2017) ................................................................16

*Urakhchin v. Allianz Asset Mgmt. of Am., LP*,
  No. 15-cv-01614 (C.D. Cal. Dec. 26, 2017) ........................................................19

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ..................................................................................11

*Wildman v. Am. Century Servs., LLC*,
  362 F. Supp. 3d 685 (W.D. Mo. 2019) ................................................................16

**Federal Statutes**

Class Action Fairness Act, 28 U.S.C. § 1715(b)-(c) ..................................................9, 10

ERISA ..................................................................................................... *passim*

**Rules**

Federal Rule of Civil Procedure 23 ...................................................................... *passim*

Federal Rule of Civil Procedure 30(b)(6) ......................................................................4

**Regulations**

68 Fed. Reg. 75632 ...............................................................................................8

## INTRODUCTION

Plaintiffs seek final approval of the Parties' Class Action Settlement Agreement providing $9 million in monetary relief and resolving Plaintiffs' claims against Defendants under the Employee Retirement Income Security Act ("ERISA") relating to the JPMorgan Chase 401(k) Savings Plan ("Plan").[1]  The Court preliminarily approved this Settlement on May 26, 2020 after having "considered each of the factors identified in FED. R. CIV. P. 23(e)(2) and in *City of Detroit v. Grinnell Corp.* ("*Grinnell*"), 495 F.2d 448, 463 (2d Cir. 1974)," and having found that it would "likely be able" to approve the Settlement. ECF No. 213 (the "Preliminary Approval Order" or "PAO"), ¶ 3.

In seeking preliminary approval, Plaintiffs detailed the three-year history of this actively litigated complex ERISA case, recounted the considerable fact and expert discovery conducted and completed, described the significant motion practice (including a contested class certification motion resolved in favor of Plaintiffs and pretrial dispositive motions including the motion to dismiss, motions to exclude Plaintiffs' experts, and summary judgment), and motions to exclude Plaintiffs' experts. Additionally, Plaintiffs presented the Settlement Agreement, described the negotiations that led to the Settlement, discussed at length the risks, costs, and uncertainty attendant to continued litigation, and explained the Settlement terms, benefits, and the plan of allocation that will be used to equitably distribute the Settlement funds to Class Members.

Plaintiffs' preliminary approval showing allowed the Court to consider, as it is now required to do under Rule 23, as amended (effective as of December 2018), whether it would "likely be able to: (i) approve the proposal under Rule 23(e)(2)." *See* PAO, ¶ 3; *In re Payment*

---

[1] All capitalized terms have the meaning assigned to them in Article 1 of the Parties'' Settlement Agreement. (ECF No. 212-1)

*Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 28 (E.D.N.Y. 2019). Notably, in order to preliminarily approve a settlement under amended Rule 23, the court now analyzes the same Rule 23(e)(2) and *Grinnell* factors that are applied to determine whether a settlement is "fair, reasonable and adequate" and would therefore  warrant final approval. *Id.*[2] Here, the Court undertook this review and concluded that it would "be likely able to approve the Settlement."  ECF No. 213, ¶ 3.

Consistent with Rule 23(e)(1), and based upon Plaintiffs' showing that approval was likely, the Court directed that notice of the Settlement be provided to Class Members. *Id.* at ¶ 3. Additionally, the Court appointed a Settlement Administrator who provided Notice to the nearly 350,000 Class Members pursuant to the approved notice plan. *Id.* at ¶¶ 6, 7; Declaration of Joseph H. Meltzer ("Meltzer Decl.") at ¶28, Ex. D. To date, the response of the Class to the Notice has been overwhelmingly positive, with only one Class Member filing an objection.[3] *Id.* In addition, as required by the Settlement, an Independent Fiduciary was retained to review the Settlement terms and has confirmed that the Settlement terms are fair and reasonable. Meltzer Decl., Ex. L.

In short, as discussed herein, everything that has occurred subsequent to preliminary approval confirms the conclusion that the Settlement should be approved. Accordingly, Plaintiffs respectfully request that the Court grant final approval to the Settlement.

---

[2] Courts in this Circuit continue to also consider the nine *Grinnell* factors when assessing whether a settlement is "fair, reasonable, and adequate*." See In re Namenda Direct Purchaser Antitrust Litig.*, 2020 WL 2769223, at *2 (S.D.N.Y. May 27, 2020) (noting that courts in the Second Circuit use the *Grinnell* factors "in tandem with Rule 23 to determine whether a class settlement warrants final approval"); *In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *1 (S.D.N.Y. Dec. 16, 2019) (noting that "the four new Rule 23 factors" do not displace the *Grinnell* factors.").

[3] As discussed below, even this single objection did not raise issues about the terms of the Settlement but rather raised concerns about the potential adverse consequences of being associated with the Settlement. The deadline for submitting objections to the Settlement is September 7, 2020. Any objections received after this submission will be addressed in a response to be filed on September 17, 2020.

## BACKGROUND

I.   **PROCEDURAL HISTORY**

   **A. Inception through Discovery, Class Certification, and the Filing of Dispositive Motions**

On January 25, 2017, Plaintiff Terre Beach, a participant in the Plan, filed a complaint on behalf of the Plan and similarly situated Plan participants, alleging a series of claims against Defendants under ERISA. ECF No. 1. Following consolidation of that action with three other actions similarly seeking relief on behalf of the Plan and Plan participants, Plaintiffs filed an amended consolidated complaint in May 2017, ECF No. 38, and a Second Amended Complaint in July 2017. ECF No. 55 ("Complaint" or "¶").

In their Complaint, Plaintiffs alleged that Defendants breached their fiduciary duties of prudence and loyalty owed to the Plan, Plaintiffs, and other Plan participants under ERISA by, *inter alia*, failing to prudently evaluate the Plan's investment portfolio with respect to six specified funds, *i.e.* the Disputed Investments. Plaintiffs alleged that these fiduciary breaches resulted in Plan participants paying unnecessarily high fees, which diminished their retirement savings. To remedy this alleged unlawful conduct, Plaintiffs sought relief pursuant to ERISA § 502(a)(2) and (3).

Defendants moved to dismiss the Complaint on July 27, 2017. ECF No. 58. On March 29, 2018, the Court denied JPMorgan's motion in large part, and allowed all of Plaintiffs' claims other than the non-disclosure claims to proceed. ECF No. 73.[4]   Thereafter, both before and after Plaintiffs filed their October 1, 2018 motion for class certification (ECF No. 95), the Parties engaged in substantial fact and expert discovery. Such discovery included requests to produce,

---

[4] With regard to Plaintiffs' breach of fiduciary duty claims, the Court noted that they were "substantially similar to those that other courts have held to be sufficient [to] survive motions to dismiss." ECF No. 80 (Apr. 24, 2018 Status Conf. Tr. at 4, lines 2-11 (citations omitted)).

pursuant to which Defendants produced over 270,000 pages of documents and other data that Plaintiffs' Counsel, and their experts, reviewed, analyzed and used in assessing and advancing Plaintiffs' claims. Meltzer Decl. ¶ 7. Plaintiffs also took 13 depositions, including of members of the Employee Plans Investment Committee ("EPIC") and the Retirement Plans Investment Group ("RPIG"), a number of the named Defendants, a Rule 30(b)(6) designee, and two of Defendants' experts. In addition, Defendants deposed each of the Named Plaintiffs, as well as Plaintiffs' experts. Also in connection with expert discovery, Plaintiffs defended the depositions of their two experts, Cynthia L. Jones -- who issued reports on damages -- and Marcia S. Wagner, who issued reports on standard fiduciary practices and processes. Meltzer Decl. ¶ 9.

Defendants strenuously opposed Plaintiffs' motion for class certification and raised a series of arguments as to why certification of a class was inappropriate in this case. On June 11, 2019, the Court largely granted Plaintiffs' motion, certifying a class of participants in the Plan from January 25, 2011 to the present. ECF No. 132. The Court adopted a refined class definition, excluding those who had invested in the Disputed Investments "only at times when the funds had no fees or reasonable fees." ECF No. 132 at 16 and 22. As such, the Court certified the following Class:

> All persons, except Defendants and any other persons with responsibility for the Plan's investment menu, who were participants in or beneficiaries of the Plan, at any time between January 25, 2011 and the present (the "Class Period"), and whose individual accounts were invested in one or more of the following funds: the Growth and Income Fund; the Mid Cap Value Fund; the Mid Cap Growth Fund; the Small Cap Core Fund, but only if the investment occurred before December 19, 2015; the Core Bond Fund, but only if the investment occurred before March 12, 2016; and any of the Target Date Funds, but only if the investment occurred before April 1, 2016.

The Parties completed discovery, including expert discovery, in the fall of 2019 in accordance with the case management orders entered in this case.

Pursuant to this Court's procedures, Plaintiffs filed a letter requesting permission to file a motion for partial summary judgment following the close of discovery (ECF No. 146), which Defendants opposed. ECF No. 153. Defendants likewise filed a letter requesting permission to file a motion for partial summary judgement (ECF No. 147), which Plaintiffs opposed. ECF No. 151. On October 13, 2019, the Court granted both Parties' requests to file summary judgment motions. ECF No. 162. Accordingly, in October and November of 2019, the Parties each filed separate motions for partial summary judgment (ECF Nos. 177 and 189), which were fully briefed as of January 24, 2020. The partial summary judgment motions filed by the Parties reflected the vast disagreements between them regarding the proper application of the law to the facts discovered in the case and the viability of the claims asserted. As reflected in the discussion below regarding the risks and uncertainties of continued litigation, *infra.* at II.C.1, there were significant bases for legitimate dispute as to the outcome of this litigation. In addition to the summary judgment motions, Defendants filed, and Plaintiffs responded to, motions to exclude the opinions and testimony of Plaintiffs' experts, Cynthia L. Jones and Marcia S. Wagner. ECF Nos. 166, 169, 184 and 187.

### B.  Mediation and Negotiation of the Settlement

The Settlement presented for final approval was reached following mediation conducted after discovery was completed and at a time when the Parties were well aware of the strengths and weaknesses of their positions. Indeed, the Parties agreed to engage Hunter R. Hughes, III, as mediator in this matter while the summary judgment and Daubert motions were pending. Mr. Hughes is an experienced and well-respected mediator, who has successfully resolved numerous ERISA cases and other actions. Meltzer Decl. ¶ 17. The Parties prepared detailed mediation statements in advance of the mediation and participated in a full-day video conference mediation

with Mr. Hughes on April 3, 2020.[5]  Through mediation with Mr. Hughes, the Parties reached an arms-length, class-wide resolution of this matter, subject to the Court's approval. Thereafter, the Parties negotiated the comprehensive Settlement Agreement, which was preliminarily approved in May 2020 and is presented for final approval now. *Id*. at ¶ 19.

## II.    THE SETTLEMENT TERMS

The Settlement provides the following relief to members of the Class certified by the Court[6] in exchange for the releases described below:

### A.    Monetary Relief

The Settlement requires Defendants to contribute the Gross Settlement Amount of $9 million dollars to a common settlement fund (the "Settlement Fund"). Settlement Agreement ¶ 1.30. Pursuant to the Settlement, Defendants were required to, and did, make such contribution within a specified time period following preliminary approval of the Settlement, and such funds have been maintained as a Qualified Settlement Fund by the appointed escrow account, with any interest and investment earnings thereon becoming part of the Qualified Settlement Fund. *Id.* at 4.2. After accounting for any Attorneys' Fees and Expenses, Administrative Expenses, and Service Awards approved by the Court, the remaining funds (the Net Settlement Amount) are to be distributed to eligible Class Members in accordance with the Plan of Allocation. *Id.* ¶ 1.41.

The Plan of Allocation, as detailed in the Settlement Agreement, provides that the Net Settlement Amount will be allocated among eligible Class Members in proportion to their Settlement Allocation Score, per the methodology set forth therein and described below. After

---

[5] A prior mediation session scheduled to be held in person in New York City on March 31, 2020 was re-scheduled for April 3, 2020 via video conference due to the impact of the coronavirus pandemic.

[6] Pursuant to the Settlement Agreement, the Class Period will end on the date of final approval of the Settlement. Settlement Agreement, ¶ 1.11. Such date will replace "the present" in the certified class definition.

determining each Class Member's Settlement Allocation Score, the Settlement Administrator will determine the total settlement payment available to each Class Member by calculating each such Class Member's pro rata share of the Net Settlement Fund; this is accomplished by comparing each Settlement Allocation Score to the sum of the Settlement Allocation Scores for all Class Members.

Active Participants' accounts will be automatically credited with their share of the Settlement Fund. *Id.* ¶ 5.2. Former Participants will have the opportunity to submit a Rollover Form allowing them to have any distribution rolled over into an individual retirement account or other eligible employer plan. *Id.* ¶ 5.3. Former Participants who do not timely submit a Rollover Form will receive a check. *Id.* ¶ 5.3. Under no circumstances will any monies revert to JPMorgan. Any checks that are uncashed will revert to the Qualified Settlement Fund and will be paid to the Plan to defray administrative fees and expenses. *Id.* ¶ 5.6.

**B.      Release of Claims**

In exchange for the relief provided by the Settlement, the Class will release the Released Defendant Parties from any claims: (i) that were asserted in the Action, could have been asserted in the Action, or that arise out of, relate to, or are based on any of the conduct alleged in the Action; (ii) that would be barred by *res judicata* based on the Court's entry of the Final Approval Order; (iii) that arise from or relate to the direction to calculate, the calculation of, and/or the method or manner of the allocation of the Net Settlement Fund pursuant to the Plan of Allocation; or (iv) that arise from or relate to the approval by the Independent Fiduciary of the Settlement Agreement, unless brought against the Independent Fiduciary alone. *Id.* ¶¶ 7.1, 7.2

The Settlement Agreement required that Defendants, in concert with Plaintiffs, select and retain an Independent Fiduciary to review the Settlement for compliance with all relevant

requirements set forth in PTE 2003-39[7] and that the Independent Fiduciary determine whether to approve and authorize Plaintiffs' Released Claims on behalf of the Plan. *Id.* ¶ 2.2. The Independent Fiduciary has now completed the required review and has issued a determination expressly authorizing the Settlement and the execution of the releases on behalf of the Plan as follows:

> After a thorough review of the pleadings and interviews with the parties' counsel, Gallagher has concluded that the Settlement was achieved at arms' length and is reasonable given the uncertainties of a larger recovery for the Class at trial and the value of claims foregone. … [I]t is fair to conclude that the Settlement on the terms described above meets the requirements of the Class Exemption.

.Meltzer Decl. ¶ 27, Ex. L.

## III. PRELIMINARY APPROVAL OF SETTLEMENT AND AUTHORIZATION OF NOTICE TO THE CLASS

In its May 26, 2020 PAO, this Court found that it was likely to approve the terms of the Settlement, authorized the distribution of the Notice, approved the form and manner of such Notice and scheduled a Fairness Hearing for September 22, 2020, to consider motions for final approval and an award of attorneys' fees and costs. ECF No. 213, ¶¶ 3, 4. In addition, the Court appointed Analytics Consulting, LLC ("Analytics") to serve as the Settlement Administrator, distribute the Notices, and carry out the other administrative duties specified by the Settlement Agreement. *Id.* ¶ 6.

## IV. CLASS NOTICE AND REACTION TO SETTLEMENT

Pursuant to the PAO, the terms of the Settlement and the Court-approved notice program, Analytics mailed the Court-approved Notice (and Former Participant Rollover Form, if applicable) to each of the Class Members identified by the Plan's record keepers. *See* Meltzer Decl. Ex. D (Analytics Decl.) ¶¶ 3-9. In total, 348,856 Notices were mailed, including 185,499 Notices to Former Participants. *Id.*

---

[7] *See* Prohibited Transaction Exemption 2003-39, 68 Fed. Reg. 75632, as amended, 75 Fed. Reg. 33830.

Prior to sending these Notices, Analytics cross-referenced the addresses on the Class List with the United States Postal Service National Change of Address ("NCOA") Database, certified the addresses *via* the Coding Accuracy Support System ("CASS"), and verified them through Delivery Point Validation ("DPV"). *Id.* ¶ 4. Analytics further requested that the USPS return (or otherwise notify Analytics of) Notices with undeliverable mailing addresses. Analytics then researched these addresses using third-party data to identify updated mailing addresses for re-mailing purposes. *Id.* ¶ 8. As a result, the Notice program implemented here was very effective. Out of 348,856 Notices that were mailed, only 3.36% were ultimately undeliverable despite these efforts. *Id.* ¶ 9.

As required by the PAO, Analytics also established the Settlement Website at www.jpmorganerisafeesettlement.com. *Id.* ¶ 14. Among other things, the Settlement Website included: (1) a "Home" page with buttons for "More Information," "Important Deadlines," and "Court Documents"; (2) drop downs from a "More Information" tab that included "Frequently Asked Questions;" "Important Case Documents" (*i.e.*, the Notice, Former Participant Rollover Form, the Preliminary Approval Order, the Class Action Settlement Agreement, and the Second Amended Complaint[8]), "Important Deadlines" and "Settlement Status"; and (3) tabs for "Counsel Information" and settlement administrator mail, email and telephone contact information. *Id.* In addition, Analytics created and maintained a toll-free telephone support line (1-866-930-3729) as a resource for Class Members seeking information about the Settlement. *Id.* ¶17. This telephone number was provided in the Notice, as well as on the Settlement Website. *Id.*[9]

---

[8] Once filed, the Settlement Administrator will update the Settlement Website with the briefs in support of Plaintiffs' Motion for Final Approval of Settlement and Class Counsel's Motion for Attorneys' Fees, Expenses, and Plaintiffs' Service Awards. Analytics Decl. ¶ 17.

[9] In addition to implementing the PAO provisions providing for notice to the Class, Paragraph 20 of the PAO provides that the Settlement Administrator will serve the notice of the Settlement on federal and state officials required by the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715(b)-(c) for Defendants. As set forth in ECF Nos. 216 and 217,

The reaction of the Class to the Notice has been overwhelmingly positive. As of this date, only one Class Member, Mr. Mark Davis, has filed an objection. ECF No. 214. *See also* Meltzer Decl. ¶ 30 & Ex. H. Mr. Davis asks that the Court remove his name "from the terms of the settlement," and that the Court "allow the Settlement to proceed forward with specific names, such as [his] removed from the Settlement for either future civil action or to hold-off civil action indefinitely." *Id.* Mr. Davis states that he is seeking such relief because he is concerned that he (and others with similar concerns) "will be retaliated against" for participating in the Settlement and he indicates that he does not perceive the benefit of participation sufficient in light of the potential risks. Thus, Mr. Davis states that "[i]f this Settlement were to proceed with objecting names included, such as myself, to these Terms and Conditions, then I and others would potentially face an indefinite blacklisting(s) across a much larger domain of future job and/or financial opportunities." *Id.*

Class Counsel has attempted to contact Mr. Davis to address his objection, to assuage his concerns and inform him that under ERISA § 510, 29 U.S.C. § 1140, it is unlawful to "discriminate against a participant or beneficiary for exercising" his/her rights under the statute, and to clarify the nature of relief he seeks. Meltzer Decl. ¶ 31.

Mr. Davis does not identify specific aspects of the Settlement or its terms that he believes are unfair, inadequate or unreasonable as to Class Members. It may be that he is seeking only to

---

due to an internal Analytics' miscommunication discovered through routine maintenance, fifteen states attorneys-general that had requested notification by e-mail in the current COVID environment were not timely notified and did not receive their CAFA notification 90 days prior to the Fairness Hearing. As a result, and in order to ensure that, in accordance with CAFA, no order granting final approval would be entered without 90 days prior notice, the Parties jointly requested that the Court proceed with the Fairness Hearing on September 22, 2020 as scheduled but hold in abeyance any decision on final approval until October 7, 2020. ECF No. 216. On July 28, 2020, the Court granted the request, noting that while the Court reserved judgment on whether to grant final approval, any approval would be deferred until October 7, 2020. ECF No. 218.

be permitted to opt out.[10]   Given these circumstances, his sole objection raises no basis for concluding that the Settlement is not fair, adequate and reasonable. Indeed, to the contrary, the fact that only one Class Member objected to the Settlement indicates the Settlement's substantive fairness that favors approval. *See, e.g.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001) (affirming the district court's determination that seventy-two exclusions and eighteen written objections out of 27,883 notices was a "small number of objections [that] weighed in favor of settlement").

## ARGUMENT

## I.   STANDARD OF REVIEW

In order to grant final approval of a proposed settlement under Federal Rule of Civil Procedure 23(e)(2), the court must find "that it is fair, reasonable, and adequate." *In re GSE Bonds Antitrust Litig.*, 2020 WL 3250593, at *1. Rule 23(e)(2) identifies four factors to be considered in making such determination: (1) adequacy of representation, (2) existence of arm's-length negotiations, (3) adequacy of relief, and (4) equitableness of treatment of class members. FED. R. CIV. P. 23(e)(2). Additionally, courts in this Circuit also consider the nine *Grinnell* factors[11] when assessing whether a settlement is "fair, reasonable, and adequate." *See In re Namenda Direct Purchaser Antitrust Litig.*, 2020 WL 2759223, at *2 ("courts in the Second Circuit use [the *Grinnell* factors] in tandem with Rule 23 to determine a class settlement warrants final approval.");

---

[10] As the Notice advises in ¶ 14, the Settlement involves a Class certified under Federal Rule of Civil Procedure 23(b)(1) which does not provide for an opportunity to opt out. If Class Counsel is able to reach Mr. Davis, they will advise him of this, and discuss what options he might have for avoiding participation in the Settlement if he so desires.

[11] The *Grinnell* factors include: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) (citing *Grinnell*, 495 F.2d at 463).

*In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *1 (observing that "the Advisory Committee Notes to the 2018 amendments indicate that the four new Rule 23 factors were intended to supplement rather than displace these '*Grinnell*' factors."). Here, as required by Rule 23(e)(2) and discussed above, this Court has already "considered each of the factors identified in FED. R. CIV. P. 23(e)(2) and in [*Grinnell*] and based thereon, conclude[d] that it [would] likely be able to approve the terms set forth in the Settlement Agreement." ECF No. 213, ¶ 3.

As stated in the PAO, this Court's determination at the time of preliminary approval was "subject to further consideration at the Fairness Hearing" following notice to the Class. *Id.* at ¶¶ 3-4. Accordingly, at this juncture the Court's task is to consider information gained and/or developments subsequent to preliminary approval of the Settlement that might impact the Court's prior conclusion as to the fairness, reasonableness, and adequacy of the settlement. *See In re GSE Bonds Antitrust Litig.*, 2020 U.S. WL 3250593, at *1 (noting that, as required, it had considered the Rule 23(e)(2) and *Grinnell* factors in granting preliminary approval to the settlement before it and thus, in granting final approval, focused on subsequent developments, which it found "only further support[ed] the fairness, reasonableness, and adequacy of the settlements").

A review of the Rule 23(e)(2) and *Grinnell* factors previously considered by this Court,[12] as augmented by knowledge of the reaction of the Class to the Notice authorized in the PAO and the report of the Independent Fiduciary, confirms this Court's prior determination that the Settlement meets the requirements of Rule 23(e)(2) for approval. Given the overwhelmingly positive reaction of members of the Class to date, the assertion of only one objection (which

---

[12] As noted above, in their preliminary approval submissions, Plaintiffs made a showing that the Settlement would likely be approved under Rule 23(e)(2) and the *Grinnell* factors and the Court considered that showing in granting preliminary approval. ECF No. 213 ¶ 3. Plaintiffs do not here reiterate their previous briefing and submissions in full. Rather, Plaintiffs here summarize and incorporate their prior briefing as to those factors that are not impacted by developments subsequent to the Settlement, and address at greater length those factors impacted by developments subsequent to preliminary approval.

provides no basis for questioning the Settlement) and the endorsement of the Independent Fiduciary, the Settlement is demonstrably fair, reasonable and adequate and, as the PAO anticipated, warrants final approval.

## II. REVIEW OF THE RULE 23(E)(2) AND *GRINNELL* FACTORS DEMONSTRATES THAT THE SETTLEMENT WARRANTS FINAL APPROVAL

### A. Class Counsel and the Class Representatives Have Adequately Represented the Class Satisfying Rule 23(e)(2)(A)

Rule 23(e)(2)(A) addresses whether class counsel and the class representatives have adequately represented the class. In previously addressing this factor, Plaintiffs directed this Court to, among other things, its prior rulings finding the Class Representatives and Class Counsel adequate to represent the Class, the significant briefing and discovery work Class Counsel performed to advance the interests of the Class, and the knowledge gained by Class Counsel through their extensive litigation of this case upon which Class Counsel relied in negotiating the Settlement.[13]  Subsequent to preliminary approval, Class Counsel has successfully effectuated the PAO and supervised the efforts of the Settlement Administrator. *See* Meltzer Decl. ¶ 55. This is further evidence that Class Counsel has adequately represented the Class. Likewise, the Class Representatives have continued to fulfill their duties to the Class in furtherance of the litigation as described in the prior briefing.[14]  These facts, in conjunction with the arms-length negotiation process that led to the Settlement (discussed below), continue to demonstrate that Rule 23(e)(2)(A)'s adequacy requirement is satisfied.

---

[13] *See* ECF No. 211 at 17-18 (citing ECF No. 132 at 16-17 and 19-20).

[14] *See id*. *See also* Meltzer Decl. Exs. I-K.

**B.     The Settlement is the Product of Arm's-Length Negotiations between Experienced Counsel after Extensive Litigation Satisfying Rule 23(e)(2)(B)**

Plaintiffs' prior briefing fully demonstrated that the Settlement "was negotiated at arms-length" and therefore, as the Court's PAO determination reflects, that Rule 23(e)(2)(B)'s procedural fairness requirement was met.[15]

As set forth in greater detail in support of the PAO, Plaintiffs' experienced and knowledgeable Counsel negotiated and agreed to the Settlement only after they had conducted a thorough investigation, participated in extensive discovery and data analysis,[16] and engaged in significant motion practice over a period of more than three (3) years.[17]   These facts and the advanced nature of the litigation continue to weigh in favor of the Settlement in connection with both Rule 23(e)(2)(B) and the third *Grinnell* factor.

As to the third *Grinnell* factor, the relevant inquiry "is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc. SEC and ERISA Litig.*, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006). Here, given that the case was poised for resolution on dispositive motions and/or trial, the Parties were certainly well advised of the strengths and weaknesses of their respective positions when they negotiated the Settlement. Additionally, the assistance of an experienced and well-regarded national mediator further demonstrates the fairness of the negotiations and resulting Settlement. *See In re GSE Bonds Antitrust Litig.*, 2019 WL

---

[15] *See* ECF 211 at 18-19 citing ECF No. 132 at 19-20 (Order certifying the Class and appointing Class Counsel).

[16] Plaintiffs' Counsel analyzed over 270,000 pages of documents and other data produced by Defendants, took and defended 20 depositions (including of members of the EPIC and RPIG, engaged an expert to assist with calculating damages, as well as a separate expert to opine on, *inter alia*, Defendants' procedural imprudence. Meltzer Decl. ¶¶ 7-9.

[17] This motion practice included defending a motion to dismiss, obtaining class certification, moving for and responding to Defendants' motion for partial summary judgment, and responding to Daubert motions. *See* ECF No. 211 at 18-19; Meltzer Decl. ¶¶ 10-13

6842332, at *2 (noting that "a mediator's involvement in settlement negotiations can help demonstrate their fairness," citing *In re Payment Card,* 330 F.R.D. at 35). Together these factors support a presumption of fairness and show that Rule 23(e)(2)(B) is satisfied.

### C.   The Settlement Provides and Equitably Distributes Significant Relief to Class Members Satisfying the Adequacy Factors of Rule 23(e)(2)(C)

Rule 23(e)(2)(C) considers the adequacy of the relief provided by a settlement taking into account:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).

These factors overlap with a number of those identified in *Grinnell* and continue to weigh in favor of approval of the Settlement. Indeed, there are no developments subsequent to the issuance of the PAO that would alter this Court's prior determination.

### 1.   The Costs, Risk, Delay of Trial and Appeal[18]

As noted in the briefing supporting preliminary approval,[19] absent the Settlement, Plaintiffs would have faced potential litigation risks. *See In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997) ("Litigation inherently involves risks."). The Parties' competing summary judgment motions and Defendants' motions to exclude Plaintiffs' liability and damages experts were pending at the time the Settlement was reached. Although Plaintiffs believe there is

---

[18] This inquiry overlaps with four of the *Grinnell* factors: (1) the "complexity, expense and likely duration of the litigation," (4) "the risks of establishing liability," (5) "the risks of establishing damages," and (6) "the risks of maintaining a class through the trial." *See Johnson v. Rausch, Sturm, Israel, Enerson & Hornik, LLP*, 333 F.R.D. 314, 321 (S.D.N.Y. 2019) (discussing the overlap of these *Grinnell* factors with the factors identified in Rule 23(e)(2)(C)(i)). In assessing these factors, courts "balance the benefits afforded the Class, including immediacy and certainty of recovery, against the continuing risks of litigation." *Id.* While there is little risk here that a class could not be maintained through trial, for the reasons discussed herein in examining the costs, risks and delays attendant to continued litigation, these *Grinnell* factors favor approval of the Settlement. *Grinnell* factors 8 and 9 also touch on the risks of litigation and are addressed below at p. 23.

[19] *See* ECF No. 211 at 19-24.

strong support for denying Defendants' motions, it is uncertain whether they would have prevailed. Moreover, even if Plaintiffs were successful in defeating Defendants' motions for summary judgment and motions to exclude, it is uncertain whether Plaintiffs ultimately would have prevailed at trial. In other recent trials involving defined contribution plans and claims of this type, the defendants were the prevailing party. *See Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 280 (S.D.N.Y. 2018); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 711 (W.D. Mo. 2019); *Brotherston v. Putnam Invs.*, *LLC*, 2017 WL 2634361 (D. Mass. June 19, 2017).[20] Thus, although Plaintiffs believe there is strong support for their case, it is uncertain whether they would have prevailed at trial on the merits of their claims.

Additionally, just prior to the Parties' mediation session, partial summary judgment was granted to defendants in *Moitoso, et al. v. FMR, LLC, et al.*, 2020 WL 1495938 (D. Mass. Mar. 27, 2020) ("*Fidelity*"), on alternative investment vehicle claims similar to those alleged here. Specifically, plaintiffs there alleged that Fidelity breached its fiduciary duties by failing to investigate non-mutual fund investment vehicles, such as collective trusts and separate accounts. Relying on significant prior caselaw,[21] the *Fidelity* court concluded "that Fidelity did not incur

---

[20] The trial court's decision in *Brotherston* was later vacated in part by the First Circuit. *See Brotherston v. Putnam Invs., LLC*, 907 F.3d 17 (1st Cir. 2018). Following the Supreme Court's denial of defendants' petition for certiorari, the parties settled the case before the trial was completed (after more than four years of litigation). *See Brotherston v. Putnam Invs., LLC*, No. 1:15-cv-13825, ECF No. 220 (D. Mass. Apr. 29, 2020) (approving plaintiffs' motion for preliminary approval).

[21] *See, e.g.*, *Main v. Am. Airlines, Inc.*, 248 F. Supp. 3d 786, 794 (N.D. Tex. 2017) (a fiduciary defendant had not breached its duty by failing either to offer or investigate alternatives to mutual funds); *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 796 (D. Minn. 2018) (plaintiffs had failed to state a claim for breach of duty by failing to "explore collective trusts and separate accounts in lieu of mutual funds"); *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 2016 WL 7494320, at *15 (D. Conn. Dec. 30, 2016) (rejecting plaintiffs' argument that the defendants breached their fiduciary duties by offering sixteen investment options, fourteen of which were mutual funds); *Wildman v. Am. Century Servs.*, LLC, 362 F. Supp. 3d 685, 704 (W.D. Mo. 2019) (since plans are under no duty to offer any particular type or mix of funds, "ERISA does not require a retirement plan to offer an index fund or a stable value fund, and the failure to include either in the Plan, standing alone, does not violate the duty of prudence"); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1076 (N.D. Cal. 2017) (defendants' failure to offer the investment option with the lowest expense ratio is not enough, on its own, to plausibly state a claim for breach of the duty of prudence).

liability because it had no inherent duty to investigate these particular types of funds," and further that "plans are under no duty to offer alternatives to mutual funds, even when the plaintiffs argue they are markedly superior." *Id*. at *12-14. The court reasoned that these "non-mutual fund vehicles differ so much from mutual funds … in terms of their regulatory and transparency features that other courts have found it impossible to make an 'apples-to-oranges' comparison of the two." *Id.* at *14 (citations omitted).

Accordingly, the *Fidelity* court rejected an argument similar to one that Plaintiffs made here, *i.e.,* that Defendants breached their fiduciary duties by failing to timely investigate alternatives and consequently replace the Small Cap Core Fund and Core Bond Fund with less costly, yet nearly identical, alternative separate account and commingled fund formats. While from a different circuit, this opinion, and the caselaw on which it relied, represented a significant risk to a finding of liability on the alternative vehicle allegations in the present case.[22]

Additionally, it is clear that Defendants would have hotly contested Plaintiffs' calculation of damages at trial. Defendants and their expert have argued throughout this litigation that Plaintiffs' damages model inappropriately compared the performance of each of the Disputed Investments with the fees of a "hypothetical" alternative fund and thus excessively overstated damages. In fact, in attempting to exclude Plaintiffs' damages expert, Defendants argued that had the damages calculations concerning the Mid Cap Growth Fund included both the performance and the fees of the S&P MidCap 400 Index Fund (the fund with which it was replaced), the "damages" for that one fund alone would have been *negative* $32.9 million through February 2016, and *negative* $50.8 million through July 2018.

---

[22] *Fidelity* is also arguably distinguishable given that, unlike this case where Defendants themselves offered less expensive alternative investment vehicles of the same investments offered in the Plan, Fidelity does not offer CITs or separate accounts as investment options in the broader market. *Id.* at *13. However, it was not certain whether this Court would have viewed this as a significant distinguishing factor.

Courts in other cases have been apt to accept similar arguments on behalf of Defendants. For instance, in *Sacerdote*, the court found that "while there were deficiencies in the Committee's processes … plaintiffs have not proven that … the Plans suffered losses as a result."  328 F. Supp. 3d at 280. Although Plaintiffs believe that Ms. Jones' loss models in this case were sound, this and other decisions illustrate that Plaintiffs faced risk with respect to damages as well as liability. *See* Restatement (Third) of Trusts, § 100 cmt. b(1) (2012) (noting that determination of investment losses in breach of fiduciary duty cases is "difficult"). This further supports settlement approval in this case. *See Hill v. State Street Corp.*, 2015 WL 127728, at *9 (D. Mass. Jan. 8, 2015); *Kemp-DeLisser v. Saint Francis Hospital and Medical Center*, 2016 WL 6542707, at *9 (D. Conn. Nov. 3, 2016) (finding complex damages analysis weighed in favor of ERISA class settlement).[23]

Aside from these risks, continuing the litigation would have resulted in complex, costly, and lengthy proceedings and trial before this Court, and potentially the Second Circuit, which would have significantly delayed any relief to Class Members (at best), and might have resulted in no relief at all. It is well-recognized that ERISA 401(k) cases such as this "often lead[] to lengthy litigation."  *See Krueger v. Ameriprise*, 2015 WL 4246879, at *1 (D. Minn. July 13, 2015). Given the risks, expenses, and delays associated with further litigation, it was reasonable and appropriate for Plaintiffs to accept a Settlement that provided the Class with an immediate, guaranteed recovery of a significant portion of their estimated damages due to allegedly excessive fees. *See Kruger v. Novant Health, Inc.*, 2016 WL 6769066, at *5 (M.D.N.C. Sept. 29, 2016) ("[S]ettlement of a 401(k) excessive fee case benefits the employees and retirees in multiple ways").

---

[23] *See also In re Marsh ERISA Litig.*, 265 F.R.D. 128, 140 (S.D.N.Y. 2010) ("Establishing damages in this case would have been a complicated endeavor. The complex damages calculations in ERISA cases like this one are expert-intensive. … Here, the parties have exchanged expert damages reports that reach widely divergent conclusions.").

In sum, the immediate and meaningful benefits of settling balanced against the risks, costs, delays, and uncertainties attendant to continued litigation, favor final approval of the Settlement.

### 2.   Effectiveness of the Proposed Method of Distributing Relief

Rule 23(e)(2)(C)(ii) requires courts to examine "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."  There are no developments that impact or alter the prior determination that this factor favors approval. Based on the plan of allocation described in Section D below, Class Members who are current Participants will have their accounts automatically credited with their share of the Settlement Fund. Settlement Agreement, ¶ 5.2. Class Members who are former Participants may submit a Rollover Form to roll over their potion of the settlement to a qualified individual retirement account or other eligible employee plan. *Id.* ¶ 5.3. Former Participants who do not provide such a Rollover Form will receive a check. *Id.* Moreover, none of the monies in the Settlement Fund will revert to Defendants. This type of method of distribution has been approved in similar ERISA class action settlements[24] and was described in the Notice.  Not one Class Member objected to this method of distribution, signaling their satisfaction with it.  This fact confirms that this factor favors approval of the Settlement.

### 3.   The Terms of Any Proposed Award of Attorneys' Fees

Rule 23(e)(2)(C)(iii) requires courts to examine "the terms of any proposed award of attorneys' fees, including timing of payment."  Here those terms are appropriately protective of

---

[24] *See, e.g., Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-cv-9936, ECF No. 322-1 at ¶¶ 6.5-6.6 (S.D.N.Y. Aug. 14, 2018); *Main v. Am. Airlines, Inc.*, No. 16-cv-00473, ECF No. 127-2 at ¶¶ 6.5-6.6 (N.D. Tex. July 7, 2017); *Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 478-79 (E.D. Pa. 2007); *Price v. Eaton Vance Corp.*, No. 18-cv-12098, ECF No. 41-6 § 5.3 (D. Mass. May 17, 2019); *Velazquez v. Mass. Fin. Servs. Co.*, No. 17-cv-11249, ECF No. 91-1 §§ 6.5-6.6 (D. Mass. June 14, 2019); *Urakhchin v. Allianz Asset Mgmt. of Am., LP*, No. 15-cv-01614, ECF No. 174-1 at 6 (C.D. Cal. Dec. 26, 2017); *Sims v. BB&T Corp.*, No. 15-cv-732, ECF No. 437 at 3-4 (M.D.N.C. Nov. 30, 2018).

the Class Members' interests. The Notice advised Class Members that Class Counsel would seek an award of attorneys' fees and expense reimbursement "not to… exceed 33% of the $9,000,000.00 settlement amount plus their litigation expenses incurred in the prosecution of the case." Meltzer Decl. ¶ 28, Ex. D-A at ¶ 10. Class Counsel has now filed, contemporaneously herewith, its application for an Award of Attorneys' Fees and Expenses and Service Awards, which demonstrates that the fees and expenses sought are reasonable and justified. Accordingly, Class Members, having been advised by the Notice of their rights to object to any part of the Settlement Agreement,[25] have the opportunity to review and respond to Class Counsel's application by way of an objection if they so choose. Notably, however, to date no Class Member has voiced any objection to the fee and expense reimbursement amounts set forth in the Notice -- a fact which demonstrates that this factor supports final approval of the Settlement.[26]

### D.    The Settlement Treats Class Members Equitably Satisfying Rule 23(e)(2)(D)

Under Rule 23(e)(2)(D), the Court must consider whether "the proposal treats class members equitably relative to each other." Here, the Plan of Allocation developed in concert with Plaintiffs' damages expert does just that, by allocating the Net Settlement Amount among all eligible Class Members on a pro rata basis in proportion to their share of total estimated damages. Settlement Agreement ¶ 5.1-5.4.

For purposes of developing the Plan of Allocation, Plaintiffs' damages expert, Cynthia Jones, first estimated total damages of all Class Members by determining the difference in fees between the Disputed Investments and the Lower Fee Alternatives ("LFAs"), and assuming that

---

[25] *See* Meltzer Decl. ¶ 28, Ex. D-A at ¶ 10.

[26] The final Rule 23(e)(2) factor, Rule 23(e)(2)(C)(iv), asks the court to consider "any agreement required to be identified by Rule 23(e)(3)," that is "made in connection with the proposal." This factor still has no weight in the approval assessment as to the Settlement as no such agreement exists. *See Johnson*, 333 F.R.D. at 322 ("Given that no other Rule 23(e)(3) agreement exists, this factor has no bearing on the preliminary approval analysis.").

the fee differential is reinvested each month through February 2016. Specifically, to arrive at the total damages estimate, Ms. Jones estimated the fees paid by Plan participants in each Disputed Investment each month versus fees using the LFAs' expense ratios in place of the expense ratios of the Disputed Investments. Then, Ms. Jones subtracted the estimate of the LFA fees and also calculated the value of the fee differential assuming it was reinvested each month at the applicable Disputed Investments' rate of return.[27]

The Plan of Allocation, in turn, relies upon the damages estimated for each Disputed Investment, relative to one another, and utilizes a point system to weigh the allocation accordingly. The table below shows damages for the Disputed Investments individually, and in total.

| Disputed Investments | Damages ($mil) |
|---|---|
| JPM Growth and Income Fund | 8,386.37 |
| Earnest Partners Mid-Cap Value Fund | 8,622.77 |
| JPM Mid-Cap Growth Fund | 22,831.02 |
| JPM Small-Cap Core Fund | 7,870.36 |
| JPM Core Bond Fund | 4,366.17 |
| All Target Date Funds | 3,116.95 |
| Total | 55,193.64 |

Damages for the JPM Mid-Cap Growth Fund have been adjusted downward, for purposes of the Plan of Allocation, because the gross investment returns for the JPM Mid-Cap Growth Fund were higher throughout the Class Period, despite having higher fees, than the gross returns to the LFA. Thus, it is estimated that a large portion of the Plan participants in the JPM Mid-Cap Growth Fund did not suffer a net investment loss due to higher fees.

Then, using a scale of 20 total points, Ms. Jones allocated the weights as follows:

---

[27] These calculations are based on the returns to the LFAs that were selected for the Plan during the Class Period.

| Disputed Investments | Points |
|---|---|
| JPM Growth and Income Fund | 4 |
| Earnest Partners Mid-Cap Value Fund | 4 |
| JPM Mid-Cap Growth Fund | 3 |
| JPM Small-Cap Core Fund | 4 |
| JPM Core Bond Fund | 3 |
| All Target Date Funds | 2 |
| Total | 20 |

To determine each Class Members' proportionate share of the Net Settlement Fund, each Class Member's dollar value of investment in the Disputed Investments, at each quarters' end during the Class Period, will be multiplied by: (a) the percentage of time during the quarter that they were invested in the Disputed Investment; and (b) the number of points allocated to that investment. The total settlement payment for each Class Member will then be calculated by comparing this Settlement Allocation Score to all Class Members' Settlement Allocation Scores.

This weighted average approach is consistent with settlements in other ERISA cases that focused on particular funds within a 401(k) plan. *See, e.g.*, *Moreno*, ECF No. 322-1 at ¶ 6.4.1 (allocating settlement fund in ERISA case based on participants' weighted quarterly account balances during the class period, with proprietary funds weighted more heavily than non-proprietary funds) & ECF No. 347 (approving settlement); *Main v. Am. Airlines, Inc.,* No. 16-cv-00473, ECF No. 127-2 at ¶ 6.4.1 (N.D. Tex. July 7, 2017) (providing for similar weighted distribution) & ECF No. 137 (N.D. Tex. Feb. 21, 2018) (approving settlement).

Furthermore, the Notice advised Class Members that the allocation plan would use a Settlement Allocation Score system as described above and that greater detail regarding the mathematical calculation was set forth in the Settlement Agreement, which is posted on the Settlement Website. Meltzer Decl. Ex. D, ¶ 17. No Class Member has objected to the allocation

plan or the method for calculating Class Member payments. As such, this factor weighs even more heavily in favor of approval now than it did upon preliminary approval.

### E.    The Additional *Grinnell* Adequacy Factors Weigh In Favor of Approval

There are three additional considerations under *Grinnell* that do not overlap entirely with the factors identified in Rule 23(e)(2). As discussed below, one of these factors is neutral and the other two support the conclusion that the Settlement warrants final approval:

#### 1.    Factor 7:  Defendant's Ability to Withstand a Greater Judgment

Courts have observed that "it does not follow that a defendant's ability to withstand a greater judgment militates against approval of the settlement," nor, standing alone, does the defendant's ability to withstand a greater judgment detract from the fairness of the settlement. *Berni v. Barilla G. e R. Fratelli, S.p.A.*, 332 F.R.D. 14, 31-32 (E.D.N.Y. 2019). *See also Christine Asia Co. v. Jack Yun Ma*, 2019 WL 5257534, at *14 (S.D.N.Y. Oct. 16, 2019) (noting that "where … the other *Grinnell* factors weigh in favor of approval, this factor alone does not suggest the settlement is unfair.") (internal citations omitted). Here, Defendants' ability to withstand a greater judgment should not impact the assessment of the apparent fairness of the Settlement.

#### 2.    Factors 8 and 9: Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and Attendant Risks of Litigation

*Grinnell* factor 8, "the range of reasonableness of the settlement in light of the best possible recovery," and *Grinnell* factor 9, "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation," are often considered together, *see In re Payment Card*, 330 F.R.D. at 47-48, and weigh in favor of approval of the Settlement here. As discussed above, there are certainly costs and risks attendant to continuing to litigate the Action. When a settlement in the amount agreed to is considered in light of those costs and risks and an analysis of the best possible recovery plaintiffs could expect, the settlement is plainly justified.

Here, the $9,000,000 in monetary relief obtained is substantial not only in the aggregate, but also represents a significant portion of the damages that Plaintiffs calculated were caused by Defendants' alleged fiduciary breaches. Plaintiffs' damages expert, Cynthia L. Jones, calculated damages to be $55.2 million, as set forth in the expert report submitted in this case. ECF No. 168-5. To arrive at that amount, Ms. Jones calculated the fee differential between the Disputed Investments and the lower fee alternatives, plus reinvestment of that fee differential through February 2016. The $9 million recovery therefore represents approximately 16% of the damages that Plaintiffs' damages expert calculated were most reasonably associated with Defendants' alleged fiduciary breaches. *Id.* This recovery compares favorably to other class action settlements. *See, e.g.*, *Johnson v. Fujitsu Tech. & Business of Am., Inc.*, 2018 WL 2183253, at *6-7 (N.D. Cal. May 11, 2018) (approving $14 million ERISA 401(k) settlement that represented just under 10% of the plaintiffs' best measure of damages).[28]

Moreover, while the $55.2 million damages figure represented the most plausible damages model in the event of a finding of liability, as set forth above, Defendants had put forth credible arguments that certain of the Disputed Investments were entitled to no recovery at all. First and foremost, had the Court agreed with Defendants' argument that Defendants were under no duty to offer alternatives to the two mutual fund offerings (*i.e.*, the Small Cap Core Fund and Core Bond Fund), Plaintiffs' damages would have been reduced by over $12 million. Had the Court accepted Defendants' argument that the performance of the Mid-Cap Growth Fund should have been taken

---

[28] *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 162 (S.D.N.Y. 2011) (recovery of 16.5% of maximum recoverable damages was within range of reasonableness); *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 191 (S.D.N.Y. 2012) (approving recovery of approximately 13% of maximum provable damages); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (recovery of 9% of damages was reasonable); *Newbridge Networks Sec. Litig.*, 1998 WL 765724, *2 (D.D.C. Oct. 23, 1998) ("[A]n agreement that secures roughly 6 to 12 percent of a potential recovery ... seems to be within the targeted range of reasonableness"); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses").

into account, such that investors in that fund suffered no damages, total damages would have been reduced by another $22.9 million.  Defendants also argued that Plaintiffs' damages methodology was hypothetical and thus excessively overstated damages. According to Defendants' expert, purported damages for Class Members that invested in the Mid Cap Growth Fund, Growth and Income Fund, and Mid Cap Value Fund were only $1.1 million; and investors in the Mid Cap Growth Fund actually suffered *negative* damages of $32.9 million through February 2015.[29]  *See* Expert Rebuttal Report of Bruce E. Stangle, ECF 192, Ex. 94 ¶ 17 and n. 37. Thus, the Settlement is even more reasonable when viewed in this context of the very real risks in establishing damages. *See, e.g.*, *In re GSE Bonds*, 2019 WL 6842332, at *4 (granting preliminary approval to a settlement providing 10.9% to 21.3% of the best possible recovery, and noting that "courts in this district have approved similar percentages.").

Further, as required by the Settlement Agreement (¶ 2.2), the terms of the Settlement have now been reviewed and approved by an independent fiduciary under PTE 2003-39. Meltzer Decl. at ¶ 27.  This development further confirms that the Settlement is fair, reasonable and adequate, and warrants final approval.

## CONCLUSION

The foregoing analysis of the Settlement under the factors identified by Rule 23(e)(2) and *Grinnell* establishes that the Settlement is fair, reasonable, and adequate and continues to merit approval. Accordingly, Plaintiffs respectfully request that the Court enter an order granting final approval of the Settlement in the form submitted herewith.

---

[29] In fact, Defendants had argued that taking performance into account, damages on that fund were actually negative, and should almost completely offset any other damages claimed by Plaintiffs on the remaining Disputed Investments.

Dated:  August 21, 2020

Respectfully submitted,

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**

/s/ *Lisa M. Port*
Joseph H. Meltzer
Donna Siegel Moffa
Lisa M. Port
Joshua Materese
Jonathan F. Neumann
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706
(610) 667-7056 (fax)
Email: jmeltzer@ktmc.com
         dmoffa@ktmc.com
         llambport@ktmc.com
         jmaterese@ktmc.com
         jneumann@ktmc.com

David S. Preminger
Tanya Korkhov
**KELLER ROHRBACK L.L.P.**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Tel: 646-380-6690
Fax: 646-380-6692
Email: dpreminger@kellerrohrback.com
         tkorkhov@kellerrohrback.com

Lynn Lincoln Sarko
Derek W. Loeser
Erin M. Riley
Gretchen S. Obrist
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: 206-623-1900
Fax: 206-623-3384
Email: lsarko@kellerrohrback.com
         dloeser@kellerrohrback.com
         eriley@kellerrohrback.com
         gobrist@kellerrohrback.com

Kai Richter
Carl F. Engstrom
Jacob Schutz
*admitted in W.D.N.Y.
Mark E. Thomson
**NICHOLS KASTER, PLLP**
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Tel: 612-256-3200
Fax: 612-338-4878
Email: krichter@nka.com
         cengstrom@nka.com
         jschutz@nka.com
         mthomson@nka.com

Samuel H. Rudman
Evan J. Kaufman
**ROBBINS GELLER RUDMAN**
   **& DOWD LLP**
58 South Service Road, Suite 200
Melville, NY 11747
Tel: 631-367-7100
Fax: 631-367-1173
Email: srudman@rgrdlaw.com
         ekaufman@rgrdlaw.com

26

Mark K. Gyandoh
**CAPOZZI ADLER, P.C.**
2933 North Front Street
Harrisburg, PA 17110
Tel: (717) 233-4101
Fax: (717) 233-4103
Email: markg@capozziadler.com

Shannon L. Hopkins (SH-1887)
Stephanie Bartone
**LEVI & KORINSKY LLP**
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (212) 363-7500
Fax: (866) 367-6510
Email: shopkins@zlk.com
       sbartone@zlk.com

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of August 2020, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which will send a notification to all counsel of record.

/s/ *Lisa M. Port*

Lisa M. Port